## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                              )
**WESLEY M. JARMON, Jr.,**                    )
                                              )
    **Plaintiff,**                             )
                                              )
**v.**                                        )    **Civil Action No. 06-1852 (EGS)**
                                              )
                                              )
**MICHAEL J. COPPS, Acting Chairman,**        )
**Federal Communications Commission,**        )
                                              )
    <u>**Defendant.**</u>                       )
_____    )

## <u>MOTION FOR SUMMARY JUDGMENT</u>

Defendant Michael J. Copps, by and through undersigned counsel, hereby moves that

summary judgment be entered in his favor pursuant to Federal Rule of Civil Procedure 56.  In

support hereof, Defendant respectfully refers the Court to the memorandum of points and

authorities, statement of material facts, and proposed order submitted herewith.

Dated: February 12, 2009        Respectfully submitted,


/S/_____.
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


    /S/_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


      /S/_____
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530

Phone: (202) 514-7198   Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **WESLEY M. JARMON, Jr.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 06-1852 (EGS)** |
| | ) | |
| **MICHARL J. COPPS, Acting Chairman,** | ) | |
| **Federal Communications Commission,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**STATEMENT OF MATERIAL FACTS FOR WHICH**
**THERE IS NO GENUINE ISSUE**

Pursuant to Local Rule 7(h), defendant Federal Communications Commission ("FCC") submits the following statement of material facts as to which there is no genuine issue:

1.      Plaintiff is African-American, and is employed as a GS-14 Auditor in the Investigations and Hearings Division ("IHD") of the FCC's Enforcement Bureau ("EB").  *See* Amended Complaint ¶ 4.

2.      At plaintiff's request, the FCC detailed him to the EPA from approximately May 12, 2000 through May 30, 2001, and then to the FCC's Office of Managing Director from approximately  June 3, 2001 to October 1, 2001.  *See* Defendant's Exhibit No. 1, Declaration of Noelle M. Green ("Green Decl.") ¶ 3.

3.      Plaintiff became employed in IHD in approximately March 24, 2002.  *Id.*

4.      By VAN 04-153-TJ, advertised from April 2nd through April 15, 2004, the FCC sought applications "FCC-Wide" to fill two GS-15 Auditor positions in its IHD.  *Id.* ¶ 4; Amended Complaint ¶ 7.

5.      The selecting official for VAN 04-153-TJ was William Davenport (Hispanic), then Chief, IHD.  *See* Green Decl. ¶¶ 6, 12.

6.      Plaintiff and several other candidates timely applied for the positions.  *Id.* ¶ 5; Amended Complaint ¶ 7.  Attachment F of the Green declaration contains a true and correct copy of the candidates' application materials.  *See* Green Decl. ¶ 11.

7.      Consistent with the FCC's personnel procedures, a rating panel was convened to evaluate the candidates' application materials and determine which candidates should be referred to the selecting official for further consideration.  *Id.* ¶ 5.

8.      The five candidates who received the highest scores from the rating panel were Robert W. Bentley (White), Patricia A. Green (White), Constance C. Hellmer (White), Andrew T. Skadin (White), and plaintiff.  *Id.*  ¶¶ 5, 12.

9.      On September 21, 2004, the five candidates referenced in ¶ 8 above were referred on the Merit Promotion Certificate to the selecting official.  *Id.* ¶ 6.

10.     Mr. Davenport and four other IHD managers -- Hillary DeNigro (White), then Deputy Chief, IHD; Eric Bash (White), then Assistant Chief, IHD; Trent Harkrader (White), Assistant Chief, IHD; and Hugh Boyle (White), then Chief, AB, (and plaintiff's first level supervisor) -- reviewed the five candidates' application materials and conducted interviews.  *Id.* ¶¶ 7, 12; Defendant's Exhibit No. 3 [Interview of William Davenport], at 25-26.

11.     Messrs. Bash and Harkrader together interviewed each of the five candidates, and then Mr. Davenport, Ms. DeNigro, and Mr. Boyle together conducted second round interviews with each of the candidates.  *Id.*; Defendant's Exhibit No. 5 [Interview of Hillary DeNigro], at 99

12.     IHD requested and received authority to fill an additional GS-15 slot under VAN 04-153-TJ.  *See* Green Decl. ¶ 8; Defendant's Exhibit No. 10, Deposition of Eric Bash ("Bash Depo."), at 27-28.

13.     On December 17, 2004, Mr. Davenport selected Mr. Bentley, Ms. Hellmer, and Mr. Skadin to fill the positions.  *See* Green Decl. ¶ 9.

14.     By letter dated January 11, 2005, the FCC informed plaintiff that he was not selected for VAN 04-153-TJ.  *Id.* ¶ 10.

15.     On or about January 14, 2005, plaintiff contacted an EEO counselor.  *See* Defendant's Exhibit No. 2, Declaration of Erlinda Miller ("Miller Decl.") ¶ 3.

16.     On March 23, 2005, plaintiff filed a formal complaint of discrimination with the FCC alleging that his non-selection for VAN 04-153-TJ constituted discrimination on the basis of his race and retaliation for engaging in prior EEO activity.  *Id.*; Defendant's Exhibit No. 17 [Plaintiff's EEO Complaint].

17.     Plaintiff's most recent EEO activity prior to his non-selection for VAN 04-153-TJ occurred on October 23, 2003, when he filed a formal complaint of discrimination (FCC-EEO-03-05) with the EEOC alleging that the FCC discriminated against him on the basis of his race when he was not selected for a GS-15 Auditor position in EB.  On April 15, 2005, the EEOC granted summary judgment in favor of the Agency.  *See* Miller Decl. ¶¶ 4-5.

18.     At the time of plaintiff's non-selection for VAN 04-153-TJ, Hugh Boyle was aware of plaintiff's prior EEO activity, but this knowledge did not factor into his decision making.  *See* Defendant's Exhibit No. 11, Interview of Hugh Boyle at 50-51.

19.     At the time of plaintiff's non-selection for VAN 04-153-TJ, Mr. Davenport was not aware of plaintiff's prior EEO activity.  *See* Defendant's Exhibit No. 4, Deposition of William Davenport ("Davenport Depo.") at 40.

20.    At the time of plaintiff's non-selection for VAN 04-153-TJ, Messrs. Bash and Harkrader were unaware of plaintiff's prior EEO activity.  *See* Defendant's Exhibit No. 10, Bash Depo. at 31, Defendant's Exhibit No. 8, Deposition of Trent Harkrader ("Harkrader Depo.") at 25.

21.    At the time of plaintiff's non-selection for VAN 04-153-TJ, Ms. DeNigro was not aware of plaintiff's prior EEO activity.  *See* Defendant's Exhibit No. 5, Deposition of Hilliary DeNigro ("DeNigro Depo.") at 38.

22.    On January 27, 2000, plaintiff filed a formal complaint of discrimination (FCC-EEO-05) alleging that, *inter alia*, the FCC discriminated against him on the basis of his race when he was not promoted to the GS-14 level in 1998 and the GS-15 level in 1999.  In March 2001, plaintiff filed a civil action in U.S. District Court for the District of Columbia concerning that complaint.  On July 2, 2002, the Court granted summary judgment in favor of the Agency.  *See* Miller Decl. ¶¶ 4-5.

23.    Mr. Bentley was qualified for the auditor position.  His qualifications included:

    a.    a BS from Bryant College, *see* Green Decl., Attachment F at 21;

    b.    being a Certified Public Accountant, *id*.;

    c.    experience working as a GS-14 Auditor in IHD, *id.* at 5-7;

    d.    supervisory and lead auditor experience, including: serving as "the lead auditor on three audit projects; " serving as "the lead auditor" in a project concerning "the review of high cost loop support payments…in the Commission's Universal Service Fund program;" serving as audit manager on eight projects; *id.* at 5-7, 8-9. 11, 14-19, 25-27;

    e.    receiving a "pass" on his most recent performance evaluation, *id.* at 23-24.

24.    Ms. Hellmer was qualified for the GS-15 position.  Her qualifications included:

    a.    a B.S. from the University of Maryland, *see* Green Decl., Attachment F at 37;

    b.     experience as a GS-14 Senior Auditor in IHD, where she was the sole auditor between January 2000 and March 2002, *id.* at 32;

    c.     supervisory and lead auditor experience including serving as the team leader for two Universal Service Fund Audits,  and serving as "Lead auditor for the California/Nevada SBC 271 and the Ameritech States SBC 271 performance monitoring," *id.* at 32-36, 39-41, 50-60;

    d.     receiving a "pass" on her most recent performance appraisal  *id.* at 45-46.

25.    Mr. Skadin was qualified for the auditor position.  His qualifications included:

    a.     a B.S. in Accounting from the University of Baltimore, *see* Green Decl., Attachment F at 71;

    b.     experience working as a GS-14 senior auditor at the FCC, a position he held since July 1994, *id*. at 63;

    c.     Experience supervising audits, including supervision of "2 to 4" employees, and serving as "project leader for the Audits Branch Time Reporting audits," and occasionally serving as "Acting Branch Chief… training new employees in performing audits…," *id*. at 63-70; and

    d.     receiving a rating of pass (in a "pass/fail" system) on his most recent performance appraisal.  *id*. at 73-74.

Dated: February 12, 2009            Respectfully submitted,

                                                  /s/
                                        JEFFREY A. TAYLOR, D.C. BAR # 498610
                                        United States Attorney

                                            /s/
                                        RUDOLPH CONTRERAS, D.C. BAR #434122
                                        Assistant United States Attorney

                                            /s/
                                        ROBIN M. MERIWEATHER, D.C. Bar. # 490114
                                          Assistant United States Attorney
                                          555 Fourth St., N.W.
                                          Washington, D.C.  20530
                                          Phone: (202) 514-7198   Fax: (202) 514-8780
                                          Robin.Meriweather2@usdoj.gov

**OF COUNSEL:**

Michael Krasnow
Federal Communications Commission
Office of the General Counsel
445 12th Street, S.W.
Washington, D.C.  20554
202-418-1740

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                    )
**WESLEY M. JARMON, Jr.,**           )
                                    )
    **Plaintiff,**             )
                                    )
    **v.**                     )          **Civil Action No. 06-1852 (EGS)**
                                    )
                                    )
**MICHAEL J. COPPS, Acting Chairman,** )
**Federal Communications Commission,** )
                                    )
    **Defendant.**             )
_____ )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR**
**SUMMARY JUDGMENT**

**SUMMARY OF ARGUMENT**

    The anti-discrimination laws were not intended to "render the judiciary a super-personnel department that re-examines an entity's business decisions," and courts have repeatedly disclaimed that role.  Adeyimi v. District of Columbia, 525 F.3d 1222, 1227 (D.C. Cir. 2008).  Further, courts should "not reexamine governmental promotion decisions where it appears the Government was faced with a difficult decision between two qualified candidates, particularly when there is no other evidence that race played a part in the decision."  Hussain v. Principi, 344 F. Supp. 2d 86, 99 (D.D.C. 2004); see also Fischbach v. D.C. Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 2008).  Nonetheless, Plaintiff asks this Court to second-guess his supervisors' decision to select three other employees for promotion to a GS-15 auditor position. The selecting official and the supervisors who interviewed candidates legitimately believed that the selectees were more qualified than plaintiff, and there is no reason to surmise that Plaintiff's

race or his past EEO activity was the true motive for the selection decision. Moreover, no reasonable finder of fact could conclude that the FCC discriminated against Plaintiff when it awarded him bonuses and awards. While Plaintiff may subjectively believe that he should have been selected for the GS-15 position, and that he deserved more bonuses and awards, on this record, no reasonable finder of fact could attribute those personnel decisions to race discrimination or retaliation.

## BACKGROUND

Plaintiff Wesley Jarmon is a GS-14 Auditor in the Audits Branch ("AB") of the Investigations and Hearings Division ("IHD") in the FCC's Enforcement Bureau ("EB"). See Am. Compl. ¶ 6; Exh. 1, Declaration of Noelle Green, ¶ 3. Mr. Jarmon was on detail for two years from 2000 - 2002, spending one year at the Environmental Protection Agency, and another year in the office of the FCC's managing director of finance. Exh. 1, Green Decl. ¶ 3; Exh. 13, Deposition of Wesley Jarmon at 34-35; Exh. 12, Deposition of Hugh Boyle at 46. During that time, the Audits Group was transferred from the Wireline Competition Bureau to the Investigations and Hearings Division, and audit groups were established to conduct an analysis under Section 271 of the Telecommunications Act of 1996. Exh. 6, Deposition of Hilary DeNigro, at 8; Exh. 12, Boyle Depo. at 47-48. Mr. Jarmon joined the IHD after he returned from the detail. See Exh. 1, Green Decl., ¶ 3.

This litigation arises out of Mr. Jarmon's unsuccessful application for a GS-15 auditor position. Mr. Jarmon also alleges disparate treatment in the award of awards and bonuses.

### A.    Vacancy Announcement No. 04-153-TJ:

By Vacancy Announcement Number ("VAN") 04-153-TJ, advertised from April 2, 2004 through April 15, 2004, the FCC sought applications "FCC-Wide" to fill two GS-15 Auditor

positions in its IHD.  <u>See</u> Exh. 1, Green Decl. at Attachment B.  Mr. Jarmon and several other

candidates timely applied for the positions.  <u>See id.</u> ¶ 5.  Consistent with the FCC's personnel

procedures, a rating panel was convened to evaluate the candidates' application materials and

determine which candidates should be referred to the selecting official for further consideration.

<u>Id.</u>  The five candidates who received the highest panel scores were Robert W. Bentley (White,

not of Hispanic origin), Patricia A. Green (White, not of Hispanic origin), Constance C. Hellmer

(White, not of Hispanic origin), Andrew T. Skadin (White, not of Hispanic origin), and Plaintiff.

<u>Id.</u>  Of those five, Plaintiff received the lowest score.  <u>Id.</u> at Attachment 5.  On June 10, 2004,

those five candidates were referred on the Merit Promotion Certificate to the selecting official,

William Davenport (Hispanic–White), Chief, IHD (and Mr. Jarmon's second level supervisor).

<u>Id.</u> ¶ 6.

  Mr. Davenport and four other IHD managers -- Hillary DeNigro (White, not of Hispanic

origin), Deputy Chief, IHD; Eric Bash (White, not of Hispanic origin), Assistant Chief, IHD;

Trent Harkrader (White, not of Hispanic origin), Assistant Chief, IHD; and Hugh Boyle (White,

not of Hispanic origin), Chief, AB (and Plaintiff's first level supervisor) -- reviewed the five

candidates' application materials and conducted interviews.  Exh. 3, Interview of William

Davenport, at 25-26.  Messrs. Bash and Harkrader together interviewed each of the five

candidates, and then Mr. Davenport, Ms. DeNigro, and Mr. Boyle together conducted second

round interviews with each of the candidates.  <u>Id.</u>; Exh. 5, Interview of Hillary DeNigro, at 99.

Mr. Davenport was particularly interested in the candidates' "leadership ability, experience,

creativity and ability to work with other people."  Exh. 3, Davenport Interview at 26.  Other

important factors considered during the selection process included the candidates' ability to meet

deadlines, understanding of the role of audits and the audit staff within EB, and strong written

3

and oral communication skills.  <u>See</u> Exh. 5, DeNigro Interview at 100.  These qualities were

important because VAN 04-153-TJ was intended to fill "team leader positions where the

individuals would be responsible for leading groups of auditors through complex audit

assignments.  Often these team leaders would be responsible for coming up with ideas for new

audits, for new surveys, and we thought those were the most important categories for that kind of

job description."  Exh. 3, Davenport Interview at 26-27.

    After completing the interviews, the IHD managers met to discuss the candidates.  <u>Id.</u> at

25-26.   Neither Mr. Davenport nor the other four managers believed that Plaintiff was one of the

three strongest candidates.  <u>See</u> Exh. 4, Davenport Depo. at 49.  The managers agreed that Bob

Bentley was one of the two most qualified candidates.  <u>See</u> Exh. 12, Deposition of Hugh Boyle,

at 63.  Mr. Davenport concluded that Mr. Bentley had the highest competence and qualifications

for the position, that Ms. Hellmer had the second-highest competence and qualifications for the

position, and that Mr. Skadin had the third-highest competence and qualifications.  Exh. 4,

Davenport Depo. at 28.  Mr. Boyle  felt that Mr. Bentley and Mr. Skadin were the two best

qualified applicants.  Exh. 12, Boyle Depo. at 43.  Neither Mr. Harkrader nor Ms. DeNigro

believed that Mr. Jarmon should be selected.  Exh. 8, Deposition of Trent Harkrader at 39-40;

Exh. 5, DeNigro Interview at 103.  Mr. Bash proposed that Ms. Hellmer be hired.[1]  Exh. 10,

Bash Depo. at 22.

    Although VAN 04-153-TJ advertised only two positions, the IHD managers believed that

three of the candidates listed on the Merit Promotion Certificate were qualified to be selected.

Exh. 4, Davenport Depo. at 27-28.  The managers thus requested and received authority to fill an

_____

[1]  Mr. Bash did not recall making a recommendation that anyone other than Ms. Hellmer be
selected.  Exh. 10, Bash Depo. at 22.

additional GS-15 slot.  Id.  On December 17, 2004, Mr. Davenport selected Mr. Bentley, Ms.

Hellmer, and Mr. Skadin to fill the positions.  See Green Decl. ¶ 9.

By letter dated January 11, 2005, the FCC informed Mr. Jarmon that he was not selected

for VAN 04-153-TJ.  See id. ¶ 10.  On or about January 14, 2005, Mr. Jarmon contacted an EEO

counselor.  See Exh. 2, Declaration of Linda Miller, ¶ 3.  On March 23, 2005, Mr. Jarmon filed a

formal administrative complaint of discrimination alleging that, among other things, he has

"written successful audit plans and conducted all phases of successful audits that have been equal

to or superior to the efforts of each candidate that has applied for a GS-15 position in the Audits

Branch."  Id. ¶ 3; Exh. 17 (EEO complaint).  This complaint was ultimately denied at the

administrative level, and plaintiff then filed this civil action.

### B.     Mr. Jarmon's Prior EEO Activity

The EEO complaint that gave rise to this litigation was not Mr. Jarmon's first.  On

January 27, 2000, he filed a formal complaint of discrimination (FCC-EEO-05) alleging that,

inter alia, the FCC discriminated against him on the basis of his race when he was not promoted

to the GS-14 level in 1998 and the GS-15 level in 1999.  Mr. Jarmon then filed a civil action in

this Court, and the Court awarded summary judgment in favor of the FCC.  See Jarmon v.

Powell, 208 F. Supp. 2d 21, 30 (D.D.C. 2002).

On October 23, 2003, Mr. Jarmon again filed a formal complaint of discrimination (FCC-

EEO-03-05), alleging that the FCC discriminated against him on the basis of his race when he

was not selected for a GS-15 Auditor position in EB.  See Miller Decl. ¶ 4.  In that case, Mr.

Jarmon requested an EEOC hearing, and on April 15, 2005, the EEOC granted summary

judgment in favor of the FCC.  Id. ¶ 5.

## STANDARD OF REVIEW

### A.  Summary Judgment (Fed.R.Civ.P. 56)

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995); Molerio v. FBI, 749 F.2d 815, 823 (D.C. Cir. 1984).  Where no genuine dispute exists as to any material fact, summary judgment is required.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of material fact is one that could change the outcome of the litigation.  Id.  The party moving for summary judgment need not prove the absence of an essential element of the nonmoving party's case.  Celotex, 477 U.S. at 325.

"The burden on the moving party may be discharged by 'showing' – that is, pointing out to the (Court) – that there is an absence of evidence to support the non-moving party's case."  Id.  Once the moving party has met its burden, the non-movant may not rest on mere allegations, but must proffer specific facts showing that a genuine issue exists for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Federal Rule of Civil Procedure 56 requires the party opposing summary judgment to go beyond the pleadings, and by affidavits, depositions, answers to interrogatories or admissions set forth "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324; Banks v. C & P Tel. Co., 802 F.2d 1416 (D.C. Cir. 1986).  To avoid summary judgment, the plaintiff must state specific facts or present some objective evidence that would enable the court to find an entitlement to relief.

6

Summary judgment is appropriate "if the evidence [the nonmoving party submits] is merely colorable . . . or is not sufficiently probative . . . (T)he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Anderson</u>, 477 U.S. at 252. "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, [the Rule 56] standard compels summary judgment if the non-moving party rests merely upon conclusory allegations, improbable inferences and unsupported speculation." <u>Spiegel v. Leavitt</u>, 2005 WL 2402322, at 8 (D.D.C. 2005). To defeat a summary judgment motion, the existence of specific, material evidentiary facts must be shown. <u>See</u> Fed. R. Civ. P. 56(e) (the nonmoving party may not rest on mere allegations but "must come forward with 'specific facts showing there is a genuine issue for trial"); <u>see also</u> <u>Burke v. Gould</u>, 286 F.3d 513, 517-20 (D.C. Cir. 2002) (requiring a showing of specific, material facts); <u>Hayes v. Shalala</u>, 902 F.Supp. 259, 263 (D.D.C. 1995) (opposition to summary judgment must consist of more than mere unsupported allegations or denials).

**B.    Disposition Of Discrimination Claims Under Title VII**

In <u>Fogg v. Gonzales</u>, 492 F.3d 447 (D.C. Cir. 2007), the D.C. Circuit held, <u>inter alia</u>, that the 1991 amendments to Title VII codified two alternative ways of establishing liability for intentional discrimination: (1) a single motive theory requiring that the plaintiff establish that discrimination was the "sole" or "but for" reason for the challenged employment action; and (2) a "mixed-motive" theory requiring only that the plaintiff demonstrate that discrimination played a "motivating part" or was a "substantial factor" in the employment decision. <u>Id.</u> at 451. Under

either theory, plaintiff must demonstrate discrimination by a preponderance of the evidence[1] and

may rely on direct or circumstantial evidence to meet that burden.  <u>Desert Palace, Inc. v. Costa</u>,

539 U.S. 90, 92-102 (2003).

      In the absence of direct evidence, Plaintiff may attempt to establish that she was the

victim of intentional discrimination on the basis of her race, color, sex, and national origin by

relying on circumstantial evidence analyzed using the burden-shifting scheme first set forth in

<u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).[2]  Under that scheme, the plaintiff

must first, by a preponderance of the evidence, establish a prima facie case of discrimination.

<u>See St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506 (1993).  If the employee succeeds, the

employer then must introduce evidence of a legitimate, nondiscriminatory reason for its action.

<u>See McDonnell Douglas</u>, 411 U.S. at 802.  Once it is established that both parties have met their

respective burdens of production (<u>i.e.</u>, plaintiff by presenting a prima facie case and defendant by

producing a non-discriminatory reason for its actions), the burden shifting scheme becomes

irrelevant.  <u>Hicks</u>, 509 U.S. at 510.  Then, the plaintiff must establish, by a preponderance of the

evidence, that "race, color, religion, sex, or national origin was a motivating factor for any

employment practice."  <u>Desert Palace, Inc.</u>, 539 U.S. at 101 (citing 42 U.S.C. § 2000e-2(m)).

      Alternatively, a plaintiff can meet the ultimate burden by demonstrating that the

defendant's legitimate, non-discriminatory reason is a pretext and that discrimination is the "but

---

[1]  "Preponderance of the evidence" means such evidence as, when weighed against that opposing it, has the more convincing force that something is so.  <u>Hopkins v. Price Waterhouse</u>, 737 F. Supp. 1202 (D.D.C. 1990), <u>aff'd</u> 920 F.2d 967 (D.C. Cir. 1990); <u>Metropolitan Stevedore Company v. Rambo</u>, 521 U.S. 121, 137 n.9 (1997).  "[W]hen the evidence is evenly balanced, the [party with the burden of persuasion] must lose."  <u>Id.</u>

[2]  Reliance on the <u>McDonnell Douglas</u> scheme for testing the viability of plaintiff's circumstantial evidence is not limited to the "single-motive" theory of liability.  <u>See</u> <u>Fogg</u>, 492 F.3d at 445.

for" reason for the challenged employment action. St. Mary's Honor Center, 509 U.S. at 515-

518. This is a more difficult standard than the requirement under Section 2000e-2(m) to show

that discrimination was a motivating factor. In the single motive case Reeves v. Sanderson

Plumbing Products, Inc., 530 U.S. 133, 148 (2000), Justice O'Connor recognized occasions

where summary judgment would be appropriate:

> Certainly there will be instances where, although the plaintiff has
> established a prima facie case and set forth sufficient evidence to
> reject the defendant's explanation, no rational factfinder could
> conclude that the action was discriminatory. For instance, an
> employer would be entitled to judgment as a matter of law if the
> record conclusively revealed some other, nondiscriminatory reason
> for the employer's decision, or if the plaintiff created only a weak
> issue of fact as to whether the employer's reason was untrue
> and there was abundant and uncontroverted independent evidence
> that no discrimination had occurred.

Accord Weigert v. Georgetown University, 120 F.Supp.2d 1, 22 (D.D.C. 2000) (quoting same).

If the Defendant proffers a legitimate non-discriminatory reason for its adverse

employment decision, the McDonnell Douglas test is applied differently. In such cases, "[t]he

McDonnell Douglas shifting framework effectively evaporates, and — the sole remaining issue

is discrimination or retaliation vel non." Prince v. Rice, __ F. Supp. 2d ___, 2008 WL 348162,

at *5 (D.D.C. Aug. 14, 2008). Specifically,

> [i]n a Title VII disparate-treatment suit where an employee has suffered
> an adverse employment action and an employer has asserted a
> legitimate, non-discriminatory reason for the decision, the district court
> need not- and should not- decide whether the plaintiff actually made
> out a prima facie case under McDonnell Douglas. Rather, in
> considering an employer's motion for summary judgment or judgment
> as a matter of law in those circumstances, the district court must resolve
> one central question: Has the employee produced sufficient evidence
> for a reasonable jury to find that the employer's asserted non-
> discriminatory reason was not the actual reason and that the employer
> intentionally discriminated against the employee on the basis of race,
> color, religion, sex or national origin?

9

Brady v. Office of the Sergeant of Arms, United States House of Representatives, 520 F.3d 490, 495 (D.C. Cir. 2008); see Czekalski v. Peters, 475 F.3d 360, 364 (D.C. Cir. 2007) ("As the Supreme Court has explained, once a defendant has proffered such a nondiscriminatory explanation, it has 'done everything that would be required of [it] if the plaintiff had properly made out a prima facie case'").

  **C.**  **Disposition Of Retaliation Claims Under Title VII.**

   To prevail on a retaliation claim, a plaintiff "must show that (1) she engaged in statutorily protected activity; (2) her employer took an adverse personnel action against her; and (3) a causal connection exists between the two." Vickers v. Powell, 493 F.3d 186, 195 (D.C. Cir. 2007). If the defendant offers a legitimate non-discriminatory reason for its decision, the Brady rule applies, and the court must determine whether there is sufficient evidence for a reasonable finder of fact to conclude that retaliation was the real reason for the challenged decisions. Pardo-Kronemann v. Jackson, 541 F. Supp. 2d 210, 215-16 (D.D.C. 2008). Plaintiff bears the burden of proving that the materially adverse actions she has challenged were the result of retaliation. Vickers, 493 F.3d at 195.

**ARGUMENT**

**I.**  **THE EVIDENCE DOES NOT SUPPORT PLAINTIFF'S RACE**
    **DISCRIMINATION CLAIMS.**

   Defendant should be awarded summary judgment because no reasonable finder of fact could conclude that Mr. Jarmon's race was the reason that he was not selected for the GS-15 position advertised in VAN 04-153-TJ. Non-selection for a promotion is a materially adverse action, and Defendant has offered legitimate non-retaliatory reasons for its decision, e.g., plaintiff was not

10

the most qualified candidate.  Thus, under <u>Brady</u>, the Court must determine whether Plaintiff has produced sufficient evidence for a reasonable jury to find that Defendant's asserted reason for the action is a pretext for unlawful race discrimination, and that his race was the "real reason" for the decision.  <u>Brady</u>, 520 F.3d at 495; <u>see</u> <u>Czekalski v. Peters</u>, 475 F.3d 360, 364 (D.C. Cir. 2007).  It would be unreasonable to draw that conclusion in this case.  Plaintiff's supervisors simply did not believe he was one of the three most-qualified candidates for the GS-15 position, and there is no reason to question or disturb their decision.

### A. Defendant's Assessment of the Relative Qualifications of the Candidates Should Be Respected.

Courts "must respect the employer's unfettered discretion to choose among qualified candidates."  <u>Adeyimi</u>, 525 F.3d at 1227 (quoting <u>Fischbach</u>, 86 F.3d at 1183) (internal quotation marks and citations omitted).  Moreover, federal agencies have the "right to select or not select from among a group of best qualified candidates."  <u>See</u> 5 C.F.R. § 335.103(b)(4).  Accordingly, when an employer explains its hiring or promotion decision "based on the relative qualifications of the candidates, a plaintiff can directly challenge that qualifications-based explanation <u>only if the plaintiff was 'significantly better qualified</u> for the job' than those ultimately chosen."  <u>Id.</u> (emphasis added); <u>see also</u> <u>Holcomb v. Powell</u>, 433 F.3d 889, 897 (D.C. Cir. 2006).  As the D.C. Circuit has explained,

> The qualifications gap must be great enough to be inherently indicative of discrimination.  Only then could the fact-finder legitimately infer that the employer consciously selected a less-qualified candidate — something that employers usually do not do, unless some other strong consideration, such as discrimination, enters into the picture.  In cases where the comparative qualifications are close, a reasonable jury would not usually find discrimination because the jury would assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call.

11

Adeyimi, 525 F.3d at 1227.

Here, the evidence provides no reasonable basis to question the FCC's assessment of the relative strengths and skills of the candidates for the GS-15 position. The selectees — Mr. Bentley, Mr. Skadin, and Ms. Hellmer — were among the five candidates who received the highest scores from the rating panel, and were referred to the selecting official (Mr. Davenport). See Exh. 1, Green Decl. ¶ 5. The rating panel scored Mr. Jarmon's application lower than the selectees' applications. Id. at Attachment C. The selectees were all highly qualified for the job, and none of them was less qualified than Mr. Jarmon, let alone "significantly" less qualified than he was.

Mr. Davenport was responsible for making the selection for the auditor position. Exh. 4, Davenport Depo. at 12. He sought to fill the position with candidates who demonstrated "leadership ability, experience, creativity and ability to work with other people." See Exh. 3, Davenport Interview at 26. Other important qualities included the ability to meet deadlines, understanding the role of audits and the audit staff within EB, and strong written and oral communication skills. Id; Exh. 5, DeNigro Interview at 100. These factors were important because the positions at issue were team leader positions where the selectees would be responsible for leading groups of auditors through complex audit assignments, and would often need to come up with ideas for new audits and new surveys." Exh. 3, Davenport Interview at 26-27.

Although Mr. Davenport had the authority and sole responsibility to make the selection, he solicited the input of the group of managers who conducted interviews. Exh. 4, Davenport Depo. at 14; Exh. 6, DeNigro Depo. at 67-69. After the interviews, Mr. Davenport and the managers met to discuss the candidates' strengths. Exh. 4, Davenport Depo. at 14. They

12

discussed the candidates' skill set regarding leadership, work product, ability to work with others and work with management, and new ideas for the audit group.  Id. at 31.

Neither Mr. Davenport nor the other four managers believed that Plaintiff was one of the three strongest candidates.  See Exh. 4, Davenport Depo. at 49.  Mr. Davenport concluded that Mr. Bentley had the highest competence and qualifications for the position, that Ms. Hellmer had the second-highest competence and qualifications for the position, and that Mr. Skadin had the third-highest competence and qualifications.  Exh. 4, Davenport Depo. at 28.  Mr. Boyle  felt that Mr. Bentley and Mr. Skadin were the two best qualified applicants.  Exh. 12, Boyle Depo. at 43.  Mr. Harkrader did not think that Mr. Jarmon should be selected, and felt that Mr. Jarmon lacked the leadership experience that the three selectees possessed.  Exh. 8, Harkrader Depo. at 39-40.  Ms. DeNigro did not believe that Mr. Jarmon was one of the top three choices, and thought that the selectees demonstrated stronger skills than Mr. Jarmon.  Exh. 5, DeNigro Interview at 103.  Mr. Bash proposed that Ms. Hellmer be hired.[2]  Exh. 10, Bash Depo. at 22.  Mr. Davenport and the other managers testified that Mr. Jarmon's race played no part in the selection process.   Exh. 3, Davenport Interview at 31; Exh. 5, DeNigro Interview at 103; Exh. 11, Boyle Interview at 51; Exh. 7, Harkrader Interview at 81; Exh. 9, Bash Interview at 110-11.

Mr. Bentley was highly qualified for the position.  He had a bachelor's degree and became a Certified Public Accountant in 1981.  Exh. 2, Green Decl. at Attachment F, p. 21 (Application A).  Like Plaintiff, Mr. Bentley had received a rating of "pass," in a pass/fail rating system, on his most recent performance appraisal.  Id. at pp. 23-24.  He had several years of

---

[2]  Mr. Bash did not recall making a recommendation that anyone other than Ms. Hellmer be selected.  Exh. 10, Bash Depo. at 22.

13

experience at the FCC, and joined the IHD at around the same time that Mr. Jarmon did.  Exh. 6, DeNigro Depo. at 52-53.

The managers were impressed with Mr. Bentley's leadership qualifications and other experience.  Exh. 4, Davenport Depo. at 30; Exh. 5, DeNigro Interview at 102.  Mr. Bentley was a "strong candidate," and he had good overall experience with different portions of the Telecommunications Act and with auditing telecommunications companies. Exh. 6, DeNigro Depo. at 81.  He had been most recently employed as a GS-14 Auditor in IHD, where he served as "the lead auditor on three audit projects."  Exh. 1, Green Decl. at Attachment F, (Application A at 5-7, 8-9, 11, 14-19, 25-27).  For the nine months preceding his application, Mr. Bentley served as "the lead auditor" in a project concerning "the review of high cost loop support payments…in the Commission's Universal Service Fund program," and was "responsible for the direction of five Enforcement Bureau auditors on this audit."  Id.; see also Exh. 8, Harkrader Depo. at 16 (explaining that Bently was the team leader of the high cost audit group).  Prior to that, Mr. Bentley "led several FCC auditors in the reviews of the pre-merger and post-merger audits for [two] companies."  Green Decl. at Attachment F, p. 6 (Application A).  Mr. Bentley also served as Audit manager on eight audit projects between August 1994 and April 1998, and as the Audit Manager of the CPR audits at Bell Atlantic and US West, he "was responsible for the day to day activities of 10 auditors, including several GS-13 and GS-14 auditors working simultaneously as teams across the country."  Id. at 8.  Ms. DeNigro noted that Mr. Bentley had "worked on, over the years, many different types of audits within the telecommunications industry and carries a great deal of experience based on that work," that he had demonstrated strong "oral and written skills," had a CPA, and had "a good history of accepting direction and sticking to deadlines…."  Exh. 5, DeNigro Interview at 102.

Mr. Skadin also was highly qualified for the GS-15 position.  Mr. Skadin had a B.S. in Accounting from the University of Baltimore.  Exh. 1, Green Decl. at Attachment F, p. 71 (Application E).  Mr. Skadin was most recently employed as a GS-14 senior auditor at the FCC, a position he held since July 1994.  Id. at 63.  Like Plaintiff, Mr. Skadin received a rating of pass (in a "pass/fail" system) on his most recent performance appraisal.  Id. at 73-74.

Mr. Skadin had significant leadership experience, experience with different kinds of audits, and long-term experience with the FCC.  Exh. 5, DeNigro Interview at 102.  During his tenure as a senior auditor at the FCC, Mr. Skadin supervised "2 to 4" employees, and served as "project leader for the Audits Branch Time Reporting audits," where his responsibilities included "supervising the audits…," and he occasionally served as "Acting Branch Chief… training new employees in performing audits…."  Exh. 1, Green Decl. at Attachment F, p. 63-65 (Application E).  In 1998, Mr. Skadin "became co-project leader with another senior auditor for the Branch's CAM Audit review process," where his responsibilities included "supervising the CAM audit review teams."  Id. at 65.  In 2003, Mr. Skadin was "assigned the leadership of running the Carrier Reporting Compliance Audit as part of the Audit Group's Universal Service Audits," and supervised the audit.  Id. at 66.  Mr. Skadin also was the most familiar with the Commission's audit process, had done well when leading teams in audit projects, was "one of the best in the group" at dealing with other people, and did an "excellent job" on recent audits.  Exh. 12, Boyle Depo. at 44-45.  He also "works very well with people with different sorts of personalities, and in a team leadership, that's very important."  Exh. 5, DeNigro Interview at 102.

Ms. Hellmer was highly qualified for the position.  Ms. Hellmer's application materials reflect that she received a B.S. from the University of Maryland, and her most recent performance appraisal reflected that she received a "pass." Exh. 1, Green Decl. at Attachment F,

p. 37, 45-46 (Applicant C).  She had been most recently employed as a GS-14 Senior Auditor in IHD, where she was the sole auditor between January 2000 and March 2002, and served as the team leader for two Universal Service Fund Audits.  Exh. 1, Green Decl. at Attachment F, pp. 31-32, 39-41, 52-53 (Applicant C).

As Mr. Harkrader testified, Ms. Hellmer "had been in the Division longer than any of the auditors for this position, and we had seen her work in various subject matter areas."  Exh. 7, Harkrader Interview at 74-75.  Ms. Hellmer demonstrated her "strong organizational skills," "personal initiative and self-starting . . . work ethic," and oral presentation skills, in several assignments.  Exh. 5, DeNigro Interview at 101; see also Exh. 6, DeNigro Depo. at 81-82.   Mr. Boyle agreed with Ms. DeNigro's assessment, and explained that Ms. Hellmer had demonstrated her leadership abilities, her ability to keep projects on track, and her ability to pay attention to time deadlines.  Exh. 11, Boyle Interview at 46.  Ms. Hellmer also performed very well in the interview process.  Id.

Specifically, Ms. Hellmer "[d]eveloped the standard audit program and procedures for both critical areas of the USF Program…[and] organized both teams…held regularly scheduled meetings to assess progress, [and] establish deadlines and milestones…."  Exh. 1, Green Decl. at Attachment F, p. 32 (Applicant C); see also id. at p. 50.  Ms. Hellmer also served as "Lead auditor for the California/Nevada SBC 271 and the Ameritech States SBC 271 performance monitoring."  Id. at 51.  She previously "led an audit team to analyze costs associated with the implementation of Long Term Number Portability for SBC Communications,"  and served as "a Team Leader on several Cost Allocation Manual reviews of the independent auditors audit of the telco's CAMs and their compliance with our Rules and Regulations…."  Id. at 62.

16

Mr. Jarmon also was qualified for the position. He had a Bachelor's degree in Business Administration (Accounting), and became a Certified Government Financial Manager in 1996. Exh. 1, Green Declaration at Attachment F (Applicant D). He had most recently served as a GS-14 Senior Auditor in the FCC's IHD, where his duties included "preparing audit programs and conducting the complete assignment of Universal Service Funds recipients and their potential misappropriations of those funds." Id. Prior to that, Mr. Jarmon was detailed to the FCC's Office of Managing Director from 2001-2002 and served as a Chief Financial Officers Council Fellow from 2000-2001 with the Environmental Protection Agency. Id. He also worked as an Auditor in the FCC's Common Carrier Bureau from 1987 to 2000. Id. He received a "pass" on his most recent performance evaluation. Id.

Unlike the other selectees, Mr. Jarmon did not impress Mr. Davenport and the other managers who reviewed the applications and conducted interviews. Mr. Jarmon's educational background was similar to that of Ms. Hellmer and Mr. Skadin, and his experience made him eligible to be interviewed. However, Mr. Davenport was "not impressed with" Mr. Jarmon's interview, Exh.4 , Davenport Depo. at 48, and believed that with respect to the five candidates listed on the Merit Promotion Certificate, "one being the best and five being the worst, …[Plaintiff] was probably the fourth or fifth…" Exh. 3, Davenport Interview at 27. Ms. DeNigro similarly believed that the selectees "showed stronger skills in the areas…described than [Mr. Jarmon] did." Exh. 5, DeNigro Interview at 103. Specifically, some of Mr. Jarmon's audit work required significant redoing and editing by others, his oral communication skills were not particularly strong, and he had difficulty meeting and/or accepting deadlines. Id. at 104. Ms. DeNigro did not feel that Mr. Jarmon had demonstrated leadership capabilities, or performed as a leader. Exh. 6, DeNigro Depo. at 42. As Mr. Harkrader testified, Mr. Jarmon lacked supervisory

17

responsibility as compared to Mr. Skadin and Ms. Hellmer. Exh. 7, Harkrader Interview at 75. Based upon Mr. Jarmon's performance on a Section 271 audit assignment in 2002, Mr. Boyle believed that Mr. Jarmon had not demonstrated an ability to do the work necessary for the GS-15 position. Exh. 12, Boyle Depo. at 47-48 (noting that plaintiff "didn't follow through" "didn't demonstrate much of an interest in the work" and "failed to attend meetings a number of times"). In contrast, the selectees that Mr. Boyle recommended "had already pretty much stepped up and were providing leadership . . . had demonstrated their abilities to provide leadership, to provide guidance" and "pretty much demonstrated the ability to do the kind of things [the group would] be doing." Id. (Boyle Depo. at 55). The managers' assessment of the applicants' relative qualifications was consistent with that of the rating panel, which scored Mr. Jarmon's application lower than those of the selectees. Exh. 1, Green Decl. at Attachment C.

Unlike the selectees, Mr. Jarmon had prior disputes and/or unfavorable interactions with management and other employees. In fact, Mr. Jarmon himself acknowledged that his "assertive, outspoken behavior has not made [him] a favorite in the audits group." Exh. 16, Memorandum from W. Jarmon to T. Harkrader at 3. Shortly after Mr. Davenport became Mr. Jarmon's supervisor, Mr. Jarmon met with him, spoke very highly of himself, and spoke "very critically" about Mr. Boyle and other managers. Exh. 4, Davenport Depo. at 39. As a result of that meeting, Mr. Davenport had concerns about Mr. Jarmon's judgment. Id. at 43 ("I felt that he had been very critical of his management and I had concerns about someone's judgment in going to a new supervisor and criticizing their immediate boss in that first meeting."). Mr. Davenport also had discussions with other managers regarding Mr. Jarmon's interactions with management, which caused Mr. Davenport to be concerned about Mr. Jarmon's communications skills. Id. at 49-53. Mr. Harkrader had "slight concerns" about Mr. Jarmon's ability to get along with people,

18

because Mr. Jarmon's criticism of the way that team leaders and others managed their projects had occasionally "rubbed people the wrong way." Harkrader Depo. at 43-44.

Ms. DeNigro shared Mr. Davenport's and Mr. Harkrader's concerns regarding Mr. Jarmon's judgment and ability to interact well with management. Mr. Jarmon "had difficulty following direction," "did not want to do the assignments as given to him," and "did not want to take direction from his managers on his assignments." Exh. 6, DeNigro Depo. at 28. For example, on an audit of the Saddleback company, Mr. Jarmon disagreed with his work assignment, and ultimately "had to be . . . specifically directed to perform audit steps that were in the program because he was basically refusing to do the work as assigned." Id. at 32. Specifically, although Ms. DeNigro asked Mr. Jarmon to test the company's expenses, Mr. Jarmon thought, and informed Ms. DeNigro, that those tests were "unnecessary." Exh. 13, Jarmon Depo. at 59-61. Mr. Jarmon documented his disagreement in a memorandum to Trent Harkrader, in which he again argued that the tests he was assigned to perform were unnecessary and illogical. Exh. 16, Memorandum from W. Jarmon to T. Harkrader dated July 27, 2004. In addition, Mr. Jarmon proposed to work on projects that were outside the workload and responsibility of the division, and outside the jurisdiction of the FCC, such as an audit of executive compensation at telecommunications companies. Exh. 6, DeNigro Depo. at 29-30; Exh. 11, Boyle Interview at 49-50 (discussing Jarmon's proposal to audit executive compensation and noting that there was nothing in the FCC's rules that allowed the agency to do so).

In sum, Mr. Davenport had to make a judgment call, based on his and the other managers' assessment of the candidates' relative strengths and weaknesses. As Ms. DeNigro has explained, "the candidates had different strengths and weaknesses. [The supervisors] were

19

unable to promote everybody . . . [and] had to pick the candidates that [they] thought were most likely to have the qualities [the supervisors] were looking for."  Exh. 5, DeNigro Interview at 101.  Faced with that decision, all five managers agreed that Mr. Jarmon was not one of the three best-qualified candidates for the position.  On this record, there is no reasonable basis to question, let alone disturb, that assessment of the candidates' relative strengths and qualifications.

### B.  Plaintiff's Belief That He Was A Superior Candidate Does Not Support An Inference of Race Discrimination.

Mr. Jarmon has failed to establish that his qualifications for the GS-15 position were plainly superior to those of the selectees.  A plaintiff "must support his allegations of superior qualifications with facts in the record; a mere unsubstantiated allegation of superior qualifications creates no genuine issue of fact and will not withstand summary judgment." Harding v. Gray, 9 F.3d 150, 154 (D.C. Cir. 1993).  Further, a candidate's subjective assessment of his own qualifications does not create an inference of pretext, and is "largely irrelevant." Washington v. Chao, 577 F. Supp. 2d 27, 44 (D.D.C. 2008).

Plaintiff has suggested that his detail to the EPA and the FCC's Chief Financial Officer's office made him a superior candidate.  Am. Compl. ¶ 14.  However, there is no evidence that either detail, or CFO training, would make Mr. Jarmon more qualified than a candidate who lacked similar experience. The vacancy announcement did not list inter-agency detail experience as a qualification, and no IHD manager identified such experience as a factor relevant to the hiring decision.  In any event, Mr. Jarmon's detail involved financial management functions, which used a "different skill set" than the auditing performed in the IHD.  Exh. 12, Boyle Depo. at 53; see also id. at 51-54. As Mr. Jarmon has acknowledged, the detail gave him accounting

20

experience relevant to preparing financial statements, however the FCC did not prepare its own

financial statements, and preparing financial statements was not a function that IHD auditors

performed.  Exh. 13, Jarmon Depo. at 41-43.

Although Mr. Jarmon may believe that he is a better auditor than the selectees, the

managers unanimously disagreed with that assessment.  Mr. Davenport testified that, in his view,

Mr. Jarmon is "convinced in his own mind that he is the best auditor in the building, but our

experience has been that that's not the case, far be it from the case." Exh. 3, Davenport Interview

at 28-29.   Mr. Davenport explained further that Mr. Jarmon's "work in some respects is

deficient, but overall he's getting what we need done when we need it.  He doesn't do any more

than we would need and often times performs worse than we would expect, but all-in-all his

performance is adequate."  Id. at 30.  Ms. DiNigro testified that:

> I don't think that Wesley's writing skills are particularly strong.  For instance,
> some audit work that he performed in the division immediately prior to the
> promotion being available required a great deal of redoing and editing by other
> people in the group.  The work product that he initially turned in, compared to the
> work product that was actually used, is dramatically different because the initial
> work product was not satisfactory or complete when…first submitted.  I believe
> that his oral communication skills are not very good.  He talks a lot, but it doesn't
> always make sense, and his point is not always clear.  He has a great deal of
> difficulty meeting deadlines, or even accepting deadlines, from the managers in
> the group.  He seems to resent the fact of having his work directed or being given
> specifics assignments with specific deadlines attached to them and has resisted
> receiving assignments from managers or being given deadlines…For those
> reasons, I simply disagree with his assertion that he is the strongest auditor, has
> the best experience and the best skills."

Exh. 5, DeNigro Interview at 104-05; see also Exh. 7, Harkrader Interview at 75-76 (Harkrader

testimony that Jarmon "was not better qualified than the candidates that we selected").

The FCC does not dispute that Mr. Jarmon was qualified for the position– he had

significant auditing experience, had worked for the FCC for several years, and his name was

listed among the five candidates forwarded to the selecting official on the Merit Promotion List. His past performance was good enough to "pass" on a pass/fail performance appraisal system. However, there is no evidence —other than Mr. Jarmon's own self-serving assessment of his strengths — that he was equally, much less significantly more, qualified in comparison to any or all of the selectees. On those facts, no reasonable juror could attribute Mr. Jarmon's non-selection to race discrimination or any other unlawful motive.

### C. There is No Other Evidence that Would Support An Inference that Plaintiff's Race Was the "Real Reason" for the Selection Decision.

To prove that an employer's explanations are a pretext for discrimination, the plaintiff must show "both that the reason was false, and that discrimination was the real reason." Weber v. Battista, 494 F.3d 179, 186 (D.C. Cir. 2007); see Hicks, 509 U.S. at 515. Thus, "[t]he ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reasons is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct." Hicks, 509 U.S. at 524; see also Carpenter v. Federal Nat'l Mortgage Ass'n, 165 F.3d 69, 72 (D.C. Cir. 1999) (if plaintiff merely shows that the legitimate nondiscriminatory reason offered by the employer is a pretext for a decision intending to cover up an unsavory reason that is not illegal under the anti-discrimination law, summary judgment for the employer is appropriate). Courts generally do not reexamine governmental selection decisions when it appears that, as here, an agency was faced with a decision between qualified candidates, particularly when there is no other evidence that discrimination played a role in the decision. Stewart v. Ashcroft, 352 F.3d 422, 429 (D.C. Cir. 2004).

The evidence simply does not suggest that the hiring decision was based on Plaintiff's race. For example, there is no direct evidence of race discrimination or racial animus. Nor is there any evidence which casts doubt on Mr. Davenport's credibility regarding the reasons for his selection decisions.

It is clear that the selectees and Mr. Jarmon had significant auditing experience, addressed the evaluation criteria for the position in their applications, and had recently received acceptable performance ratings. Mr. Davenport's selection decision in this case thus depended upon assessing the significance of differences in qualifications and making a judgment call regarding which candidates were best-suited for the positions. Mr. Davenport and the other IHD managers are familiar with the auditing field and already employed at the GS-15 level at the FCC, are clearly most familiar with the requisite knowledge, skills, and abilities to successfully perform as an Auditor at that level, and are thus best able to assess distinctions in the candidates' application materials and determine which candidates were best-suited to fill the positions. Accordingly, there is no evidence that Plaintiff's qualifications are "plainly superior" to the selectees', and fine distinctions between various projects on which the candidates may have worked and differences in qualifications that merely indicate a "close call" are not sufficient to forestall summary judgment in this case. Stewart, 352 F.3d at 430.

## II.    THE EVIDENCE DOES NOT SUPPORT PLAINTIFF'S RETALIATION CLAIM.

Plaintiff also alleges that his non-selection for the advertised GS-15 position was retaliation for his prior EEO activity. The denial of a promotion is a materially adverse action, and Defendant has offered legitimate non-retaliatory reasons for its decision. Thus, under Brady, the Court must determine whether Plaintiff has produced sufficient evidence for a reasonable

jury to find that Defendant's asserted reason for the action is a pretext for retaliation.  See Brady, 520 F.3d at 495.  It is not enough for a plaintiff to show that the Defendant's reasons are not just, or fair, or sensible, rather he must show that the explanation given is a phony reason. Fischbach v. D.C. Dept. of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (citing Pignato v. American Trans Air, Inc., 14 F.3d 342, 349 (7th Cir. 1994)).  When assessing that issue, courts consider whether a jury could infer retaliation or discrimination from:  (1) the strength of Mr. Jarmon's prima facie case; (2) any evidence that he may present to attack Defendant's stated non-retaliatory/non-discriminatory reason for the action; and (3) any further evidence of retaliation/discrimination that may be available to him.  Short, 2008 WL 2174856, at *3 (citing Waterhouse v. District of Columbia, 298 F.3d 989, 992-93 (D.C. Cir. 2002); Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998)).

### A.  Plaintiff's Prima Facie Case Of Retaliation Is Weak

To state a prima facie case of retaliation, a plaintiff  must show that (1) he engaged in statutorily protected activity; (2) his employer took an adverse personnel action against him; and (3) a causal connection exists between the two.  Vickers, 493 F.3d at 195; Paquin v. Federal National Mortgage Association, 119 F.3d 23, 31 (D.C. Cir. 1997).  Although Plaintiff had past EEO activity and suffered an adverse action, the evidence does not support an inference that a causal connection exists between the two.  Accordingly, he has not established a prima facie case of retaliation, and he cannot rely on the strength of that prima facie case to discredit Defendant's explanation of the selection decision.

**1.  The Past EEO Activity Was Too Remote In Time To Support an Inference of A Causal Connection Or Retaliatory Motive.**

The timing of the relevant events does not support an inference that there is a causal connection between Plaintiff's EEO activities and his non-promotion.  The causal nexus necessary to prove retaliation may be shown by evidence that the adverse action followed the protected activity within such a period of time and in such a manner that reprisal can be inferred. See Reshard v. Peters, __ F. Supp. 2d __, 2008 WL 4381546, at *14 (D.D.C. Sept. 29, 2008); Hamilton v. Paulson, 542 F. Supp. 2d 37, 58 (D.D.C. 2008).  However, if the Plaintiff relies solely on the temporal proximity between the employer's knowledge of protected activity and the allegedly discriminatory action to establish causation, the time between these events "must be very close."  Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001); see also Reshard, 2008 WL 4381546, at *14 (citing same).  This Court has held that a span of three months is too long to support an inference of causation.  See Hamilton, 542 F. Supp. 2d at 58; Mayers v. Laborers' Health & Safety Fund of N. Am., 478 F.3d 364, 370 (D.C. Cir. 2007) (concluding eight to nine month gap between protected activity and challenged actions was too long to show causation).

Here, more than a year elapsed between Plaintiff's prior EEO activity and the denial of the promotion.  Plaintiff's most recent EEO activity prior to his non-selection for VAN 04-153-TJ occurred on October 23, 2003, when he filed a formal complaint of discrimination (FCC-EEO-03-05) with the EEOC alleging that the FCC discriminated against him on the basis of his race when he was not selected for a GS-15 Auditor position in EB.  Miller Decl. ¶ 4.  He applied for the promotion under VAN 04-153-TJ approximately six months later, in April 2004, and Mr. Davenport selected Ms. Hellmer, Mr. Bentley, and Mr. Skaden on December 17, 2004.  See Exh.

25

1, Green Decl. ¶¶ 5, 9. That fourteen-month gap between his EEO activity and the non-selection

is far too long to support an inference that Plaintiff was not selected because of his prior EEO

activity, and he adduces no other evidence to establish the necessary causal nexus. <u>Mayers</u>, 478

F.3d at 370; <u>see also Clark County School Dist.</u>, 532 U.S. at 274 ("Action taken (as here) 20

months later suggests, by itself, no causality at all."); <u>Hamilton</u>, 542 F. Supp. 2d at 58.

        **2.   The Selecting Official Was Not Aware of Plaintiff's Past EEO Activity.**

There can be no retaliatory intent unless the employer has knowledge of the employee's

protected activity. <u>See Jones v. Bernanke, Chairman of the Board of Governors of the Federal</u>

<u>Reserve System</u>, 538 F.Supp.2d 53, 64 (D.D.C.2008) (holding that employee failed to show that

his direct supervisors knew about his protected activity prior to taking adverse employment

action against him and the employee could not prove a retaliatory motive absent supervisors'

knowledge of his protected activity); <u>Mason v. DaVita, Inc.</u>, 542 F. Supp. 2d 21, 31 (D.D.C.

2008) ("In order to show causation, a plaintiff must show that the official responsible for the

alleged retaliatory act had knowledge of the protected activity."). Mr. Davenport, the selecting

official for the vacancy, was not aware of Plaintiff's prior EEO activity at the time that he made

the selection decision. <u>See</u> Davenport Dep. at 40. Ms. DeNigro, Mr. Bash, and Mr. Harkrader --

- who interviewed Plaintiff and did not believe him to be the best candidate for the position ---

also were unaware of Mr. Jarmon's prior EEO activity. <u>See</u> Deposition transcript of Eric Bash at

31; Deposition transcript of Trent Harkrader at 25; Deposition transcript of Hillary DeNigro at

38. Of the five managers involved in the selection process for VAN 04-153-TJ, only Mr. Boyle

was definitively aware of Plaintiff's prior EEO activity at the time of the selection decision. Yet,

as discussed <u>supra</u>, none of the managers believed that Plaintiff was one of the best qualified

applicants for the position, and none of the managers recommended that Plaintiff be selected.

Therefore, on this record, it would be unreasonable to conclude that Plaintiff's prior EEO activity motivated his non-selection.

Although Plaintiff's direct supervisor, Mr. Boyle, was aware of Plaintiff's EEO activity at the time he interviewed Plaintiff, his knowledge should not be imputed to Mr. Davenport or the other selecting officials. As noted, Mr. Boyle was not the selecting official --- Mr. Davenport was. There is no evidence that Mr. Boyle shared his knowledge of Plaintiff's EEO activity with Mr. Davenport or any of the other managers involved in the selection process. To the contrary, the other managers all testified that they were unaware of Mr. Jarmon's past EEO activity. See Exh. 4, Davenport Depo. at 40; Exh. 10, Bash Depo. at 31; Exh. 8, Harkrader Depo. at 25; Exh.6, DeNigro Depo. at 38. Further, there is no evidence that Mr. Boyle used his knowledge of Mr. Jarmon's past EEO activity to influence the other managers' evaluation of the applicants or the ultimate selection decision. In fact, he testified that Mr. Jarmon's past EEO activity did not influence the selection decision at all. Exh. 11, Boyle Interview at 50-51. Therefore, Plaintiff cannot rely upon Mr. Boyle's knowledge to establish causation.[3] See Oliver-Simon v. Nicholson, 384 F. Supp. 2d 198, 316 (D.D.C. 2005) (declining to impute one manager's knowledge of past EEO activity to other managers under a 'cat's paw' theory where evidence did not support that inference).

### B. There is No Other Evidence That Would Discredit Defendant's Explanation Or Indicate That Defendant Had A Retaliatory Intent.

As discussed supra in connection with the discrimination claims, the evidence does not contradict Defendant's explanations, or otherwise suggest that they are pretextual. Plaintiff appears to believe that Mr. Davenport's selection decision was unfair, and that he is a better

---

[3] Of course, knowledge alone is not enough to infer causation.

auditor than some or all of the selectees.   But that does not provide a basis to question the

legitimacy of Defendant's reasons, or allow a reasonable juror to infer retaliation.  See Fishbach,

86 F.3d at 1193.

**III.    THE EVIDENCE DOES NOT SUPPORT PLAINTIFF'S DISPARATE TREATMENT CLAIMS PREMISED UPON AN ALLEGED DISPARITY IN THE AMOUNT OF BONUSES AND AWARDS THAT HE RECEIVED.**

Mr. Jarmon also alleges that he received lower bonus pay and fewer time off awards than

other auditors.  Am. Compl. ¶¶ 27-28.  Being denied bonuses or awards generally qualifies as an

adverse employment action.  See Johnson v. District of Columbia, 572 F. Supp. 2d 94, 108

(D.D.C. 2008).  However, the evidence does not support Mr. Jarmon's bald assertion that he

suffered that adverse action, i.e. that he was denied awards and bonuses or that he was treated

less favorably than similarly-situated coworkers in that regard. Mr. Boyle, plaintiff's direct

supervisor, testified that Mr. Jarmon received "average" bonuses and awards,  which were

roughly equivalent to those of his peers.  Exh. 11, Boyle Interview at 49.

Even if there were a disparity in the bonuses and awards, Plaintiff has not shown that his

race was the reason for that disparity.  Bonuses and awards were agreed upon yearly, by the

managers acting collectively.  Exh. 5, DeNigro Interview at 106.  "They are intended to reflect

the contribution that each employee has made during the course of that particular period, and

Wesley's bonuses have always been reflective of that."  Id.  Plaintiff has not provided evidence

from which a reasonable finder of fact could conclude that the bonuses and awards that he

received were based on his race or protected activity, as opposed to the quality of his

performance.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant its motion for summary judgment.

Dated: February 12, 2009                    Respectfully submitted,


        /s/                               .
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


        /s/
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


        /s/
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198   Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov


**OF COUNSEL:**

Michael Krasnow
Federal Communications Commission
Office of the General Counsel
445 12th Street, S.W.
Washington, D.C.  20554
202-418-1740

29

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | | |
|---|---|---|
| **WESLEY M. JARMON, Jr.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 06-1852 (EGS)** |
| | ) | |
| **MICHARL J. COPPS, Acting Chairman,** | ) | |
| **Federal Communications Commission,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**ORDER**

Upon consideration of Defendant's Motion for Summary Judgment, it is this

_____ day of _____,

ORDERED that Defendant's motion for summary judgment be and hereby is

GRANTED.

It is further ORDERED that summary judgment be issued in favor of the defendant on all

claims.

SO ORDERED.

_____
United States District Judge