## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

WESLEY M. JARMON, JR.,         )
                                      )

           Plaintiff,          )
                                      )

           v.              )       Civil Action No. 06-1852 (EGS)
                                      )

MICHAEL J. COPPS, Acting Chairman,  )
Federal Communications Commission,    )
                                      )

          Defendant.         )
_____ )

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Wesley M. Jarmon, Jr., by and through the undersigned, hereby submits the following Plaintiff's Memorandum of Points and Authorities in Opposition to the Defendant's Motion for Summary Judgment. The Defendant's Motion for Summary Judgment should be denied in its entirety. The Defendant violated Federal law by not selecting Plaintiff (an African-American with prior EEO activity) for the position of GS-15 Auditor. Additionally, during the time period from 2002 through 2004, Plaintiff received monetary and time-off awards that were considerably lower than his coworkers that were selected for the GS-15 Auditor positions.

The Defendant claims that it had a legitimate justification for not selecting Plaintiff in that supervisors believed Plaintiff had numerous performance deficiencies. However, the documentation in the record does not support the Defendant's claim. Rather, the evidence shows that Plaintiff was better qualified than two of the selectees, he had no documented performance deficiencies, the selection process was based on subjective criteria and the Defendant officials harbored discriminatory animus against Plaintiff because of his race and prior EEO activity.

An objective review of the qualifications of the top five applicants shows that Plaintiff was better qualified than two of the individuals selected for the position, Connie Helmer and Andy Skadin.  Plaintiff possessed superior experience, training, skills and qualifications.  Yet, the Defendant, through a five member selection panel which included no African-Americans, made a decision to select three White applicants.  To justify its decision, the selecting officials raised a variable array of excuses and undocumented concerns about Plaintiff.  Those excuses are not supported by any documentation in the record and only serve to establish the stereotyped notions about African-Americans possessed by the White managers involved in the selection, which is that Plaintiff was difficult to get along with, arrogant and lack leadership ability.

Moreover, the selection was made based solely on subjective criteria.  At no time did the selecting official or anyone from Human Resources explain the selection criteria to the managers involved in the selection.  As a result, managers involved in the selection considered different criteria and weighted each of the criteria differently.

The failure to use standard objective selection criteria is compounded by the clear existing bias of the selecting official, William Davenport, and his subordinate, Hillary DeNigro. Both individuals cite to undocumented and unsupported allegations about Plaintiff's performance in an effort to excuse their selection decision.  Even in their statements, they are unable to hide their discriminatory and retaliatory animus towards Plaintiff.

Furthermore, the credibility of all managers in the selection process is in question.  The Defendant goes out of its way to degrade Plaintiff and demean his performance in order to justify not selecting him.  In addition to being unable to present documentation of Plaintiff's performance, managers admitted to having consulted with each other prior to providing interrogatory responses during discovery.

While Mr. Davenport, the selecting official, claims that at the time of the selection he does not recall whether he knew of Plaintiff's prior EEO activity, Plaintiff certainly recalls. In fact, he has a vivid recollection of the conversation with Mr. Davenport that occurred prior the selection in this case in which the two individuals discussed Plaintiff's prior EEO activity. Although that conversation may have been of little significance to Mr. Davenport, it certainly was not unimportant to Plaintiff.

As indicated in Plaintiff's Statement of Material Facts for Which There Is a Genuine Dispute, there are countless disputed material facts. The credibility of witnesses cannot be determined without a hearing and the genuine dispute of fact precludes summary judgment. Furthermore, the Defendant's Motion for Summary Judgment is unsupported by law, which prohibits selection decisions based on race or prior EEO activity. The Defendant can present no legitimate justification for its selection decisions. The record is replete with evidence of pretext.

In ruling on the Defendant's Motion for Summary Judgment, the facts must be considered in a light most favorable to Plaintiff. Such facts establish that the Defendant's decision not to select Plaintiff could have no other justification than discrimination. Therefore, Plaintiff respectfully requests that the Defendant's Motion for Summary Judgment be denied.

## BACKGROUND

Plaintiff is employed by the Federal Communications Commission ("FCC") as a GS-0511-14 Auditor in the Enforcement Bureau, Investigations and Hearings Division. Plaintiff's Exhibit 4, Wesley Jarmon Affidavit. He is African-American and has engaged in prior EEO activity. Id. Since 1987, Plaintiff has been employed as an Auditor with the FCC at grade levels ranging from GS-11 to GS-14. See Plaintiff's Exhibit 3, Wesley Jarmon Application for Vacancy Announcement No. 04-153TJ, Auditor, GS-0511-15. Prior to joining the FCC, Plaintiff

worked as an Auditor with the State of Texas from 1981 to 1986 and as an Accountant/Auditor with the Atlanta Life Insurance Company from 1976 to 1981.  Id.

In 2004, Plaintiff applied for the position, which is the subject of this case, of GS-15 Auditor with the FCC under vacancy announcement number 03-0140-LJ.  Id.  The selecting official for the position was William Davenport, Chief of the Investigations and Hearings Division in the Enforcement Bureau.  Defendant's Exhibit[1] 3 at 23, 25.  Mr. Davenport enlisted the assistance of four other managers to help with the selection, his deputy Hillary DeNigro; two Assistant Division Chiefs, Eric Bash and Trent Harkrader; and the Chief Auditor Hugh Boyle. Id. at 25.  Mr. Davenport is Plaintiff's second-line supervisor.  Plaintiff's Exhibit 9, Wesley Jarmon Interview at 4.  Mr. Boyle is Plaintiff's first-line supervisor.  Id.

Mr. Davenport received the resumes of five of the candidates who had been best qualified for the GS-15 Auditor positions.  Defendant's Exhibit 3, William Davenport Interview at 25. Mr. Davenport and the four other managers involved in the selection conducted interviews and selected three of the five best qualified individuals for the position.  Id. at 25, 27.  The individuals selected for the positions were Andy Skadin, Bob Bentley and Connie Helmer.  Id. at 27.  According to Mr. Davenport, the three individuals were selected because of their leadership ability, performance and personality of being "easy to work with."  Id. at 27.  All three individuals selected for the position were White, not of Hispanic origin.  Defendant's Memorandum of Points and Authorities in Support of Motion for Summary Judgment [hereinafter Defendant's Points and Authorities] at 3.  None of the five managers involved in the selection were African-American.  Defendant's Exhibit 11, Hugh Boyle Interview at 38; Defendant's Exhibit 9,

---

[1] All citations to "Defendant's Exhibits" are referring to Defendant's exhibits as listed in its Memorandum of Points and Authorities in Support of Motion for Summary Judgment and Statement of Material Facts for Which There is No Genuine Issue.  All page references are to the original page numbering of each document.

Eric Bash Interview at 58; Defendant's Exhibit 7, Trent Harkrader Interview at 72; Defendant's Exhibit 5, Hillary DeNigro Interview at 96; Defendant's Exhibit 3 at 24.

The Defendant informed Plaintiff by letter dated January 11, 2005 that he had not been selected for the position.  Plaintiff's Exhibit 3.  Plaintiff subsequently filed the instant EEO complaint regarding his non-selection.  In 2003, Plaintiff filed an EEO complaint after he was not selected for a GS-15 Auditor position with the Defendant.  Defendant's Statement of Material Facts for Which There is No Genuine Dispute [hereinafter Defendant's Statement of Facts] at ¶ 17.  Additionally, Plaintiff filed an EEO complaint in 2000 after he was not promoted to the GS-15 level.  Id. at ¶ 22.

At the time he submitted his application, Plaintiff had more than 25 years of financial accounting and auditing experience, 17 years of which were at the FCC.  Plaintiff's Exhibit 3. He is a Certified Financial Manager with a Bachelor Degree in Business Administration (Accounting).  Id.  He has been performing in his position as Senior Auditor at the GS-14 level since 2002.  Id.  He has years of experience supervising others, including directly supervising a staff of 8 professional accountants through the course of two assignments.  Id.  He has extensive supervisory and managerial experience in the audit field, including serving as Lead Auditor on two occasions.  Plaintiff's Exhibit 4.  On those occasions as Lead Auditor, he supervised three Auditors.  Id.  In the office, he conducted all of the writing for the audit report and preparing the audit program to use in the field.  Id.

During his tenure with the FCC, Plaintiff was selected as a 2000 Chief Financial Officers (CFO) Council Fellow.  See Plaintiff's Exhibit 5, Certified Financial Officer Fellowship Agreement.  That program is designed to "provide career development opportunities to promising financial managers."  Id.  He also completed a detail to Senior Accountant with the

FCC.  Plaintiff's Exhibit 3.  In the CFO Council Fellow program, he received extensive

leadership training and financial statement training.  Plaintiff's Exhibit 4.  As a result of the

training that he received, the Environmental Protection Agency ("EPA") had him on a detail as a

CFO to prepare their annual financial statements.  Id.  As a result of the work that he did, EPA

receive their first unqualified opinion of approval for their financial statements.  Id.

 Furthermore, Plaintiff has consistently received good performance evaluations and

feedback from his supervisors at the FCC.  Id.  The Defendant presently employs a pass/fail

performance rating system.  Id.  Plaintiff's ratings during the time period prior to the selection

were passing in all areas, including leadership and ability to work well with others.  Plaintiff's

Exhibit 4; Plaintiff's Exhibit 6, Wesley Jarmon Performance Evaluations.  Prior to implementing

the pass/fail rating system, the Defendant used a rating system numbered 1-5 with 5 being the

highest rating.  Plaintiff's Exhibit 4.  His ratings were typically were fours and fives.  Id.

STANDARD OF REVIEW

## A.  STANDARD FOR SUMMARY JUDGMENT

 In order to obtain summary judgment, the moving party must establish that there are no

genuine disputes of material fact and that it is entitled to judgment as a matter of law.  Celotex

Corp. v. Catrett, 477 U.S. 317, 323-24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

255 (1986).  In evaluating a motion for summary judgment, the Court must interpret the facts in

the light most favorable to the nonmoving party.  Anderson, 477 U.S. at 249; see also Brother v.

Klevehagen, 28 F.3d 452, 455 (5th Cir. 1994).  A "genuine" dispute of fact exists if the evidence

is such that a reasonable fact finder could find in favor of the non-moving party.  Oliver v.

Digital Equipment Corp., 846 F.2d 103, 105 (1st Cir. 1988).  A disputed fact is "material" if,

when the Judge resolves the dispute in the non-movant's favor, it has the potential to alter the

outcome of the suit under the governing substantive law.  <u>Anderson</u>, 477 U.S. at 247-49.  In

other words, material facts are those that prove or disprove an element of a claim for relief, or

that are necessary to the proof or defense of a claim.  <u>Id.</u>

<strong>ARGUMENT</strong>

**I.      PLAINTIFF PROFFERS A *PRIMA FACIE* CASE OF RACE
        DISCRIMINATION**

Title VII of the Civil Rights Act of 1964, as amended by 42 U.S.C. § 2000e-16, prohibits

discrimination in federal employment on the basis of race, color, religion, sex, and national

origin.  When alleging discrimination, a plaintiff must present evidence to create a *prima facie*

inference which, if unrebutted, would permit a finding of unlawful discrimination.  <u>See</u>

<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).  In order to establish a *prima*

*facie* case, a plaintiff must demonstrate that: (1) he is a member of the protected class; (2) the

employer took a adverse employment action against him; and (3) the circumstances of the

employer's treatment of a plaintiff gives rise to an inference of discrimination, such as where the

employer treats a similarly situated person who is not a member of a plaintiff's protected class

more favorably than the employer treated the plaintiff.  <u>Id.</u>

Once a plaintiff establishes a *prima facie* case, the employer has the burden of production

to set forth a legitimate non-discriminatory reason for its action against the plaintiff.  <u>Texas</u>

<u>Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981); <u>McDonnell Douglas</u>, 411 U.S. at

802-03.  Then, if the employer satisfies its burden of production, the plaintiff must show that the

employer's articulated reason was merely a pretext for discrimination.  <u>Burdine,</u> 450 U.S. at

253.  The plaintiff has the ultimate burden of proving by a preponderance of the evidence that a

factor made unlawful by the applicable statute played a motivating role in the alleged adverse

employment action.  <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 508 (1993).

In this case, it is undisputed that Plaintiff can establish a *prima facie* case of race discrimination.  Plaintiff applied for the position of Auditor, GS-15, under Vacancy Announcement No. 04-153TJ, but was not selected.  Plaintiff's Exhibit 9 at 5.  Plaintiff was one of five individuals on the best qualified list and was interviewed for the position by the Defendant.  Defendant's Exhibit 3 at 25.  None of the other individuals on the best qualified list were African-American.  Defendant's Points and Authorities at 3.  The three individuals that were selected for the position were all White, not of Hispanic origin.  Id.  Furthermore, none of the five managers involved in the selection were African-American.  Defendant's Exhibit 11 at 38; Defendant's Exhibit 9 at 58; Defendant's Exhibit 7 at 72; Defendant's Exhibit 5 at 96; Defendant's Exhibit 3 at 24.

As set forth below in Section III, Plaintiff is more experienced and better qualified for the position than White selectees.  Moreover, as discussed below, there is evidence of racial animus sufficient to raise an inference of discrimination.

## II.    PLAINTIFF PROFFERS EVIDENCE OF RETALIATORY ANIMUS

Plaintiff can establish a *prima facie* case of retaliation.  A plaintiff may establish a *prima facie* case of retaliation by showing that: (1) he engaged in a protected activity; (2) the defendant was aware of the protected activity; (3) he was subsequently subjected to adverse treatment by the defendant; and (4) a nexus exists between the protected activity and the adverse treatment.  Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000).  An action is materially adverse if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2415 (2006).  A nexus may be shown by evidence that the adverse treatment followed the protected activity within such a period of time and in such a manner that a reprisal motive is inferred.  See

Hochstadt v. Worcester Found. for Experimental Biology, Inc., 425 F. Supp. 318, 324 (D. Mass.), aff'd 545 F.2d 222 (1st Cir. 1976).

### a. The Selecting Official, William Davenport, Was Aware Of Plaintiff's Prior EEO Activity

In its Motion, the Defendant claims that Mr. Davenport was unaware of Plaintiff's prior EEO activity. However, the record reflects the inaccuracy in the Defendant's contention. In response to questioning by the EEO investigator about his knowledge of Plaintiff's prior EEO complaints, Mr. Davenport stated, "I'm not sure if I knew that he had filed prior EEO complaints at the time of the selection. **I can't say for sure**." Defendant's Exhibit 3 at 30 (emphasis added). Although Mr. Davenport's recollection on the matter may be hazy, Plaintiff's is not. Plaintiff made William Davenport personally aware of his prior EEO activity in July 2003. Plaintiff's Exhibit 4. At that time, Plaintiff requested a meeting with his second line supervisor, Maureen Del Duca and William Davenport, who was the acting deputy. Id. In that meeting, he discussed his past EEO activity and non-selection for the GS-15 auditor position in 2002. Id.

In evaluating a motion for summary judgment, the Judge must interpret the facts in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 249. Summary judgment should not be used as a "trial on affidavits." Anderson, 477 U.S. at 255. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inference from the facts are jury functions, not those of a judge. . ." Id. (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)). When considered in the light most favorable to Plaintiff, it should be determined that this Mr. Davenport was aware of Plaintiff's prior EEO activity, or, at a minimum, that a genuine dispute exists over the discussions that occurred at that meeting.

**b.   Other Managers Involved In The Selection Process, Including Plaintiff's First Line Supervisor, Were Aware of Plaintiff's EEO Activity**

In addition to Mr. Davenport's knowledge of Plaintiff's prior EEO activity, Mr. Boyle admitted his knowledge of Plaintiff's prior EEO activity at the time of the selection. Plaintiff's Exhibit 2, Hugh Boyle Deposition at 77. Similarly, when asked whether she was aware of his EEO activity, Ms. DeNigro responded that she did not think so, but was unsure. Defendant's Exhibit 5 at 108. Viewing the facts in a light most favorable to Plaintiff, it should be presumed that DeNigro knew of Plaintiff's EEO activity at the time of the selection.

**c.   There Is A Nexus Between Plaintiff's EEO Activity And His Non-Selection**

Mr. Davenport's retaliatory animus against Plaintiff is evidenced by his statements about Plaintiff. Although Plaintiff met with Mr. Davenport to raise concerns about being treated fairly, Mr. Davenport perceived Plaintiff's demeanor in this meeting as arrogant and very insensitive. Defendant's Exhibit 4, William Davenport Deposition at 38. Despite his assertion that Plaintiff was arrogant, Mr. Davenport could recall nothing that led to his belief. Id. at 41.

Moreover, as discussed in great detail below, the selection decision made by Mr. Davenport was based on subjective criteria, not objective qualifications. Plaintiff's qualifications were improperly overlooked and ignored. The Defendant is unable to provide any reasonable explanation for its actions. See Watson v. Fort Worth Bank & Trust, 487 U.S. 977 (1988) (superseded in part on other grounds by the 1991 Amendments to Title VII).[2]

---

[2] In Watson, the plaintiff, who was black, was rejected in favor of white applicants for four promotions to supervisory positions in the defendant's bank. Watson v. Fort Worth Bank & Trust, 487 U.S. 977 (1988). The bank had not developed precise and formal selection criteria for the positions, but instead relied on the subjective judgment of white supervisors who were acquainted with the candidates and with the nature of the jobs. Id. In writing the opinion, Justice O'Connor held that "[i]f an employer's undisciplined system of subjective decision-making has precisely the same effects as a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VII's proscription against discriminatory actions should not apply." Id. at 990-91.

III.   **THE DEFENDANT'S PROFFERED LEGITIMATE NON-DISCRIMINATORY REASON IS NOTHING MORE THAN A PRETEXT FOR DISCRIMINATION**

As discussed below, the Defendant's legitimate non-discriminatory reason is not supported by documentation or other evidence in the record.  Such unsupported allegations are insufficient to warrant summary judgment.  Summary judgment should be granted only if "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c).  However, the documentation presented by the Defendant, or lack thereof, only serves to highlight the disputed material facts and the lack of legal support for the Defendant's actions.

Moreover, the Defendant's inability to present documentation in support of the arguments raised by its managers for not selecting Plaintiff establishes that the Defendant's non-selection justification is nothing more than a pretext for discrimination.  "[A] plaintiff need only establish a *prima facie* case and introduce evidence sufficient to discredit the defendant's proffered nondiscriminatory reasons; at that point, the fact-finder, if so persuaded, may infer discrimination." Barbour v. Merrill, 48 F.3d 1270, 1277 (D.C. Cir. 1995) (referring to the holding in St. Mary's Honor Center v. Hicks, 509 U.S. 511 (1993)); see also EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994) ("A finding of pretextuality allows a juror to reject a defendant's proffered reasons for a challenged employment action and thus permits the ultimate inference of discrimination."); Perdomo v. Browner, 67 F.3d 140, 146 (7th Cir. 1995) ("The trier of fact is permitted to infer discrimination from a finding that the employer's proffered reason was spurious.").  A plaintiff need not rebut all of a defendant's proffered reasons, but must

instead show that the defendant's decision was based on a prohibited factor.  <u>Monroe v. Children's Home Ass'n</u>, 128 F.3d 591, 593 (7th Cir. 1997).

### a.   Plaintiff Was Better Qualified Than Other Selectees

"Where a plaintiff's qualifications are so vastly superior than the selectee's, this may be considered as evidence of pretext, casting doubt on the legitimate, non-discriminatory explanation offered by the employer and creating a question of material fact." <u>Choates v. Powell</u>, 265 F. Supp. 2d 81, 95 (D.D.C. 2003).   In this case, Plaintiff's qualifications were vastly superior to two of the selectees for the GS-15 Auditor position.

### A.   Plaintiff's Qualifications

Plaintiff's application clearly identifies his superior qualifications.  At the time he submitted his application, Plaintiff had more than 25 years of financial accounting and auditing experience, 17 years of which were at the FCC.  Plaintiff Exhibit 3.  He is a Certified Financial Manager with a Bachelor Degree in Business Administration (Accounting). <u>Id.</u>  He has been performing in his position as Senior Auditor at the GS-14 level since 2002. <u>Id.</u>  He has years of supervisory experience, including directly supervising a staff of 8 professional accountants through the course of two assignments. <u>Id.</u>  He has extensive supervisory and managerial experience in the audit field, including serving as Lead Auditor on two occasions.  Plaintiff's Exhibit 4.  On those occasions as Lead Auditor, he supervised three Auditors. <u>Id.</u>  In the office, he conducted all of the writing for the audit report and prepared the audit program to use in the field. <u>Id.</u>

During his tenure with the FCC, Plaintiff was selected as a 2000 Chief Financial Officers (CFO) Council Fellow. <u>See</u> Plaintiff's Exhibit 5.  That program is designed to "provide career development opportunities to promising financial managers." <u>Id.</u>  He also completed a detail to

Senior Accountant with the FCC.  Plaintiff's Exhibit 3.  In the CFO Council Fellow program, he received extensive leadership training and financial statement training.  Plaintiff's Exhibit 4.  As a result of the training that he received, EPA had him on a detail as a CFO to prepare their annual financial statements.  Id.  As a result of the work that he did, EPA receive their first unqualified opinion of approval for their financial statements.  Id.

Furthermore, Plaintiff has consistently received good performance evaluations and feedback from his supervisors at the FCC.  Id.  The Defendant presently employs a pass/fail rating system.  Id.  Plaintiff's ratings during the time period prior to the selection were passing in all areas, including leadership and ability to work well with others.  Plaintiff's Exhibit 4; Plaintiff's Exhibit 6.  Prior to implementing the pass/fail rating system, the Defendant used a rating system numbered 1-5 with 5 being the highest rating.  Plaintiff's Exhibit 4. Plaintiff's ratings were typically were fours and fives.  Id.

### B.  Selectee Constance Helmer Was Not As Well Qualified As Plaintiff

In stark contrast to Plaintiff's qualifications as Certified Financial Manager and 17 years of FCC experience, selectee Connie Helmer had only 10 years of experience at the FCC and is not a Certified Financial Manager.  Plaintiff's Exhibit 7, Constance Helmer Application for Vacancy Announcement No. 04-153TJ, Auditor, GS-0511-15.  Moreover, the evaluation of panel members calls into question her qualifications for the position.  When comparing the qualifications of Plaintiff and Ms. Helmer, selection panel member Trent Harkrader admitted that Connie Helmer was not critical in her analysis like Plaintiff.  Defendant's Exhibit 8, Trent Harkrader Deposition at 63.  Moreover, when asked whether Connie Helmer was more qualified for the position than Plaintiff, Hugh Boyle responded that he believed the two individuals that he recommended for the position, Bob Bentley and Andy Skadin, were "significantly better

qualified than the other three." Plaintiff's Exhibit 2 at 73, 63. Nonetheless, Ms. Helmer was William Davenport's top selection choice for the selection along with Mr. Bentley. Defendant's Exhibit 4 at 28.

Even Ms. DeNigro was unable to support her justification for selecting Ms. Helmer. Ms. DeNigro testified that in the selection process she considered the most important factors to be leadership, ability to work with people, ability to meet deadlines, understanding the role of audits, understanding the role of the audit staff and directing efforts to the Enforcement Bureau's goals. Defendant's Exhibit 5 at 100. However, of those numerous factors, the only one that she identified which Ms. Helmer possessed was the ability to meet deadlines. Id. at 101.

Finally, in 2002 there was a vacancy announcement for a GS-15 auditor position. Plaintiff's Exhibit 2 at 76. Connie Helmer was not on the best qualified list for that position. Id.

The Defendant's decision to select Ms. Helmer is unsupported. Despite Plaintiff's clearly superior qualifications, the Defendant selected Ms. Helmer for the position at issue. The Defendant's decision should be closely scrutinized and raises a genuine dispute of material fact.

### C. Selectee Andy Skadin Was Not As Well Qualified As Plaintiff

Selectee Andrew Skadin is not as well qualified as Plaintiff. Although, Mr. Skadin had worked as a Senior Auditor with the FCC since 1994, he had only supervised between 2 and 4 people. Plaintiff's Exhibit 8, Andy Skadin Application for Vacancy Announcement No. 04-153TJ, Auditor, GS-0511-15. He is not a Certified Financial Manager and possesses no advanced degrees. Id. He did not possess similar leadership or technical experience as Plaintiff. Id. Plaintiff's qualifications, discussed above, are plainly superior to those of Mr. Skadin. The decision to select Mr. Skadin over Plaintiff is further evidence of pretext.

### b.  The Defendant Raises Undocumented Performance Issues About Plaintiff

"Evidence indicating that an employer misjudged an employee's performance or qualifications is, of course, relevant to the question whether its stated reason is a pretext masking prohibited discrimination, *see* Parker v. HUD*, 282 U.S. App. D.C. 17, 891 F.2d 316, 322 (D.C. Cir. 1989); if the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so." <u>Fischbach v. District of Columbia Dep't of Corrections</u>, 86 F.3d 1180, 1183 (D.C. Cir. 1996); <u>see</u> <u>also</u> <u>Southwest Merchandizing Corp. v. NLRB</u>, 53 F.3d 1334, 1344 (D.C. Cir. 1995) (finding that the jury could infer pretext and unlawful discrimination from an employer's shifting and inconsistent explanations for its action).

In this case, the Defendant has used a seemingly unending stream of excuses for not selecting Plaintiff.  This alone raises a material dispute of fact sufficient to warrant this case proceeding to hearing.  The Defendant contends that Plaintiff had numerous performance deficiencies including not being able to get along with others, having poor writing skills, inability to comply with deadlines, proposing audits that made no sense and lacking leadership experience.  Despite the Federal Government's zeal for documenting performance problems, Plaintiff's file is devoid of any documentation of the alleged performance problems.

Rather than identifying a rational justification for not selecting Plaintiff, the Defendant has gone out of its way to create a myriad of excuses for not selecting him.  None of the excuses for selecting Plaintiff are justified or documented in the record.  <u>See</u> <u>Czakalski v. Peters</u>, 475 F.3d 360, 367 (D.C. Cir. 2007) (finding pretext where supervisor stated that the plaintiff allowed a program to languish but the plaintiff showed that the program was not funded during the relevant period); <u>see</u> <u>also</u> <u>Farris v. Clinton</u>, 602 F. Supp. 2d 74, 90 (D.D.C. 2009) (holding that

where plaintiff received inconsistent explanations, a jury could infer that "incorrect information was not the result of innocent human error; therefore, the defendant is not entitled to summary judgment on this claim"). In this case, the Defendant's excuses are nothing more than a pretext for its discriminatory action and summary judgment should be denied.

### A.  Evaluations Of Plaintiff Do Not Indicate Concerns About His Performance Nor Were Such Concerns Conveyed To Him

Plaintiff has been a stellar performer throughout his career. Plaintiff's Exhibit 4; Plaintiff's Exhibit 6. He received a passing rating on all of his performance evaluations prior to the selection. Plaintiff's Exhibit 4. Prior to the Defendant changing to a pass/fail rating system, he received ratings of 4 or 5, in a rating system where 5 was the highest possible rating. Id. His evaluations contained no narrative or discussion of any performance problems. Plaintiff's Exhibit 4; Plaintiff's Exhibit 6. He has never been placed on an Individual Development Plan nor have any performance concerns ever been raised or discussed with him. Plaintiff's Exhibit 4. Moreover, he has never been disciplined for his performance. Id.  In fact, during his performance evaluations, he repeatedly asked what he needed to do to get a promotion. Id. The response has always been that he was doing a great job and should just keep on doing what he had been doing. Id. None of Plaintiff's evaluations listed any concern about his performance or behavior in the workplace. Id.; Plaintiff's Exhibit 6.

Mr. Davenport claimed that in the 2002-2003 time periods, Mr. Boyle had an unfavorable view of Plaintiff's performance that was shared with him by Mr. Boyle. Defendant's Exhibit 4 at 98. However, Mr. Boyle made no mention of such performance discussions with Mr. Davenport. Nor has the Defendant presented any evidence of such communications or documentation of unfavorable performance.

In fact, Plaintiff's first-line supervisor, Hugh Boyle, stated that Plaintiff's audit suggestions demonstrated initiative and that he had complimented Plaintiff on his work performance.  Plaintiff's Exhibit 2 at 14, 20-21.  Mr. Boyle also stated that Plaintiff demonstrated leadership skills or abilities.  Id. at 14.  When asked whether Plaintiff had leadership skills and abilities, Mr. Boyle responded, "I'd say so."  Id.  In 2000, Mr. Boyle wrote a letter in support of Plaintiff's application for the CFO Council's Fellowship Program in which he stated, "[Plaintiff] is a hard working, dedicated employee who I believe would benefit from the program.  He has a strong accounting and auditing background that should make him a valuable candidate for the program."  Plaintiff's Exhibit 10, Letter of Recommendation from Hugh Boyle.

## B.  There Is No Evidence Of Plaintiff's Failure To Comply With Deadlines

The Defendant claims that in regard to an audit project in 2004, "the recollection of IHD managers is that [Plaintiff] was generally slow in accomplishing tasks and often had little to show for his efforts…"  Plaintiff's Exhibit 1, Defendant's Responses to Plaintiff's Interrogatory Requests, Response to Interrogatory No. 16.  However, the Defendant also admitted that there was "no record available relative to Mr. Jarmon's compliance with deadlines."  Id.  Defendant's vague recollection of Plaintiff's performance is admittedly unsupported by any records, including his performance evaluation.  Plaintiff disputes that there was any problem with is compliance with deadlines. The lack of evidence in the record creates a dispute of material fact which should be construed in favor of Plaintiff.

### C. The Defendant's Assertion That Plaintiff Did Not Get Along With Others Is Unsupported

Mr. Davenport testified that part of his selection consideration was that he had concerns about Plaintiff's ability to interact with other people and had "heard stories" from other managers, primarily Hillary DeNigro, Hugh Boyle and Trent Harkrader, about Plaintiff's interactions with others. Defendant's Exhibit 4 at 49. He even claimed that Plaintiff was "extremely difficult to work with." Defendant's Exhibit 3 at 28.

However, the record does not include any basis for such testimony. As Mr. Harkrader explained, Plaintiff was someone who "thought if there was a different way or better way to do it, he would let those feelings be known and he would let those opinions be known." Defendant's Exhibit 8 at 44. Mr. Harkrader further explained that, "No one ever came to me and said he's being completely unprofessional or even unprofessional in the slightest." Id. at 45. Mr. Harkrader also testified, "I've had a number of conversations with Wes that I actually thought were fairly friendly." Defendant's Exhibit 7 at 77. Even, Mr. Boyle, Plaintiff's first-line supervisor, stated that Plaintiff was "congenial." Plaintiff's Exhibit 2 at 13.

Moreover, as with the other excuses the Defendant raises for not selecting Plaintiff, there is no evidence to support this contention. Plaintiff's performance evaluation from the 2002-2003 time periods contains a Critical Performance Area labeled as Working With Others. Plaintiff's Exhibit 6. That critical performance area is defined as:

> Works constructively and in collaboration with other FCC employees and/or personnel from other organizations toward common goals. Assumes personal responsibility for areas assigned to her/him. In all work situations, maintains open, honest and constructive interactions with other FCC employees, personnel from other organizations, and the public.
>
> Id.

18

The comments section for Appraiser Hugh Boyle notes that "Areas of individual performance upon which employee should focus for the remainder of the rating period are identified below or in a separate transmittal."  Id.  However, the evaluations from 2002-2004 contained no performance issues "identified below" or any separate transmittal identifying any performance problems.  Id.  Nor have any of Plaintiff's other performance ratings addressed such alleged problems.  Plaintiff's Exhibit 4.

Defendant's attempt to impugn Plaintiff's credibility by attacking his ability to interact with others is nothing more than a subjective *post hoc* assertion by management.  Such an attack is unsupported and establishes the Defendant's discriminatory animus toward Plaintiff.

### D.  The Defendant's Assertion That Plaintiff Lacked Leadership Or Supervisory Experience Is Incorrect

In Hawkins v. Holder, Civil Action No. 07-10 (CKK), 2009 U.S. Dist. LEXIS 9193  (D.D.C. 2009), the Court found a genuine dispute of material fact where the plaintiff presented evidence of duties she performed, which the defendant claimed she had not done, and where the defendant provided contradictory testimony about why duties were removed from the plaintiff.  Therefore, the Court denied the defendant's Motion for Summary Judgment on the plaintiff's non-promotion claim.  Id.  Similarly, in this case, the Defendant claims that Plaintiff lacked leadership experience.  However, the evidence presented by Plaintiff indicates a genuine dispute over this issue.

In his testimony to the EEO investigator, Mr. Davenport stated, "He, as far as I can tell, has never supervised any other auditors to my recollection."  Defendant's Exhibit 3 at 29.  Ms. DeNigro stated her belief that Plaintiff had not performed as a leader or demonstrated leadership capabilities.  Defendant's Exhibit 6, Hillary DeNigro Deposition at 42.  However, the evidence shows that the recollection of Mr. Davenport and Ms. DeNigro is incorrect.  At the time of the

selection, Plaintiff had "more than 13 years of experience supervising others and conducting field audits and/or investigations to monitor and evaluate the telecommunications Carriers for compliance with the Federal Communications Commission's (FCC) rules and regulations." Plaintiff's Exhibit 3.

Plaintiff also has extensive supervisory and managerial experience in the audit field, including serving as Lead Auditor on two occasions. Plaintiff's Exhibit 4. On those occasions as Lead Auditor, he supervised three Auditors. Id. In the office, he conducted all of the writing for the audit report and prepared the audit program to use in the field. Id. Additionally, during his tenure with the FCC, Plaintiff was selected as a 2000 Chief Financial Officers (CFO) Council Fellow. Plaintiff's Exhibit 5. That program is designed to "provide career development opportunities to promising financial managers." Id. Plaintiff participated in the prestigious CFO Council Fellow program working with the EPA at the GS-14 level to prepare their financial statements. Plaintiff's Exhibit 3; Plaintiff's Exhibit 4. He also completed a detail to Senior Accountant with the FCC. Plaintiff's Exhibit 3.

Moreover, Mr. Boyle, Plaintiff's first-line supervisor, stated that Plaintiff demonstrated leadership skills or abilities. Plaintiff's Exhibit 2 at 14. He noted that on the high cost audit assignment Saddleback, Plaintiff had been the lead auditor. Id. at 68-69. In fact, one of the evaluation criteria for Plaintiff is designated as Professional Application. That criteria is explained as "Effectively applies job knowledge and job skills. Examples include written and oral communications, **leadership**, assignment planning and organization, analysis and problem solving." Plaintiff's Exhibit 6 (emphasis added). Neither in Plaintiff's performance evaluations nor at any other time did Mr. Boyle, Plaintiff's first-line supervisor, indicate any deficiencies in Plaintiff's leadership skills.

### E.  There Is No Basis For The Defendant's Claim That Plaintiff Suggested Audits Outside Of The Commission's Jurisdiction

One of the Defendant's justifications for not hiring Plaintiff was his request to audit compensation of telecommunication executives.  Mr. Davenport claimed that Plaintiff's suggested audit was made no sense in the context of the Defendant's jurisdictional authority. Defendant's Exhibit 4 at 84.  However, the FCC's authority is not as limited as Mr. Davenport might believe.

The FCC's purpose is "[t]o promote robust competition and innovation in the telecommunications marketplace by strictly enforcing the Communications Act and the FCC's rules."  See FCC, Mission Statement, available at http://www.fcc.gov/eb/ebmission.html. Regulations for the FCC are included in the Code of Federal Regulations at Title 47, Chapter 1. 47 C.F.R. 32.6720 discusses the Uniform System of Accounts for Telecommunications Companies.  It states that the "account shall include costs incurred in the provision of general and administrative services as follows:"

> (a) Formulating corporate policy and in providing overall administration and management. **Included are the pay, fees and expenses of boards of directors or similar policy boards and all board-designated officers of the company** and their office staffs, e.g., secretaries and staff assistants.

47 C.F.R. 32.6720 (emphasis added).  An audit of compensation for telecommunication executives would be included in this provision.

Despite Mr. Davenport's determination that such an audit did not make sense within the FCC's jurisdiction, Mr. Boyle admitted that he did not know if the audit was outside of the authority of the FCC.  Plaintiff's Exhibit 2 at 17-18.  Moreover, although Ms. DeNigro chastised Plaintiff for raising an audit that was not pursued by management, Mr. Boyle explained that

Plaintiff's willingness to forward audit suggestions demonstrated initiative. Plaintiff's Exhibit 2 at 14; Defendant's Exhibit 6 at 35-36.

### c. The Selecting Officials Harbored Discriminatory Animus Against Plaintiff

The clear racial bias of the selecting officials is shown through their unsupported claims of Plaintiff's performance deficiencies and notions of his behavior as stereotypical of African-Americans. In Walker v. England, 590 F. Supp. 2d 113, 141-142 (D.D.C. 2008), the Court found sufficient evidence to cast doubt on the credibility and the defendant's explanation for the plaintiff's non-selection where there was conflicting evidence about the selection process. Thus, the Court explained that:

> In addition to these and other factual disputes that preclude entry of summary judgment, the evidence that Capozolli had knowledge of Walker's race and EEO-related activities, the inconsistencies in the explanation of his evaluation process, and his failure to follow Defendant's evaluation procedure that requires equity in the evaluation process (if the jury were to find that Walker was not, in fact, interviewed by Capozolli), if credited, are sufficient for a reasonable jury to find that Walker was not selected because of racial discrimination or retaliation for his EEO-related activities. Accordingly, the Court shall deny Defendant's Motion for Summary Judgment as to Walker's claims of discrimination and retaliation based on his non-selection for the Mechanical Engineering Technician position.

Id. at 142 (internal footnote omitted).

The situation in this case is similar to Walker. Mr. Davenport, the selecting official, knew of Plaintiff's race and prior EEO activities. There are countless inconsistencies in the evaluation process which would allow a jury to find that Plaintiff's non-selection was because of his race and prior EEO activity.

**A.  Mr. Davenport Disliked Plaintiff Because Of His Race And Prior EEO Activity**

**1.  Mr. Davenport's Contentions About The Basis For Not Selecting Plaintiff Are Unsupported**

Mr. Davenport made the ultimate selection decision in this case.  Defendant's Exhibit 3 at 25.  However, in his decision he factored Plaintiff's race, prior EEO activity and his stereotypical notions of African-Americans.  Mr. Davenport claimed that "Wesley's experience and his performance did not make us confident that he would be able to perform at the GS-15 level."  Id. at 31.  There is simply no evidence to support this contention.

 Mr. Davenport explained that he had "heard stories from time to time about Mr. Jarmon's interaction with other people that made [him] concerned."  Defendant's Exhibit 4 at 49.  According to Mr. Davenport, these stories came primarily from the selection panel members Hillary DeNigro, Hugh Boyle and Trent Harkrader.  Id.  Despite the influence that this had on his selection decision, he could not identify any of the stories, except that he "heard that Mr. Jarmon had some sort of confrontation with Ms. DeNigro about his performance audit."  Id. at 50.  It is unimaginable that a selecting official had justified concerns about an applicant's ability to interact, yet could not recall the circumstances.

Mr. Davenport also expressed that he was "not impressed" with Plaintiff's interview including Plaintiff's explanation that he would "lead by example."  Defendant's Exhibit 4 at 47-48.  It is unclear why leading by example would not be an acceptable interview response.  According to Barclay's, "All great leaders, lead by example." See http://www.barclays.com/latitudeclub/bs_ls_ls_leading_by_example.html.  Mr. Davenport further claimed that Plaintiff's "ideas for audits make no sense" and that he is "extremely difficult to work with."  Defendant's Exhibit 3 at 28.  As discussed above, there is no evidence

that Plaintiff was difficult to work with or that he audit ideas made no sense.  In fact, the evidence is to the contrary.  See supra III.b.

Despite all of his complaints about Plaintiff's work and qualifications, Mr. Davenport testified that he had "not conducted interviews or reviews of [Plaintiff] personally."  Defendant's Exhibit 3 at 30.  Yet, he claimed that Plaintiff's performance was "adequate."  Id.  It strains the imagination to see how an individual that is not involved in personally interviewing or reviewing Plaintiff's work, could judge his qualifications and decide not to select him based on performance concerns.  Moreover, if there were performance concerns or Plaintiff's work was simply adequate, logic dictates that some written documentation would exist to support these contentions.  However, other than the self serving statements of management officials and *post hoc* subjective notions, the Defendant has presented no documentation.  Such unsupported allegations clearly evidence racial animus toward Plaintiff.

### 2.  Rather Than Consider Plaintiff's Qualifications, Mr. Davenport Based His Decision On Stereotyped Notions Of Plaintiff

The selecting official in this case, Mr. Davenport, failed to make an objective decision about Plaintiff's qualifications.  Instead, he made a decision about Plaintiff based on his stereotyped notions of African-Americans.  Although he believed Plaintiff was arrogant and difficult to get along with, Mr. Davenport had a very different perception of the white applicants.[3]  Mr. Davenport told the EEO investigator that he selected Mr. Skadin, Mr. Bentley

---

[3] Common stereotypes of African-American males include that they are "unintelligent, violent, dangerous, criminal, physically imposing, aggressive, hypersexual, ignorant, unskillful, and arrogant." D. Aaron Lacy, The Most Endangered Title VII Plaintiff?: Exponential Discrimination Against Black Males, 86 Neb. L. Rev. 552, 565 (2008); see also Floyd Weatherspoon, Remedying Employment Discrimination Against African-American Males: Stereotypical Biases Engender a Case of Race Plus Sex Discrimination, 36 Washburn L.J. 23, 34 (1996). ("[S]tereotypical biases about African-American males can be identified.  They include having sexual prowess, ignorance, lack of skill and education, violent tendencies, and arrogance.").

and Ms. Helmer because of their personality and because "[t]hey're easy to work with."
Defendant's Exhibit 3 at 27.

In contrast, Mr. Davenport testified that he had concerns about Plaintiff's attitude.
Defendant's Exhibit 4 at 43. Mr. Davenport discussed a meeting he had with Plaintiff prior to
the selection in which Plaintiff discussed "fairness" and whether he had been treated fairly. Id. at
37, 40. Mr. Davenport perceived Plaintiff's demeanor in this meeting as arrogant and very
insensitive. Id. at 38. Yet, he could recall nothing that led him to believe that Plaintiff was
arrogant. Id. at 41.

Mr. Davenport felt that Plaintiff has not been "shy about expressing his opinions in the
past." Id. at 95. Mr. Davenport complimented Plaintiff's White coworker's on their
performance, but never complimented him. Id. at 66-67. During Mr. Davenport's tenure as
manager at FCC, five individuals have been promoted to GS-15. Id. at 75. None of those
individuals were African-American. Id.

There is no evidence that Plaintiff was arrogant or difficult to get along with. Rather, the
evidence, as discussed in detail above, shows that Mr. Davenport made assumptions about
Plaintiff's personality and demeanor based on his race.[4] Mr. Davenport should not be permitted
to allow his bias against Plaintiff's race and reprisal to factor into his selection decision.

_____

[4] As explained in Jesse B. Simple, Note, Invisible Man: Black and Male under Title VII, 104 Harv. L. Rev. 749,
756-57 (1991) (internal citations omitted):

There are several possible ways to explain the discrimination against black men. Differences in cultural
styles often lead employers to conclude that black men have attitudes and personal characteristics that
conflict with a predominantly white social atmosphere. Many black men -- although certainly not all -- are
more verbally direct, expressive, and assertive than white men, who provide the standard against which
black male behavior is measured. No connection exists between black male deportment and employee
competence, yet in litigating at-will employment under title VII, employers' use of the attitude or personal-
style defense often obscures the critical question whether the black male employee failed adequately to
perform his job. The case law is revealing: one defendant employer in a title VII suit asserted that the black
male plaintiff had "an attitude problem" and a "chip on his shoulder" another case reflects complaints that a
black male employee was "hostile and accusatory" in his interactions; in yet another case, an employer

**B.  The Statements Of The Manager's Assisting Mr. Davenport In The Selection Process Evidence A Clear Distain For Plaintiff Because Of His Race And Prior EEO Activity**

The managers involved in the selection process with Mr. Davenport also allowed their preconceived notions of African-Americans to factor into their selection decisions.  Ms. DeNigro felt that Plaintiff would characterize and perceive things different from her.  Defendant's Exhibit 6 at 41.  Ms. DeNigro also claimed that providing constructive criticism to Plaintiff would have been "detrimental" and that he "resists direction from management very, very strongly."  Id. at 26.  She stated that he was angry and resentful towards management.  Id. at 31.  Nonetheless, she admitted being resentful was not a major performance concern for his position.  Id. at 39.  Moreover, despite her claim that Plaintiff was resentful and angry at management, she stated that he would "often smile at her" and that he would "smile and say hello and have pleasant conversation."  Id. at 48.

Mr. Bash believed that Plaintiff was not as collegial as the selected candidates.  Defendant's Exhibit 9 at 63.  Mr. Bash further stated that Plaintiff was not selected because of his "demeanor."  Defendant's Exhibit 10, Eric Bash Deposition at 34.  He explained that "demeanor" was a factor in his selection decision and he assumed that other managers had considered the same.  Id. at 35.  However, Mr. Bash could not identify any specific demeanor problems to which he referred.[5]

---

expressed his opinion that the black male plaintiff was a "black militant," despite a lack of evidence to that effect.  The frequency with which title VII defendants attribute negative attitudes to black men suggests that many workplace tensions are grounded in cultural conflicts.

[5] In contrast, Mr. Harkrader explained that Plaintiff was someone who "thought if there was a different way or better way to do it, he would let those feelings be known and he would let those opinions be known."  Defendant's Exhibit 8 at 44.  Mr. Harkrader further stated that, "No one ever came to me and said he's being completely unprofessional or one unprofessional in the slightest."  Id. at 45.  Mr. Harkrader also testified, "I've had a number of conversations with Wes that I actually thought were fairly friendly."  Defendant's Exhibit 7 at 77.  Even, Mr. Boyle, Plaintiff's first-line supervisor, stated that Plaintiff was "congenial." Plaintiff's Exhibit 2 at 13.

These *post hoc* justifications by the Defendant are nothing more than discriminatory animus. Ms. DeNigro acknowledged that Plaintiff was different from her in his perceptions and attempted to portray him as angry at management. However, she admitted that he would smile at her and engage in pleasant conversation. These managers involved in the selection decision believed that Plaintiff had a poor demeanor, yet none are able to present evidence to show that their belief is anything more than a stereotypical notion of how an African-American male should behave.[6]

### C. Even Plaintiff's Coworkers Recognized Management's Bias Against Him

Patricia Green, Plaintiff's coworker, explained the underlying racial bias in the office:

> I can't say that I've ever heard any racist comments from either Mr. Boyle or Mr. Davenport, but I have a suspicion that it's kind of an unconscious thing whether the reason [Plaintiff] wasn't selected is that they tend to select people they feel more comfortable with, and they don't even realize they are being discriminatory because when you look at the people who were selected, both this year and in 2004 and back in— I think it was 2003, some of them weren't even minimally qualified. So I think that if there wasn't some sort of racial bias, then Wesley would have been one of those selected.

Plaintiff's Exhibit 11, Patricia Green Interview at 118.

This unconscious bias toward Plaintiff is evident from the stereotypical ideas that the manager's involved in the selection possessed. As discussed above, without any basis the managers believed that Plaintiff was difficult to get along with and lacked qualifications. Rather than selecting on the basis of qualifications, the selections were made, as noted by Ms. Green, based on individuals that the selection officials were more comfortable with because of their race. This is evident from the statement of Mr. Davenport that he selected Mr. Skadin, Mr.

---

[6] See Simple, Invisible, supra, at 756-57.

Bentley and Ms. Helmer because of their personality and because "[t]hey're easy to work with." Defendant's Exhibit 3 at 27.

### d. The Credibility Of The Managers Involved In The Selection Is In Question

#### A. Mr. Davenport Provided Incorrect Information About The Best Qualified Candidates

Mr. Davenport testified to the EEO investigator that the panel members "unanimously agreed" on the best qualified candidates for the selection. Defendant's Exhibit 3 at 26.  However, Mr. Boyle testified that his recommended candidates were Andrew Skadin and Robert Bentley, but that "[o]ther people had came with strong support for Connie Helmer."  Defendant's Exhibit 11 at 45.  Even Ms. DeNigro admitted, "we didn't all agree on who the two best candidates were."  Defendant's Exhibit 6 at 69.  Thus, the selecting official, William Davenport, incorrectly stated that the panel had unanimously agreed about best qualified applicants.  The inaccuracies in his statement should call into question the testimony in other areas of this case.

#### B. The Testimony Of The Managers Involved In The Selection Was Corroborated And Is Therefore Unreliable Absent A Credibility Determination

The panel members conferred before providing discovery responses.  As such, their testimony is unreliable.  Mr. Harkrader admitted that he had one or two simultaneous communications with the other panel members, Ms. DeNigro, Mr. Davenport and Mr. Boyle, "in the context of preparing…interrogatory responses."  Defendant's Exhibit 8 at 9-11.  Those communications included a discussion of Plaintiff's detail to the EPA.  Id. at 64.  Mr. Bash even referenced a discussion after the selection where Plaintiff's EEO activity may have been discussed among selecting officials.  Defendant's Exhibit 10 at 31.

**e.   The Decision Making Process For The Selection Was Purely Subjective**

The Defendant failed to use objective criteria in making its selection decision.  There were no standard criteria or method of weighing criteria conveyed to the managers involved in the selection.  Nor did Mr. Davenport, the selecting official, explain the criteria he believed to be important to the other managers.  The use of subjective decision-making in this case allowed the Defendant to select less qualified white candidates.  See Watson v. Fort Worth Bank & Trust, 487 U.S. 977 (1988) (superseded in part on other grounds by the 1991 Amendments to Title VII) (defendant failed to develop precise and formal selection criteria for positions, but instead relied on the subjective judgment of white supervisors who were acquainted with the candidates and with the nature of the jobs).

In this case, as in Watson, the Defendant neglected to use a standard selection criteria, choosing instead to rely on the subjective determinations of supervisors, none of whom were African-American.  The Defendant admits that "No guideline was provided to the IHD managers directing them to consider or not consider "seniority." Plaintiff's Exhibit 1, Response to Interrogatory No. 19.   Nor was any guide "provided to the IHD managers directing them to consider or not consider "communication skills." Id. at Response to Interrogatory No 20.

The Defendant claims that "Mr. Davenport was particularly interested in the candidates' 'leadership ability, experience, creativity and ability to work with other people.'"  Defendant's Points and Authorities at 3.  The Defendant further claims that other factors considered were "the candidates' ability to meet deadlines, understanding the role of audits and the audit staff within EB, and strong written and oral communication skills." Id. at 3-4.  However, the record does not indicate that Mr. Davenport shared with the other panel members that such factors should be included in their decision making process.

Mr. Davenport, the selecting official, never told panel member Harkrader that in the selection they were looking for any particular type of skills. Defendant's Exhibit 8 at 51. According to Mr. Harkrader, he received no written or oral instruction regarding how to select the applicant. Id. at 28. He further explained that, in the interviewed conducted by Eric Bash and himself, he did not remember having any written questions that were asked of all candidates. Id. at 34. In his selection decision, Mr. Harkrader considered his own work experience with each of the candidates. Defendant's Exhibit 7 at 73-74.

Ms. DeNigro was aware that the selection process follows a formal program. Defendant's Exhibit 6 at 59. However, she stated that the selection committee "didn't have specific formal criteria. There was no checklist. There was no specific list of elements or numbered grading or lettered grading of, you know, different elements." Id. at 60. Moreover, "[t]here was no scoring process in our evaluation." Id. Ms. DeNigro further explained that seniority was considered as a selection factor, but "[s]ome people in the group would have valued it more than others." Id. at 63.

Mr. Bash was not even sure if he was formally part of an interview panel. Defendant's Exhibit 9 at 59. He selected Connie Helmer as his top choice based on her "pleasantness and demeanor." Defendant's Exhibit 10 at 22. He believed he also chose her based on her experience. Id. In assessing Plaintiff's management skills, Mr. Boyle did not take the CFO training into account. Plaintiff's Exhibit 2 at 55. Nor did Mr. Boyle give any weight in his selection decision to Plaintiff's credentials as Certified Government Financial Manager. [7] Id. at 71. Instead, he "looked at the years of service." Id.

---

[7] Nonetheless, Ms. DeNigro noted the importance of Mr. Bentley's CPA certification as a "good factor." Defendant's Exhibit 5 at 102.

It is clear that each manager had his or her own idea of what factors were important in the selection. Rather than discussing the factors, each proceeded on their own to make a determination. Some considered completely subjective factors, such as pleasantness, and some failed to consider factors at all. There can be no rational non-discriminatory justification for a selection in which there is no standardization for panel members, only subjectivity. Jones v. Mukasey, 565 F. Supp. 2d 68, 82 (D.D.C. 2008) (denying summary judgment where the employer inconsistently applied hiring criteria between the African-American plaintiff and other White applicants).

### f. The Defendant Has A Lack of African-American Employees In Professional Positions

The Defendant's underlying hiring policy directly affected Plaintiff's ability to obtain a GS-15 Auditor position. In 2004, the year in which Plaintiff submitted his application, the Defendant employed 1966 employees, 618 of whom were African-American. Plaintiff's Exhibit 12, Blacks in Government Report. However, of the 1358 total professional employees, only 125 were African-American. Id. In prior years, the percentage of African-American employees in professional positions remained relatively unchanged. Id. From 1996 through 2004, the total number of African-American's at the FCC increased by 1.7%. Id. Yet, the number of total professional employees increased its African-American professional employees by only .43%. Id. Additionally, Ann Bright, Plaintiff's coworker, explained that African-American auditors are absent at the GS-15 level. Plaintiff's Exhibit 13, Ann Bright Interview at 90. This statement was echoed by Plaintiff who noted that since he began working for the FCC in July 1987, there has never been an African-American GS-15 Auditor in the Enforcement Bureau. Plaintiff's Exhibit 4. The history of hiring shows disparate treatment of Plaintiff and the lack of a nondiscriminatory justification for not hiring him.

### g. The Defendant Proffers Insufficient Justification For Denying Plaintiff Awards

Plaintiff was also subjected to disparate treatment by receiving lesser awards than his White counterparts. During the time period from December 1, 2002 through December 31, 2004, Plaintiff received 32 hours of Time-Off Awards. Plaintiff's Exhibit 14, List of Monetary and Time-Off Awards. In stark contrast, Ms. Helmer received 104 hours of Time-Off Awards during the same time period, Mr. Bentley received 80 hours of Time-Off Awards and Mr. Skadin received 72 hours of Time-Off Awards. Id.

Similarly, during that time period, Andy Skadin received cash awards that totaled $1300.00, Robert Bentley received cash awards that totaled $1200.00 and Connie Helmer received cash awards that totaled $900.00. Id. However, Plaintiff received cash awards that totaled only $600.00. Id.

According to the Defendant, Plaintiff's awards were "average." Defendant's Points and Authorities at 28. Clearly, there was nothing average about a Time-Off Award that was 40 hours less than the award to Mr. Skadin and more than 70 hours less than the award to Ms. Helmer. Moreover, Ms. DeNigro attempted to explain that Plaintiff had gotten lower awards "than some people and probably more than others." Defendant's Exhibit 5 at 106. Ms. DeNigro's estimate was overstated. Plaintiff received cash awards of $600 from December 1, 2002 through December 31, 2004. Plaintiff's Exhibit 14. Of the 19 individuals in the division that received awards, only one received a lesser award than Plaintiff. Id.

Furthermore, the Defendant claims that "[b]onuses and awards were agreed upon yearly, by the managers collectively." Defendant's Points and Authorities at 28. As discussed above, Plaintiff's managers harbored discriminatory animus against him. The decision to award him substantially less than his coworkers was based on improper motives.

**CONCLUSION**

The Defendant's discriminatory and retaliatory animus toward Plaintiff is evidenced by its baseless decision not to select him for the GS-15 Auditor position. Despite Plaintiff's superior qualifications, the Defendant attempted to justify its decision not to select Plaintiff by raising countless performance related concerns. However, there is a genuine dispute of fact regarding the performance issues allotted to Plaintiff by the Defendant. Not only does Plaintiff dispute that he had any performance problems, but even more telling is the lack of documentation to support the Defendant's allegations. Federal government agencies are well known for documenting conduct and performance problems in the workplace. Despite this common standard, the Defendant can present no documentation of Plaintiff's alleged deficiencies.

Moreover, rather than evaluating the applicants on objective standardized criteria; the managers involved in the selection substituted their own subjective idealizations and experience with applicants. Such subjectively allowed for managers to interject their own underlying or outright biases against African-Americans into the selection process. This is precisely the reason that subjective selection processes have been rallied against by the Courts.

The Defendant's justification and rational for denying Plaintiff a position for which he was one of the best qualified applicants is highly suspect and disputed. The dispute in this matter is not trivial and is supported by citations to the record and substantive evidence. The question of the Defendant's true motive for Plaintiff's non-selection is one of fact and credibility, which should not be disregarded in a summary manner.

The Defendant's Motion for Summary Judgment should be denied in its entirety and this matter should proceed to hearing.

Respectfully Submitted,

_____/s/ Gary M. Gilbert_____ __
GARY M. GILBERT, ESQ.  #MD15808
Attorney for Plaintiff

Law Office of Gary M. Gilbert & Associates
8401 Colesville Road, Suite 300
Silver Spring, Maryland  20910
Phone (301) 608-0880; Facsimile (301) 608-0881
Email gary@ggilbertlaw.com


_____/s/ Benjamin E. Wick_____ __
BENJAMIN E. WICK, ESQ. CO Bar #39762
Attorney for Plaintiff

Law Office of Gary M. Gilbert & Associates
8401 Colesville Road, Suite 300
Silver Spring, Maryland  20910
Phone (301) 608-0880; Facsimile (301) 608-0881
Email bwick@ggilbertlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Plaintiff's Memorandum of Points and Authorities in

Opposition to the Defendant's Motion for Summary Judgment was forwarded electronically on

June 25, 2009 to:

HONORABLE EMMET G. SULLIVAN

ROBIN M. MERIWEATHER
Assistant United States Attorney




                    /s/  Benjamin E Wick
            Benjamin E. Wick, Esq.
            On behalf of Gary Gilbert, Esq.
            Law Office of Gary M. Gilbert & Associates
            8401 Colesville Road, Suite 300
            Silver Spring, Maryland  20910
            Phone (301) 608-0880; Facsimile (301) 608-0881

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

WESLEY M. JARMON, JR.,          )

                               )

          Plaintiff,         )

                               )

          v.               )        Civil Action No. 06-1852 (EGS)

                               )

MICHAEL J. COPPS, Acting Chairman,  )

Federal Communications Commission,   )

                               )

          Defendant.       )

_____ )

## **ORDER**

Upon consideration of the Plaintiff's Memorandum of Points and Authorities in Opposition to

the Defendant's Motion for Summary Judgment it is this _____ day of _____,

ORDERED that Defendant's Motion for Summary Judgment be and hereby is DENIED.


SO ORDERED.


_____

United States District Judge

**Exhibits for Plaintiff's Statement of Material Facts for Which There is a Genuine Dispute and Plaintiff's Memorandum of Points and Authorities in Opposition to the Defendant's Motion for Summary Judgment**

**<u>Plaintiff's Exhibits:</u>**

Plaintiff's Exhibit 1, Defendant's Responses to Plaintiff's Interrogatory Requests.

Plaintiff's Exhibit 2, Hugh Boyle Deposition.

Plaintiff's Exhibit 3, Wesley Jarmon Application for Vacancy Announcement No. 04-153TJ, Auditor, GS-0511-15.

Plaintiff's Exhibit 4, Wesley Jarmon Affidavit.

Plaintiff's Exhibit 5, Certified Financial Officer Fellowship Agreement.

Plaintiff's Exhibit 6, Wesley Jarmon Performance Evaluations.

Plaintiff's Exhibit 7, Constance Helmer Application for Vacancy Announcement No. 04-153TJ, Auditor, GS-0511-15.

Plaintiff's Exhibit 8, Andy Skadin Application for Vacancy Announcement No. 04-153TJ, Auditor, GS-0511-15.

Plaintiff's Exhibit 9, Wesley Jarmon Interview.

Plaintiff's Exhibit 10,  Letter of Recommendation from Hugh Boyle.

Plaintiff's Exhibit 11, Patricia Green Interview.

Plaintiff's Exhibit 12, Blacks In Government Report.

Plaintiff's Exhibit 13, Ann Bright Interview.

Plaintiff's Exhibit 14, List of Monetary and Time-Off Awards.

**Exhibits from Defendant's Statement of Material Facts for Which There Is a Genuine Dispute and Defendant's Memorandum of Points and Authorities in Support of Motion for Summary Judgment[8]**

<u>**Defendant's Exhibits:**</u>

Defendant's Exhibit 1, Noelle Green Declaration.

Defendant's Exhibit 2, Erlinda Miller Declaration.

Defendant's Exhibit 3, William Davenport Interview.

Defendant's Exhibit 4, William Davenport Deposition Transcript.

Defendant's Exhibit 5, Hillary DeNigro Interview.

Defendant's Exhibit 6, Hillary DeNigro Deposition Transcript.

Defendant's Exhibit 7, Trent Harkrader Interview.

Defendant's Exhibit 8, Trent Harkrader Deposition Transcript.

Defendant's Exhibit 9, Eric Bash Interview.

Defendant's Exhibit 10, Eric Bash Deposition Transcript.

Defendant's Exhibit 11, Hugh Boyle Interview.

Defendant's Exhibit 12, Hugh Boyle Deposition Transcript.

Defendant's Exhibit 13, Wesley Jarmon Deposition Transcript.

Defendant's Exhibit 14, Wesley Jarmon Interview.

Defendant's Exhibit 15, Emails.

Defendant's Exhibit 16, 7/27/04 Memo from Wesley Jarmon.

Defendant's Exhibit 17, EEO Complaint.

---

[8] The list of Defendant's exhibits is being provided as a reference since Plaintiff cites to Defendant's exhibits throughout his submissions.