## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **WESLEY M. JARMON, Jr.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 06-1852 (EGS)** |
| | ) | |
| **JULIUS GENACHOWSKI, Chairman,** | ) | |
| **Federal Communications Commission,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____ )

### REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### SUMMARY OF ARGUMENT

William Davenport selected Robert Bentley, Constance Hellmer, and Andy Skadin for GS-15 Auditor positions in the Investigations and Hearings Division of the FCC's Enforcement Bureau because they were the three best qualified applicants. Bentley, Hellmer, and Skadin's qualifications, relevant skills, and performance in the interviews were superior to those of Plaintiff Wesley Jarmon (hereafter "Jarmon") and the other applicants. Neither the individuals on the rating panel which prepared the best qualified list from which Mr. Davenport made his selection nor the four other supervisors who interviewed the candidates believed that Jarmon was one of the three best candidates. Instead, they all shared Mr. Davenport's assessment of Jarmon's relative qualifications.

To successfully challenge that selection decision, Jarmon must show that he was "significantly" or "markedly" more qualified than the selectees. Hendricks v. Geithner, 568 F.3d 1008, 1012 (D.C. Cir. 2009). Although Jarmon's qualifications were good enough to be one of the five applicants interviewed for the position, he offers nothing but his unsupported, subjective

opinion that he was one of the top three applicants.  There is no evidence that any manager or supervisor believed Jarmon to be one of the top three candidates, or that Jarmon's qualifications were so markedly superior to those of the selectees that he should have been selected.  Nor is there any direct or circumstantial evidence that Jarmon's race or prior EEO activity was the real reason for the selection decision, that Mr. Davenport or other managers have fabricated their rationale, or any other indication that Defendant's explanation for the selection decision is a pretext for race discrimination or retaliation.  Therefore, no reasonable finder of fact could attribute Jarmon's non-selection to race discrimination or retaliation, and summary judgment should be entered in favor of Defendant.  See Adeyimi v. District of Columbia, 525 F.3d 1222, 1227-28 (D.C. Cir. 2008).

There is no material factual dispute regarding the selectees' qualifications, although Jarmon vehemently tries to suggest otherwise.  Jarmon simply disagrees with the conclusion that Defendant has drawn from those undisputed facts — i.e., he believes he should have been deemed superior to Skadin and Hellmer.  However, Title VII plaintiffs "ha[ve] the duty to put forth evidence of discrimination, not to quibble about the candidates' relative qualifications." Chappelle-Johnson v. Bair, 574 F. Supp. 2d 103, 109 (D.D.C. 2008). Yet Jarmon quibbles at great length about the selecting official's assessment of the candidates' relative qualifications, and debates the significance of minor differences in the selectees' work experience and skills. Those fine distinctions between the candidates' qualifications do not demonstrate that Hellmer and Skadin were less qualified than Jarmon for the position, much less that they were significantly less qualified, and therefore do not suggest a discriminatory motive.

A large portion of Jarmon's opposition memorandum purports to rebut arguments that Defendant has not raised — namely that Jarmon allegedly was an 'angry black male' employee

2

with severe disciplinary and performance problems who was not remotely qualified for any GS-15 position.  Jarmon then claims that these rationales (which Defendant has not proffered to justify its selection decision) are pretextual, and that the underlying material facts are disputed.  However, Defendant has not argued that Jarmon was unqualified, 'angry' and hostile, or that his past performance was uniformly subpar.  Instead, Defendant explained that Jarmon was qualified for the position, but the three selectees were better qualified.  See Defendant's Motion for Summary Judgment ("Def. MSJ") at 16-19.  The managers' discussion of Mr. Jarmon's weaknesses simply illustrates how Jarmon's past performance compares to that of the selectees.

Jarmon also fails to identify any probative evidence from which a reasonable finder of fact could infer that Mr. Davenport and the other supervisors have fabricated their rationale for selecting Bentley, Hellmer, and Skadin or deliberately misstated Jarmon's qualifications. The managers do not contradict their own testimony, but consistently explain their individual assessment of Jarmon and the selectees.  While the managers did not all agree with every element of other managers' assessments — for example, Mr. Davenport appears to have believed that Hellmer was the second-best applicant whereas Mr. Boyle believed that Skadin was the second-best applicant — none of the managers considered Jarmon one of the top candidates. They offered clear and consistent explanations concerning their impressions of Jarmon, and Jarmon's subjective belief that those opinions are incorrect does not create a genuine issue for trial.  Therefore, the race discrimination claim fails as a matter of law.

Jarmon's retaliation claim suffers the same defect.  The record supports Mr. Davenport's legitimate non-discriminatory reason for selecting Bentley, Hellmer, and Skadin — Jarmon was not significantly more qualified than the selectees and his skills were, at best, close to Hellmer and Skadin's.  Even if Mr. Davenport knew about Jarmon's EEO activity (and he did not), that

3

prior EEO activity was not sufficiently close in time to the selection decision to support an

inference of retaliation.  Jarmon's other arguments do not cast doubt on the Defendant's rationale

or the witnesses' credibility.  Therefore the retaliation claim should also be resolved in favor of

Defendant.

Finally, Jarmon has not carried his burden of establishing that his race was the real reason

that he received lower performance and time-off awards than Skadin and Hellmer.  Defendant

has explained that such awards were reflective of and dependent upon individuals' work

performance, and that Jarmon's awards were consistent with his performance at the relevant time

period.  Jarmon produces no evidence which contradicts that explanation, and instead relies on

speculative and conclusory statements attacking Defendant's motives.  However, unsubstantiated

opinions do not permit a reasonable finder of fact to attribute the awards to anything other than

merit, much less to Jarmon's race or prior EEO activity.

## **ARGUMENT**

I.     **THE FCC DEEMED THE SELECTEES MORE QUALIFIED THAN JARMON
       AND NO REASONABLE FINDER OF FACT COULD CONCLUDE THAT
       JARMON'S RACE WAS THE REAL REASON FOR THAT DECISION.**

   **A.  Jarmon Has Neither Rebutted Defendant's Assessment of The Candidates'
        Relative Qualifications Nor Created A Material Factual Dispute On That Issue.**

This is a case in which the Agency was required to choose among several qualified

candidates for a GS-15 Auditor position, and exercised its business judgment and discretion to

decide who would best perform that job.  See Def. Exh. 5, DeNigro Interview at 101.  Although

Jarmon was one of the five candidates whose qualifications made him eligible to be interviewed

for the position, his resume, past performance, and performance in the interview did not establish

that he was one of the three most highly qualified applicants.  Therefore, William Davenport (the

selecting official) promoted Robert Bentley, Andy Skadin, and Constance Hellmer, and did not

choose Jarmon.  The other four managers who interviewed candidates and reviewed their

application materials shared Mr. Davenport's assessment of Jarmon's relative qualifications;

none of them believed that Jarmon was one of the top three candidates.  <u>See</u> Def. Exh. 4,

Davenport Depo. at 28;  Def. Exh. 12, Boyle Depo. at 43; Def. Exh. 8, Harkrader Depo. at 39-40;

Def. Exh. 5, DeNigro Interview at 103; Def. Exh. 10, Bash Depo. at 22.  They all testified that

race played no role in the selection process.  <u>See</u> Def. Exh. 3, Davenport Interview at 31; Def.

Exh. 5, DeNigro Interview at 103; Def. Exh. 11, Boyle Interview at 51; Def. Exh. 7, Harkrader

Interview at 81; Def. Exh. 9, Bash Interview at 110-11.

The managers' assessment of Jarmon's relative qualifications was consistent with the

rating panel's review of Jarmon's application package.  That panel was comprised of a group of

three individuals different from the managers who conducted the interviews.  <u>See</u> Def. Exh. 1,

Green Decl., Attachment C.  The panel reviewed the applications before any interviews were

conducted, and ranked Jarmon below the three selectees.  Specifically, the rating panel graded

Jarmon's application 91/100, in contrast to Bentley's 96/100, Hellmer's 96/100, and Skadin's

92/100.  <u>See</u> Def. Exh. 1, Green Decl., Attachment C.

This Court has recognized that where, as here, a plaintiff contests a promotion decision in

which the agency must select among several qualified employees,

> the D.C. Circuit has articulated more detailed standards that specify what a
> plaintiff must demonstrate in order to create a sufficient inference of
> discrimination in this last step of the framework. . . . [I]f a plaintiff attempts to
> create an inference of discrimination by arguing that he was better qualified for
> the position than the chosen applicant, "the qualifications gap must be great
> enough to be inherently indicative of discrimination." Specifically, the evidentiary
> record must demonstrate that the plaintiff was "markedly more qualified" or
> "substantially more qualified" than the chosen applicant. *Id.; see also Young,* 457
> F.Supp.2d at 20 (requiring plaintiff to show that her credentials were "starkly

> superior" or that she was "substantially more qualified"). In addition, a "plaintiff's
> subjective assessment of her own qualifications and performance cannot serve to
> establish pretext under the law."

Harris v. Chao, 480 F. Supp. 2d 104, 109-110 (D.D.C. 2007); see also Hendricks, 568

F.3d at 1012.

Jarmon cannot satisfy that stringent test.  He concedes that Bentley, Hellmer, and Skadin

were qualified for the GS-15 position, but argues that he was more qualified than Hellmer and

Skadin (but not Bentley).[1]  See Def. Statement of Material Facts ¶¶ 23-25; Def. Reply in

Support of Statement of Material Facts ¶¶ 23-25.  Jarmon cites no evidence that any other

manager or supervisor believed he was substantially more qualified for a GS-15 position than

Hellmer or Skadin, because there is none.  Instead, he relies on his own assessment of how his

skills and experience compare to these individuals'.  Jarmon's own assessment of his

qualifications falls far short of the showing necessary to proceed to trial on a race discrimination

claim.

### 1.  No Reasonable Finder of Fact Would Conclude That Jarmon Was Significantly More Qualified Than Skadin.

Skadin was a superior candidate to Jarmon because Skadin had substantial

leadership experience, experience with different types of audits, was most familiar with

the FCC's audit process, had done well leading teams in other audit projects, did an

"excellent job" on recent audits, and worked very well with people.  Def. MSJ at 15

---

[1]  Jarmon does not challenge Bentley's selection, and instead concedes that Bentley was more qualified than he.  Accordingly, Plaintiff's claims of discrimination and retaliation with respect to Bentley should be deemed abandoned.  See Iweala v. Operational Technologies Services, Inc. --- F.Supp.2d ----, 2009 WL 2045531 at *3 (D.D.C. 2009) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

(citing testimony).  Jarmon claims to have been better than Skadin in three respects: (1)
he allegedly supervised more employees than Skadin; (2) Jarmon was a certified financial
manager whereas Skadin was not; and (3) Skadin allegedly lacked leadership and
technical experience similar to Jarmon's.  Those alleged distinctions do not establish that
Jarmon was better qualified, let alone substantially more qualified, than Skadin.

First, the number of employees that Skadin had supervised in the past did not
make his supervisory experience significantly or markedly inferior to Jarmon's.  Mr.
Davenport sought candidates who had leadership ability, experience, creativity, and an
ability to work with other people.  Def. Exh. 3, Davenport Interview at 26.  Skadin's past
supervisory performance at the FCC demonstrated that he had both leadership ability and
supervisory experience.  Def. Exh. 1, Green Decl. Attachment F, pp. 63-69.  He
supervised employees in connection with the Audits Branch Time Reporting audits,
Audits Branch Telemessaging audits, the CAM audit review process (which involved
supervising CAM audit teams), and the Carrier Reporting Compliance Audit.  See id. at
63-67.  In addition, Skadin was project leader for the Cost Allocation Manual audit
review program, which required him to supervise 3 staff auditors, and was the auditor-in-
charge for several audits of telephone companies' compliance with FCC rules and
regulations.  See id. at 69.

Jarmon's assumption that the number of employees that a person supervises is a
proxy for the value of that supervisory experience merely reflects his subjective opinion
of what would make an applicant a strong candidate; notably, none of the managers
expressed a similar opinion.  Nor is there any evidence that supports Jarmon's
assumption that the fact that Skadin's supervisory experience involved teams of four or

fewer employees, whereas Jarmon allegedly supervised as many as 12 auditors,[2] somehow diminishes the relevance of Skadin's experience or makes Skadin less qualified than Jarmon.

Furthermore, Skadin's resume demonstrates that he had more extensive supervisory experience than Jarmon.  Skadin had supervisory duties on at least six audits, throughout his FCC employment, whereas Jarmon's resume lists only two audits in which he had a lead or supervisory role.[3]  Compare Def. Exh. 1, Greene Decl. Attachment F pp. 63-69 (Skadin) with Pltf. Exh. 3 at Def. 000504.).  Weighing the relative value of Skadin's supervisory experience against Jarmon's is the type of discretionary decision that courts should not second-guess.  See Barnette v. Chertoff, 453 F.3d 513, 517 (D.C. Cir. 2006) ("Courts must defer to the employer's decision as to which qualities required by the job . . . it weighs more heavily."); Youssef v. FBI, 541 F. Supp. 2d 121, 149 (D.D.C. 2008) (citing additional cases).

Jarmon's subjective belief that his educational background made him a significantly stronger candidate than Skadin also lacks evidentiary support.  Both Jarmon and Skadin had bachelor's degrees, and Skadin had a Bachelor's degree in accounting. See Def. Exh. 1, Green Decl., Attachment F. p. 71; Pltf. Exh. 3 at Def. 000498.  The position did not require a master's degree or CPA — which neither Jarmon nor Skadin

---

[2] Jarmon's resume states that he supervised a staff of 8 accountants, not 12.  See Pltf. Exh. 3 at Def. 000504.
[3]  Although Jarmon was the lead auditor on the Saddleback audit, that did not involve supervising other employees, as he was the sole auditor assigned to that audit.  See Def.Exh. 12, Boyle Depo. at  82-83.

possessed.[4]  See Def. Exh. 1, Green Decl., Attachment F pp. 71, 90; id. Attachment B

(Vacancy Announcement).  Further, Jarmon has conceded that Skadin was qualified for

the position.  Def. SOMF ¶ 23; Def. Reply SOMF ¶ 23.  Although Jarmon was a certified

financial manager, neither Mr. Davenport nor any of the other managers identified that as

a relevant credential, let alone a credential that would make Jarmon markedly superior to

an applicant who was not a certified financial manager.  See Def. Exh. 12, Boyle Depo. at

51-53 (explaining that financial management was fundamentally different from the audit

function, and involved a distinct skill set).  Therefore, being a certified financial manager

does not make Jarmon better qualified than Skadin. See generally Smith v. Napolitano,

__ F. Supp. 2d __, 2009 WL 1740520 (D.D.C. June 22, 2009) (concluding fact that

employee had college degree did not make him superior to selectee who lacked that

degree because degree was not required for position and the selectee was otherwise at

least as qualified as the plaintiff).

Jarmon professes to have more leadership and technical experience than Skadin,

but fails to cite specific facts in the record to substantiate that opinion.  As discussed

supra, Skadin had a supervisory role on at least six audits, whereas Jarmon has identified

only two audits in which he supervised others.  Further, Skadin served as Acting Branch

Chief — a leadership position that Jarmon never held.  See Def. Exh. 1, Greene Decl.

Attachment F. p. 100-01.  Both applicants listed a variety of technical auditing experience

on their applications.  Compare Def. Exh. 1, Greene Decl. Attachment F pp. 63-69, 75-80

(Skadin) with id. pp.89-99 (Jarmon). While Jarmon may believe that his own skills were

---

[4]  It is unclear why Jarmon faults Skadin for lacking an advanced degree, considering that
Jarmon himself does not have one.  See Opp. at 14.

better than Skadin's, that opinion neither creates a material factual dispute nor suggests

that Defendant's rationale for selecting Skadin is pretextual.  See Harding v. Gray, 9 F.3d

150, 154 (D.C. Cir. 1993) (absent record support "a mere unsubstantiated allegation of

superior qualifications creates no genuine issue of fact and will not withstand summary

judgment"); Gross, 599 F. Supp. 2d at 31 (explaining that management's perception is

relevant, not plaintiff's); Washington v. Chao, 577 F. Supp. 2d 27, 44 (D.D.C. 2008)

(plaintiff's subjective assessment of his own skills is "largely irrelevant" and does not

create an inference of pretext).

   Finally, Jarmon's attack on Skadin's selection ignores Skadin's other relative

strengths.  The ability to work well with others and with management was one of the

skills the managers discussed when evaluating candidates, and the Vacancy

Announcement listed oral communication skills as a qualifying criterion.  See Def. Exh.

4, Davenport Depo. at 31-32; Def. Exh. 1, Green Decl., Attachment B.   See Def. Exh.

12, Boyle Depo. at 44-45 (describing Skadin as "one of the best in the group" at dealing

with other people"); Def. Exh. 5, DeNigro Interview at 102 (noting that Skadin "works

very well with people with different sorts of personalities").  The managers had varying

degrees of concern regarding Jarmon's ability to interact well with others.  See Def. Exh.

4, Davenport Depo. at 49-53; Def. Exh. 8, Harkrader Depo. at 43-44; Def. Exh. 6,

DeNigro Depo. at 32.  In contrast, no manager expressed any concerns about Skadin's

ability to work well with management and other employees.  Indeed, the managers

praised Skadin for that skill.  Jarmon, in contrast, admits that his outspokenness made

him "not a favorite" in the group. Def. Exh. 16, Memo from W. Jarmon, at 3.  And

Harkrader noted that Jarmon could be difficult to get along with.  See Def. Exh. 8, Harkrader Depo. at 43-44.

Whereas Jarmon had refused to perform an audit task that he was assigned, see Def. Exh. 13, Jarmon Depo. at 59-61, no manager described any similar incident involving Skadin.  In addition, Skadin's recent performance was excellent.  See Def. Exh. 12, Boyle Depo. at 44-45.  In sum, Skadin's superior interpersonal skills and excellent performance easily tipped the scales to make him a more desirable candidate for promotion than Jarmon, and the Court should defer to Defendant's assessment of his qualifications.  See Barnette, 453 F.3d at 517.

### 2. No Reasonable Finder of Fact Would Conclude That Jarmon Was Significantly More Qualified Than Hellmer.

Hellmer was a superior candidate to Jarmon because she had demonstrated strong organizational skills, was a good leader, and had "personal initiative and [a] self-starting . . .work ethic," and an ability to keep projects on track and pay attention to deadlines.  Def. Exh. 5, DeNigro Interview at 101; see Def. Exh. 7, Harkrader Interview at 74-75; Def. Exh. 11, Boyle Interview at 45; Def. Exh. 4, Davenport Depo. at 29, 31.  She also performed very well in the interview.  See Def. Exh. 11, Boyle Interview at 46.  Jarmon claims to have been superior to Hellmer in two respects: (1) he was a certified financial manager; and (2) he had 7 more years experience at the FCC.  Jarmon also contends that the managers' allegedly disparate assessments of Hellmer's qualifications, and Hellmer's failure to make the best qualified list for a GS-15 position advertised in 2002, demonstrates that he was more qualified than Hellmer.  None of those allegations suggest that Jarmon was a markedly superior candidate to Hellmer.

Being a certified financial manager did not make Jarmon more qualified than Hellmer, much less markedly more qualified. As explained supra, financial management was not a qualifying skill identified in the vacancy announcement, and it involves a different skill set than the audit work performed in the FCC's Investigations and Hearings Division. See Def. Exh. 12, Boyle Depo. at 51-53; See Def. Exh. 1, Green Decl., Attachment B. Jarmon's subjective opinion that being a certified financial manager made him a superior candidate for the position neither draws Hellmer's selection into question nor creates a material factual dispute. See Chao, 577 F. Supp. 2d at 44.

Jarmon's longer tenure at the FCC also did not make him significantly more qualified than Hellmer. Courts do not assume that a candidate with more years of experience at an agency is inherently more qualified than an employee with less seniority. See Stewart v. Ashcroft, 352 F.3d 422, 430 (D.C. Cir. 2003) (holding that courts should refuse to independently assess the significance of small differences in candidates' experience such as their length of service at the agency); Harris, 480 F. Supp. 2d at 110 (rejecting argument that plaintiff was more highly qualified because he had more years of experience than selectee). Neither Mr. Davenport nor the other managers stated that an applicant's tenure at the FCC was a dispositive factor when evaluating the candidates for the position, and the vacancy announcement does not state that this is a seniority-based position. See Def. Exh. 1, Green Decl., Attachment B; Def. Exh. 3, Davenport Interview at 26; Def. Exh. 6, DeNigro Depo. at 62 (noting that seniority was a factor that the managers valued to varying degrees). Moreover, Hellmer had more experience in the Investigations and Hearings Division, and more experience working with the managers who conducted the interviews. See Def. Exh. 7, Harkrader Interview at 74-75. At least one manager felt that seniority within the division was more relevant than seniority within the agency. See

12

Def. Exh. 8, Harkrader Depo. at 62.  The fact that Hellmer had more relevant experience than

Jarmon more than compensated for her slightly shorter tenure at the FCC.  See Harris, 480 F.

Supp. 2d at 110.

      The interviewers' description of Hellmer's skills does not call her qualifications into

question.  Hellmer clearly had leadership skills; she was team leader for two Universal Service

Fund audits.  See Def. Exh. 1, Green Decl. Attachment F. pp. 53, 58; Def. Exh. 4, Davenport

Depo. at 28-31.  She also had expressed ideas about the future of the audits group and was

engaged with management.  See Def. Exh. 4, Davenport Depo. at 29, 31.  Those were both

highly relevant skills.  See id. at 31-32; Def. Exh. 1, Green Decl., Attachment B.  Although Mr.

Harkrader thought that Jarmon was "critical in his analysis" to a different degree than Hellmer,

see Def. Exh. 8, Harkrader Depo. at 63, he testified that Hellmer was superior to Jarmon in other

ways — she met deadlines and as a team leader she was good at getting the people who worked

for her to meet deadlines.  See id. at 61.

      Ms. DeNigro identified several strengths beyond Hellmer's ability to meet deadlines, and

Jarmon's assertions to the contrary conflict with the evidence of record.  Ms. DeNigro explained

that Hellmer

> was a good candidate because she had really superior organizational skills and
> superior initiative to many of the other candidates.  She was really a self-starter,
> extremely eager, very hard worker, accomplished a lot in short periods of time,
> met deadlines well, was someone whose oral skills [supervisors] relied on in the
> division to interact with people outside the division, including people inside the
> Agency and outside the Agency.

Def. Exh. 6, DeNigro Depo. at 81.

      Mr. Boyle's testimony does not support Jarmon's contention that he was more qualified

than Hellmer. Mr. Boyle did not elaborate upon Ms. Hellmer's qualifications in his deposition,

and his belief that Bentley and Skadin were significantly more qualified than the other applicants says nothing about how Hellmer's qualifications compared to Jarmon's. In fact, Mr. Boyle did not focus on comparing Jarmon, Hellmer, and Green's relative qualifications, because he focused on identifying his top two candidates. Def. Exh. 12, Boyle Depo. at 73. Further, Mr. Boyle acknowledged that other managers were impressed with Hellmer's attention to detail and ability to meet deadlines, and thought that those skills would make her a good team leader. Id. at 74. He also noted that Hellmer "probably did the best job of anybody . . . in the interview process." Id.

The slight variances among the managers' assessment of Hellmer's relative strengths highlights the fact that they had to make a judgment call and weigh each candidate's qualifications for the job. See generally Def. Exh. 6, DeNigro Depo. at 67-69 (explaining that the managers discussed each person's pro's and con's, skills, and experience). Mr. Davenport and at least one other manager deemed Bentley and Hellmer the two best candidates, and Mr. Boyle deemed Bentley and Skadin the two best candidates. See id. at 69; Def. Exh. 12, Boyle Depo. at 63. Notably, no one deemed Jarmon one of the top two or three candidates. Thus, regardless whether Hellmer was superior to Skadin, or vice versa, the managers' testimony in no way suggests that Jarmon was superior to Hellmer.

Hellmer's failure to make the best qualified list for a GS-15 position advertised in 2002 has no bearing on her qualifications for the GS-15 position at issue here. The rating panel that reviewed applications for that vacancy could have had any number of reasons for declining to place Hellmer on the best qualified list; each vacancy is different, and there is no evidence that the applicant pool was identical, or that the skills necessary for that position mirrored the skills for the GS-15 position at issue here. Furthermore, Hellmer performed at a very high level during

the two years between that selection decision and her application for the position at issue here.

Indeed, her performance between May 1, 2002 and April 30, 2003 earned her a quality step

increase and performance award, and she received a time-off award on August 10, 2003 for

demonstrating initiative. See Def. Exh. 1, Green Decl., Attachment F pp. 47-48. Those recent

accomplishments made her a strong candidate for the GS-15 position advertised in 2004. See

generally Def. Exh. 4, Davenport Depo. at 28-31 (discussing Hellmer's leadership skills and

performance).

    In sum, Jarmon has failed to establish that he was significantly more qualified than

Hellmer. As Ms. DeNigro explained, "the candidates had different strengths and weaknesses.

[The supervisors] were unable to promote everybody . .. [and] had to pick the candidates that

[they] thought were most likely to have the qualities [the supervisors] were looking for." Def.

Exh. 5, DeNigro Interview at 101. Neither Mr. Davenport nor any other manager deemed

Jarmon more qualified than Hellmer. While Jarmon may disagree with that assessment, the

record makes it clear that there was not a "qualifications gap . . .great enough to be inherently

indicative of discrimination." Adeyimi, 525 F.3d at 1227; Chao, 480 F. Supp. 2d at 104. At

best, the evidence construed in the light most favorable to Jarmon arguably shows that their

"comparative qualifications are close." Adeyimi, 525 F.3d at 1227. In that situation, "a

reasonable jury would not usually find discrimination," and instead would "assume that the

employer is more capable of assessing the significance of small differences in the qualifications

of the candidates, or that the employer simply made a judgment call." Id. The Court should

reach the same conclusion here.

### 3. No Reasonable Finder of Fact Would Find Defendant's Explanation of the Selection Decision Pretextual.

Perhaps recognizing that he cannot show that his qualifications were markedly superior to the selectees', Jarmon tries to manufacture a factual dispute by challenging the managers' assessment of his performance. Specifically, he claims that the shortcomings that Mr. Davenport and others identified are not documented in his performance appraisals, and disputes the conclusions that the managers drew from his past conduct and performance, and then posits that this raises an inference of pretext. That argument is flawed in several respects. First, it mischaracterizes Defendant's rationale for the selection. Second, it is based on the mistaken premise that the managers' opinion of Jarmon's performance and skills must be corroborated by extrinsic evidence. Third, it ignores the record evidence that supports the managers' assessments. Fourth, this line of argument ignores the other ways in which the selectees were superior to Jarmon.

### a. Jarmon Mischaracterizes Defendant's Rationale For Selecting Bentley, Hellmer, and Skadin.

Reading Jarmon's opposition would lead one to believe that Defendant justified the selection by stating that Jarmon was an employee who was not remotely qualified for a GS-15 auditor position because he had very serious performance problems, absolutely no leadership skills or experience, and no ability to interact with others. However, Defendant admits that Jarmon was qualified for the position, see Def. MSJ at 21. When resolving this motion, the Court must assess the legitimate non-discriminatory reason that Defendant has proffered, not phantom justifications manufactured by Jarmon.

Defendant has repeatedly and consistently explained that the managers had to choose among several qualified candidates, and that their selection decision simply reflects their belief

that Bentley, Hellmer, and Skadin were better candidates than Jarmon.  To the extent that the managers discussed Jarmon's weaknesses, that simply illustrated the areas in which he was less qualified than the selectees, and the reasons that the managers might be more reluctant to promote Jarmon over Bentley, Skadin, and Hellmer.  Those critiques were a response to Jarmon's claim that he was better qualified than the selectees.  <u>See, e.g.</u>, Def. Exh. 3, Davenport Interview at 27-30 (describing reasons for selecting the other candidates and raising criticisms of Jarmon's performance only in response to question regarding Jarmon's assertion that he was a stronger candidate than the selectees).  In other words, Mr. Davenport and the other managers involved in the selection process focused primarily on what made Bentley, Skadin, and Hellmer the best candidates, <u>not</u> on what made Jarmon a bad candidate.

> **b. Defendant Was Not Required To Document The Concerns About Jarmon's Ability To Perform As A GS-15 Auditor In His Perfomance Appraisals Or Any Other Record.**

Jarmon's repeated assertion that there is "no evidence" regarding the weaknesses in his performance and skills improperly discounts the managers' deposition and EEO testimony.  "Affidavits and deposition testimony are cognizable forms of evidence at summary judgment, and are therefore entitled to consideration."  <u>Harris</u>, 480 F. Supp. 2d at 110 n.2 (citing <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 247 (1986).  Therefore, a "defendant is not required to provide additional corroboration of [the managers'] statements," through performance evaluations or any other document.  <u>Id.</u>

Further, the fact that Jarmon received a "pass" on his performance evaluations and was never formally disciplined does not contradict any of the managers' testimony regarding his relative weaknesses.  First, the lack of any formal disciplinary actions is irrelevant, because none of the supervisors testified that Jarmon's performance was so poor that he should have been

disciplined.  Mr. Davenport concluded that Jarmon's performance was "adequate."  See Def.

Exh. 3, Davenport Interview at 30.  Nor is there any inconsistency between Jarmon's

performance ratings and the managers' assessment of his skills.  Jarmon was graded on a

pass/fail system, which had been in place since 2000 and was used to grade Jarmon no later than

the rating period May 1, 2002 through April 30, 2003.  See Def. Exh. 18, Green Supplemental

Decl. ¶ 3.  Average or marginally good performance (e.g., a "C-" on an educational grading

scale) is enough to 'pass.'  Therefore there is no reason to presume that the managers would have

given Jarmon a different rating if they believed that his performance was less than perfect.  See

Def. Exh. 4, Davenport Depo. at 104-05 (explaining that an employee would only fail if

performance "was so deficient that his work was completely useless without any sort of

redeeming quality").  Moreover, Jarmon was rated on his ability to perform at the GS-14 level,

whereas the managers' evaluation of his application for promotion assessed his ability to perform

as a GS-15 auditor.

The fact that Mr. Davenport and other managers provided detailed explanations of the

candidates' relative strengths and weaknesses after the selection was completed does not

diminish the evidentiary weight of that testimony.  Before Jarmon filed an EEO complaint and

commenced this litigation, the FCC "simply had no occasion to explain its decision to hire"

Skadin, Hellmer, and Bentley.  Jackson, 496 F.3d at 709.  Accordingly, Jarmon's attempt to

dismiss the managers' testimony  as "post hoc rationalizations" is baseless.  See id. at 709-10.

### c.  There Is No Fact Dispute Regarding Jarmon's Leadership Experience.

Jarmon's discussion of his leadership experience, Opp. at  19-20, is an effort to

manufacture a factual dispute where there is none.  Defendant has acknowledged that Jarmon

had <u>some</u> leadership experience; if he did not, he would not have made the best qualified list or been eligible to be interviewed.  Thus, Jarmon's assertion that he possessed some leadership experience is not a disputed issue.  However, as discussed in Part I-A-1, and I-A-2 <u>supra</u>, the selectees had more extensive and more relevant leadership and supervisory experience than Jarmon, and that is why they were promoted.

Mr. Davenport and Ms. DeNigro's opinion of Jarmon's leadership skills, or lack thereof, creates neither a material factual dispute nor an inference of pretext.  Mr. Davenport and Ms. DeNigro did not believe that Jarmon had the leadership necessary to be one of the three top candidates, and testified that they did not recall seeing Jarmon demonstrate leadership experience.  Jarmon contends that if he can disprove their opinions — <u>i.e.</u>, by showing that he did have leadership experience — a reasonable juror could infer pretext and a discriminatory motive.  <u>See</u> Opp. at 15, 19-20.  That argument reflects a fundamental misunderstanding of controlling precedent.  The pertinent question is not whether Jarmon lacked leadership experience, but whether Mr. Davenport and Ms. DeNigro "honestly and reasonably believed" that he lacked it.  <u>Brady v. Office of Sergeant At Arms</u>, 520 F.3d 490, 496  (D.C. Cir. 2008); <u>see also</u> <u>Woodruff v. Peters</u>, 482 F.3d 521, 531 (D.C. Cir. 2007) ("We review not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers").  Pretext can only be inferred if the plaintiff presents evidence indicating that the defendant does <u>not</u> believe its rationale, <u>i.e.</u> evidence that the explanation was dishonest and unreasonable.  <u>See</u> <u>Brady</u>, 520 F.3d at 496.  Thus, a misstatement of the applicant's qualifications must be so severe that it suggests that the employer does not truly believe that assessment of the applicant's skills and has fabricated the rationale. <u>See</u> <u>Holcomb</u>, 433 F.3d at 898.

19

Here, there is no reason to doubt that Mr. Davenport and Ms. DeNigro honestly believed their assessment of Jarmon's leadership experience to be correct. Neither manager misstated Jarmon's experience. They simply expressed their own opinions and understanding of Jarmon's skills, based on their personal dealings with Jarmon.

Ms. DeNigro did not state that Jarmon had never had leadership experience, but simply testified that she had not personally witnessed him demonstrating such experience. See Def. Exh. 6, DeNigro Depo. at 42. That was not a misstatement. Although Jarmon's application materials stated that he had supervised employees on audits, that experience would have occurred during a time period before Ms. DeNigro met him, in a different division of the FCC. See Def. Exh. 1, Greene Decl. Attachment F, pp. 92, 96 (listing and describing supervisory experience gained in projects in Common Carrier Division between 1987 and 2000); id. at 90-91 (describing experience from 2002 through application without claiming that the experience requires supervision of other auditors); Def. Exh. 6, DeNigro Depo. at 5, 8 (indicating that DeNigro joined the FCC in 2001 and first met Jarmon "about 2002"); id. at 92 (stating that Jarmon was not assigned supervisory duties during DeNigro's tenure in the division). In addition, during her deposition, Ms. DeNigro also explained that she could not recall every detail of Jarmon's application package and resume. See Exh. 6, DeNigro Depo. at 52, 84. Ms. DeNigro would not have been personally or intimately familiar with all of Jarmon's past experience because she was not his direct supervisor. See Def. Exh. 6, DeNigro Depo. at 9 (explaining that DeNigro was never Jarmon's direct supervisor). Of course, Ms. DeNigro would not have personally witnessed any leadership Jarmon demonstrated while he was detailed to the EPA. In sum, Ms. DeNigro's testimony does not contradict itself or misstate her exposure to Jarmon in a leadership or supervisory capacity. Accordingly, even if Ms. DeNigro had misjudged Jarmon's experience,

20

there is no reason to question the sincerity of her testimony that she had not witnessed him demonstrating leadership.

Likewise, Mr. Davenport did not conclusively state that Jarmon had never supervised any employees, but instead testified that he did not recall any such supervisory experience. See Def. Exh. 3, Davenport Interview at 29. Mr. Davenport joined the Investigations and Hearings Division in 2002, and worked in the FCC's Enforcement Bureau from 1999 through early 2002. See Def. Exh. 4, Davenport Depo. at 6-7. Accordingly, he had no occasion to observe any supervisory experience that Jarmon may have had in the Common Carrier Division between 1987 and 2000. See Def. Exh. 1, Greene Decl. Attachment F, pp. 92, 96 (describing Jarmon's supervisory experience Jarmon claims to have had between 1987 and 2000). And, like Ms. DeNigro, Mr. Davenport would not have been personally familiar with all of Jarmon's past experience because he was not Jarmon's direct supervisor. See Def. Exh. 4, Davenport Depo. at 7-8, 11 (explaining that Davenport was not Jarmon's direct supervisor). Nor would Mr. Davenport have been present to witness Jarmon's performance at the EPA. In sum, there is no reason to doubt that Mr. Davenport honestly did not recall any supervisory experience, and honestly believed that Jarmon lacked such experience. Accordingly, it would be unreasonable to construe Mr. Davenport's testimony regarding his *recollection* of Jarmon's past experience as a deliberate misstatement of Jarmon's skills. See Holcomb, 433 F.3d at 898.

Mr. Boyle was Jarmon's direct supervisor, and worked with Jarmon off and on over fifteen years or more. See Def. Exh. 12, Boyle Depo. at 11. Therefore, he was personally familiar with Jarmon's recent experience. It is not disputed that Mr. Boyle believed that Jarmon had leadership experience. See id. at 14. Nonetheless, he did not consider Jarmon to be one of the top three candidates for the GS-15 Auditor vacancy. See id. at 43. And, as discussed supra,

21

the record does not remotely support an inference that Jarmon's leadership experience made him vastly superior to the selectees.

In sum, there is no material conflict between Mr. Boyle's testimony and Mr. Davenport and Ms. DeNigro's assessment of Jarmon's leadership skills, nor any reason to doubt the credibility of Mr. Davenport and Ms. DeNigro's testimony. Mr. Davenport and Ms. DeNigro honestly believed that Jarmon lacked leadership skills in comparison to the three selectees. Mr. Boyle agreed that Jarmon was not one of the top two candidates, but believed that Jarmon had some leadership skills. "It is not this Court's job to determine if [those opinions] were wise, fair, or correct, but rather whether the [managers] honestly believed those reasons and acted in good faith upon those beliefs." Simpson v. Leavitt, 557 F. Supp. 2d 118, 130 (D.D.C. 2008). Further, even if the Court believes that Ms. DeNigro and Mr. Davenport could have assessed Jarmon's leadership experience more favorably than they did, that does not establish pretext where, as here, "the Government was faced with a difficult decision between [multiple] qualified candidates." Jackson, 496 F.3d at 117. The difference between Mr. Boyle's and Mr. Davenport and Ms DeNigro's opinion simply reflects the ordinary variations among supervisors' assessments of an employee's skills, and the different capacities in which each manager interacted with Jarmon.

> **d.  Jarmon's Conclusory Disagreement With Management's Opinions Does Not Create A Material Factual Dispute Regarding His Compliance With Deadlines And His Ability To Interact Well With Others.**

Jarmon claims that there is a dispute regarding his compliance with deadlines and his ability to get along with others. However, he relies principally on his subjective opinion of his own performance. That falls far short of the evidentiary showing necessary to raise a factual

22

dispute and defeat a motion for summary judgment.  See Harris, 480 F. Supp. 2d at 110.  As this Court recently recognized, "plaintiff's  perception of himself, and of his work performance, is not relevant.  It is the perception of the decisionmaker which is relevant."  Gross v. Akin, Gump, Strauss, Hauer & Feld, LLP, 599 F. Supp. 2d 23, 31 (D.D.C. 2009).

There is no material factual dispute regarding Jarmon's ability to meet deadlines.  First, neither Davenport nor the other managers testified that Jarmon's failure to meet certain deadlines was the sole or dispositive reason that he was not selected for promotion.  Instead, some managers identified meeting deadlines as one of Hellmer's strengths and, in response to an interrogatory seeking evidence of Jarmon's compliance with deadlines, the managers noted that Jarmon had been slow with some projects.  See Def. Exh. 12, Boyle Depo. at 74; Def. Exh. 6, DeNigro Depo. at 81; Pltf. Exh. 1 at Interrogatory 6.  In addition, Mr. Davenport recalled hearing that Jarmon had some type of dispute with DeNigro about his performance — which may have occurred after the selection decision was made — and he thought it involved an issue of meeting deadlines.[5]  See Def. Exh. 4, Davenport Depo. at 50-51.  Because Jarmon's compliance with deadlines was not the dispositive reason for selecting Hellmer, Skadin, and Bentley, this is not a material issue.

Second, Jarmon has identified no evidence that contradicts management's impression that he was slow with some projects.  Defendant does not have a burden to corroborate that opinion with additional evidence, or to prove that it is factually correct.  It is enough that the managers honestly believed in their opinion.  See Simpson, 557 F. Supp. 2d at 130.

---

[5]  In fact, Jarmon was privy to a performance-related dispute that Jarmon had with Ms. DeNigro and other supervisors, in early 2005.  See Def. Reply Exh. 2 (emails).  That incident post-dated the selection decision.  However, the email threads corroborate Mr. Davenport's recollection.

Third, Jarmon has pointed to no evidence indicating that he met deadlines in a manner that was markedly superior to the selectees' compliance with deadlines. Thus, this issue is at best tangential to the ultimate question of whether there was such a substantial gap in the candidates' qualifications that one can infer race discrimination. Finally, Jarmon's unsupported and conclusory assertion that he "disputes that there was any problem with [h]is compliance with deadlines" is a subjective assessment of his own performance and, as such, is neither relevant nor capable of creating a material factual dispute. See Gross, 599 F. Supp. 2d at 31; Chappell-Johnson, 574 F. Supp. 2d at 109.

Jarmon has also failed to raise a factual dispute or inference of pretext regarding the managers' belief that his interpersonal skills were weaker than the selectees'. Again, the question is not whether the managers were correct, but whether they honestly believed in their assessment. See Simpson, 557 F. Supp. 2d at 130. Mr. Davenport and Ms. DeNigro have explained in detail why they questioned Jarmon's ability to work well with management and/or other FCC employees. See Def. Exh. 6, DeNigro Depo. at 28, 31-32, 37-38; Def. Exh. 4, Davenport Depo. at 39-43; 49-53; Def. MSJ at 18-19 (discussing Jarmon's disputes and unfavorable interactions with management). Mr. Harkrader's testimony does not contradict that assessment; although Mr. Harkrader personally had no problems getting along with Jarmon, he had "slight concerns" about Jarmon's communication skills, recognized that others shared those concerns, and also noted that Jarmon had occasionally "rubbed people the wrong way." Def. Exh. 8, Harkrader Depo. at 43-44. Jarmon himself admits that he behaved in an "assertive, outspoken" manner which did not make him a "favorite" in the group. Def. Exh. 16 at 3. And when Jarmon inquired about the status of the GS-15 vacancy announcement, he noted that he had repeatedly criticized the agency's efficiency. See Def. Reply Exh. 18, Dec. 13, 2004 email from

Jarmon to Davenport ("I have mentioned to everyone and anyone that I thought could make a difference and would listen, how inefficient this Agency moves in most aspects of its internal operations."). He has also admitted that he told Ms. DeNigro that he would not perform tests that were part of his audit assignment because he deemed them "unnecessary." Def. Exh. 13, Jarmon Depo. at 59-61. On that record, it would be unreasonable to doubt the sincerity of the supervisors' concerns about Jarmon's ability to work well with management and other employees.

The fact that Jarmon passed his performance evaluation does not draw the legitimacy of management's concerns into question. None of the managers contend that Jarmon's interpersonal skills were so poor that he could not perform at the minimal levels necessary to be a GS-14 auditor; thus there was no reason to expect these issues to be discussed in Jarmon's performance evaluation. See Def. Exh. 3, Davenport Interview at 30 (describing Jarmon's performance as adequate); Def. Exh. 4, Davenport Depo. at 104-05 (explaining that employee's work would have to be virtually useless to merit a 'fail' rating). Hence, a reasonable finder of fact would not infer pretext from the evaluation's silence on this issue.

### e. Jarmon's Disagreement With Defendant's Interpretation Of The Scope Of The FCC's Audit Authority Is Irrelevant.

Defendant cited Jarmon's repeated requests that the FCC investigate executive compensation, despite the supervisors' prior rejection of his proposal, as an example of Jarmon's lapses in judgment and unfavorable interactions with management. See Def. MSJ at 19; Def. Exh. 6, DeNigro Depo. at 29-30. Although Jarmon failed to produce legal support for his proposal when his supervisors requested it, he now claims that the FCC's mission statement and regulations allow the agency to review executive compensation. See Pltf. Opp. at 21. Like

several of Jarmon's other arguments, this is premised on the mistaken belief that this Court should second-guess the agency's decisions and independently determine whether the agency was right or wrong.  Mr. Davenport and Ms. DeNigro honestly believed that this proposal was outside the FCC's jurisdiction, and Jarmon's contrary legal opinion does not cast doubt on the sincerity of those beliefs.  See Gross, 599 F. Supp. 2d at 31 (explaining that management's perception is relevant, not plaintiff's).

At bottom, Jarmon disagrees with the managers' assessment of his strengths and weaknesses and therefore asks the Court to infer that the managers are being dishonest. However, the more sensible explanation — and the one that a reasonable finder of fact would draw — is that some managers had more concerns about Jarmon's skills than others, and that, although Jarmon performed well enough to receive a 'pass' on the pass/fail evaluation of his performance as a GS-14 auditor, his performance in the past and during the interview process simply was not good enough to make him one of the top three candidates for the advertised GS-15 position.  On this record, no reasonable finder of fact would infer that Mr. Davenport has lied about the reasons for selecting Bentley, Hellmer, and Skadin, let alone that Jarmon's race was the real reason for the selection decision.  Nor could any reasonable finder of fact attribute the other managers' assessment of Jarmon's qualifications to his race.

**B.   There Is No Evidence That Would Permit A Reasonable Finder Of Fact To Conclude That Mr. Davenport Or Other Managers Had Racially Based Animus Towards Jarmon.**

Jarmon contends that Mr. Davenport and the other managers harbored racial animus towards him.  See Pltf. Opp. at 22-28.  But Jarmon has not come close to showing that Mr. Davenport or any other manager was racially biased.  Jarmon cites no evidence that demonstrates animus, and his speculation that such animus exists lacks record support.  His subjective

26

disagreement with his supervisors' opinions does not mean that race was the real reason for their decision.

Mr. Davenport's opinion of Jarmon's skills and performance does not prove racial animus. As discussed <u>supra</u>, Mr. Davenport's deposition and affidavit provide an adequate evidentiary basis for his conclusions, and those conclusions did not have to be corroborated in a performance review. Further, there are emails which corroborate Mr. Davenport's recollection that Jarmon had a confrontation with Ms. DeNigro regarding an audit, and the tone Jarmon took in that email exchange and other communications with division managers sheds light on why some managers found Jarmon difficult to work with. <u>See</u> Def. Exh. 18. Therefore, this is not a case in which the manager's explanations are so clearly false that it is reasonable to infer that they are a pretext for invidious discrimination.

Jarmon also asks the Court to infer animus from the alleged unreasonableness of Mr. Davenport's impression of Jarmon's answer to a specific interview question, and from Mr. Davenport's alleged lack of exposure to Jarmon prior to the selection. Both of those arguments are baseless. Title VII does not require Mr. Davenport to explain why he did not like Jarmon's answer to a particular interview question; while Jarmon and his attorney may think Jarmon's answer was acceptable, <u>see</u> Opp. at 23-24, their opinion is irrelevant. <u>See</u> <u>Gross</u>, 599 F. Supp. 2d at 31. Mr. Davenport was the selecting official, and therefore was the proper judge of Jarmon's answer to that question as well as Jarmon's overall skills. Mr. Davenport reviewed the applicant materials, interviewed Jarmon and the other candidates, and discussed the interviews with the other managers. <u>See</u> Def. Exh. 3, Davenport Interview at ; Def. Exh. 4, Davenport Depo. at 20-26. He also met Jarmon in 2003, shortly after he became deputy division chief. <u>See</u> Def. Exh. 4, Davenport Depo. at 15. Therefore, Mr. Davenport had a more than ample basis to make his

selection decision, and there was nothing 'irregular' about his evaluation of Jarmon's application and past performance.  Mr. Davenport did not have to be Jarmon's direct supervisor, or the person who reviewed performance evaluations with Jarmon,[6] to form an opinion of Jarmon's ability to perform at the GS-15 level.

Jarmon's assertion that Mr. Davenport and other managers racially stereotyped Jarmon is entirely speculative.  It is Jarmon's counsel, not FCC management, who appears to be stereotyping Jarmon's demeanor as that of an "angry black man."  See Pltf. Opp. at 24-25.  Mr. Davenport did not recall whether he thought Jarmon was "angry" when he first met him.  See Def. Exh. 4. Davenport Depo. at 60-61.  Ms. DeNigro thought Jarmon was angry or frustrated with management on some occasions, and noted that on other occasions he was polite to her; she did not link that behavior to Jarmon's race. See Def. Exh. 6, DeNigro Depo. at 13, 37, 48. Neither Mr. Davenport nor Ms. DeNigro expressed an opinion that African Americans are particularly angry, or indicated that they are aware of that supposed stereotype.  And to the extent that Mr. Davenport and other managers found Jarmon occasionally difficult to get along with, those impressions were based upon their interactions with Jarmon, and what they heard about other manager's interactions with Jarmon, not Jarmon's race.  See supra Part A-3-d. Jarmon described himself as someone whose assertiveness and outspokenness made him "not a favorite."  Def. Exh. 16, at 3.  There is no legitimate reason to conclude that Jarmon's race had anything to do with management's impression of his interpersonal skills and demeanor.

---

[6]  Plaintiff selectively quotes Mr. Davenport's EEO affidavit and claims that Mr. Davenport never interviewed Jarmon.  See Opp. at 24.  However, that EEO testimony clearly indicates that Mr. Davenport interviewed Jarmon for the GS-15 position, and that he simply was not the person who met with Jarmon to discuss his performance reviews or how he could obtain a promotion. See  Def. Exh. 3, Davenport Interview at 25-26, 30.

Jarmon's attempt to infer racial animus from Mr. Bash's opinion of Jarmon's demeanor and collegiality is equally off base. Mr. Bash's impression of Jarmon's demeanor during the interview was less favorable than his impression of the other candidates' demeanor. See Def. Exh. 10, Bash Depo. at 18-19. Mr. Bash did not contradict himself. He simply noted that, while he did not find Mr. Jarmon unpleasant or unfriendly, he generally recalled that Jarmon gave very short yes-no answers, and did not seem to reciprocate conversation. See id. at 12-13. Mr. Bash also felt that Mr. Jarmon's relative experience was a reason for Jarmon's non-selection. See id. at 34. There is nothing inherently discriminatory or biased about that assessment, and Jarmon has not identified any evidence which casts doubt on the sincerity of Mr. Bash's belief that Jarmon was less collegial than the selectees or that the selectees' experience made them more qualified.

Patricia Green's speculation regarding "unconscious racism" at the FCC also does not create an inference of racial animus. Ms. Green was also an unsuccessful applicant for the position, and her affidavit simply expresses her subjective "suspicion" that the FCC managers prefer non-minority applicants without realizing that they are being discriminatory. See Pltf. Exh. 11. Even if that affidavit were probative evidence that unconscious racism exists at the FCC (and it is not, because it is clearly speculative and unsubstantiated), that would not establish a Title VII violation because Jarmon must show *intentional* discrimination to prevail on his disparate treatment claim. See generally Ginger v. District of Columbia, 477 F. Supp. 2d 41, 52 (D.D.C. 2007). Further, Ms. Green has never supervised Jarmon, was not present at Jarmon's interview, and does not claim to have any first-hand knowledge of Jarmon's skills and performance. Therefore, she has no basis to conclude that Jarmon's race was the reason Jarmon was not selected, and any testimony opining on the reasons for Jarmon's non-selection would be

29

inadmissible for lack of foundation.  In sum, Ms. Green's suspicions regarding racial bias is

unsupported speculation that does not create a material factual dispute.  See Stewart, 352 F.3d at

431 (concluding testimony from coworker regarding her opinion that race was a motivating

factor in selection decision would not support jury finding of liability because it was speculative

and thus wholly unpersuasive); Gross, 599 F. Supp. 2d at 34 ("Statements made by those who

are not involved in the decisional process normally are insufficient, standing alone, to establish

pretext or the requisite discriminatory animus."); see also Brown v. Brody, 199 F.3d 446, 459

(D.C. Cir. 1999) ("mere speculation" offered by plaintiff does not create a material factual

dispute).

### C.  The Nature of the Selection Criteria And the Selection Process Do Not Support An Inference of Discrimination.

Jarmon takes issue with the alleged subjectivity of the managers' assessment of the

candidates' qualifications, and claims that it allowed discrimination to infect the process.  Opp.

at 29-30.  Jarmon conveniently ignores the fact that the selection criteria include objective,

readily verifiable skills, such as leadership experience and knowledge of auditing principles,

auditing standards, and Commission rules and regulations.  See Def. Exh. 1, Green Decl.,

Attachment F pp. 82-83.  Interpersonal skills are more subjective, and one of the selection

criteria was an "ability to interact orally with individuals at all levels."  Id. at 83; see Aka v.

Washington Hosp. Ctr., 156 F.3d 1284, 1298 (D.C. Cir. 1998).  But subjective criteria are not

presumptively discriminatory.  See Moncada v. Peters, 579 F. Supp. 2d 46, 55 (D.D.C. 2008); id.

at 55 n.2 ("the use of subjective criteria in employment decisions is neither rare nor insidious").

Courts "must not second-guess an employer's initial choice of appropriate

qualifications;" rather, the courts "defer to the employer's decision of what nondiscriminatory

qualities it will seek in filling a position." Jackson, 496 F.3d at 709. Subjective criteria are commonly used, and are particularly appropriate where, as here, employers must assess several qualified candidates' respective ability to perform a supervisory level GS-15 position and compare applicant's performance in interviews. See id. (observing that an employer legitimately "may select an employee who on paper is less qualified for other reasons, such as subjective reactions that emerge in the interview"). Moreover, there is nothing suspicious about the fact that the managers did not use a formal checklist to rank the applicants. "Reasonable employers . . . do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job descriptions." Id.

Jarmon's portrayal of the selection criteria as inconsistent, irregular, and mysterious, see Opp. at 29-31, conflicts with the record. The vacancy announcement clearly identified five evaluation criteria: an ability to develop appropriate audit programs; the ability to lead and coordinate auditing projects; knowledge of generally accepted accounting principles, certain standards, and FCC rules and regulations; an ability to communicate in writing; and an ability to interact orally with individuals at all levels, both within and outside the FCC. Def. Exh. 1, Green Decl., Attachment B. Mr. Davenport and the managers considered those criteria when evaluating applicants. See, e.g., Def. Exh. 4, Davenport Depo. at 31-32. The other skills that supervisors referenced, i.e., ensuring that a team met deadlines, being a self-starter, interacting well with others, and having a pleasant demeanor, are fairly encompassed within those broader descriptions, as they pertain to an ability to successfully lead a team of auditors and to interact orally with individuals of all levels. See Def. Exh. 10, Boyle Depo. at 74 (explaining link between Hellmer's ability to meet deadlines and successful team leadership). Moreover, even if those skills were fundamentally distinct from the five criteria set forth in the job description, it

31

would be unreasonable to infer that the managers evaluated those skills to mask their intentional race discrimination.  See Jackson, 496 F.3d at 709 (deeming it "obvious" that employers assessing candidates' qualifications may consider additional factors that are not listed in a job description); see generally Chappell-Johnson, 574 F. Supp. 2d at 103 ("[E]ven if a court suspects that a job applicant was victimized by poor selection procedures, it may not second-guess an employer's personnel decision absent *demonstrably* discriminatory motive.") (quoting Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).

Jarmon neither argues nor proves that the white applicants were evaluated using different criteria than he was.  Therefore, his reliance upon Jones v. Mukasey, 565 F. Supp. 2d 68, 82 (D.D.C. 2008), is misplaced.  The managers applied the same criteria to evaluate all five interviewees.  See, e.g., Def. Exh. 4, Davenport Depo. at 22, 33; Def. Exh. 12, Boyle Depo. at 61.  Jarmon's qualifications were not markedly superior to the selectees'.  Thus there is no basis to surmise that Defendant adopted subjective criteria in an effort to cancel out any superior objective qualifications that Jarmon possessed, and it would be unreasonable to infer that the selection criteria and process were designed to disadvantage or discriminate against Jarmon.

### D.  There Is No Credibility Issue Regarding Mr. Davenport's Or Other Managers' Testimony.

Mr. Davenport's assertion that the managers unanimously agreed on the best qualified candidates does not place his credibility into dispute.  The managers initially disagreed regarding whether Skadin was more qualified than Hellmer.  See Def. Exh. 6, DeNigro Depo. at 64; Def. Exh. 4, Davenport Depo. at 69-70.  However, as explained supra, no manager proposed that Jarmon or Green should be hired.  Mr. Boyle is the only manager who claims to have found Skadin superior to Hellmer, and he testified that the other managers agreed that Skadin deserved

consideration.  See Def. Exh. 12, Boyle Depo. at  43, 64.  Therefore, Mr. Davenport fairly

described the ultimate decision as unanimous.  Further, even if Mr. Davenport was mistaken

regarding the unanimity of that decision (and he was not), it would be unreasonable to infer that

he lied.  It is more likely an honest mistake, given that Mr. Davenport's EEO interview occurred

approximately a year after the selection decision.

    The fact that one or two managers discussed the case with Mr. Harkrader while preparing

interrogatory responses does not impugn the managers' credibility.  First, there is no rule that

precludes agency employees from conferring with each other during the discovery process,

particularly where, as here, they are reviewing and verifying responses to interrogatories.

Further, the record does not indicate that those conversations caused witnesses to alter their

testimony; the depositions, taken after interrogatory responses were served, are consistent with

the managers' EEO testimony.

### E.  The Composition of the FCC's Workforce Does Not Warrant An Inference Of Discrimination.

    Finally, Jarmon attempts to infer race discrimination from the relative lack of African

American GS-15 auditors, citing a report that he authored.  However, his statistical data is not

properly before the Court, because Jarmon did not produce the report in discovery, and he is not

qualified as an expert to opine on the matter.  Further, "statistical evidence is generally not

conclusive in disparate treatment cases," and its value is particularly weak where, as here, there

is no "proof that the individuals upon whom the statistics were based were similarly situated to

plaintiff."  Aguilar v. Salazar, __ F. Supp. 2d __, 2009 WL 1687576 at * 3 (D.D.C. June 18,

2009).  In any event, that data is unpersuasive.  There is no indication of how many (if any)

African Americans applied for prior GS-15 auditor positions, or how may GS-15 vacancies were

announced during the relevant time period.  Absent that data regarding the applicant pool and

number of opportunities to apply, the numbers cannot support a reasonable inference of race

discrimination.  See Hunter v. Rice, 480 F. Supp. 2d 125, 136 (D.D.C. 2007) (finding statistical

data inconclusive because it did not indicate how many members of the class applied for

positions relative to how many were hired or how many were employed in the agency as a

whole); Harris, 480 F. Supp. 2d at 111.

## II.    NO REASONABLE FINDER OF FACT COULD CONCLUDE THAT JARMON'S PRIOR EEO ACTIVITY WAS THE REAL REASON FOR THE SELECTION DECISION.

Jarmon's retaliation claims suffer substantially the same shortcomings as his race

discrimination claims — the record does not contain facts sufficient to discredit Defendant's

qualifications-based rationale for selecting Bentley, Hellmer, and Skadin.  Instead, as discussed

supra, there is considerable evidence that the selectees had superior skills and experience than

Jarmon, and there is no reason to infer that those reasons are false, manufactured, or otherwise

pretextual.

Although the opposition brief blends the retaliation discussion with the race

discrimination analysis, Jarmon appears to raise two arguments specific to retaliation: (1) he

claims that Mr. Davenport and other managers knew about his prior EEO activity; (2) implies

that the managers discussed that EEO activity; and (3) contends that management's alleged

disregard and/or misjudging of his qualifications and the use of subjective criteria in the

evaluation process create a nexus between Jarmon's EEO activity and his non-selection. Those

arguments are unfounded.

First, it is not reasonable to assume that any manager other than Mr. Boyle was aware of

Jarmon's EEO activity.  At the EEO stage, Mr. Davenport was unsure whether he knew of

Jarmon's EEO activity.  <u>See</u> Def. Exh. 3, Davenport Interview at 31.  He later testified that he

was unaware of that EEO activity.  <u>See</u> Exh. 4, Davenport Depo. at 40.  The other managers also

disclaimed any knowledge of Jarmon's EEO activity.  <u>See</u> Exh. 10, Bash Depo. at 31; Exh. 8,

Harkrader Depo. at 245; Exh. 6, DeNigro Depo. at 38.

    Although Mr. Davenport and Ms. DeNigro initially could not recall whether they were

aware of Jarmon's EEO activity, there is no evidence that Boyle told them about that activity.

Mr. Boyle does not claim to have discussed Jarmon's EEO activity during a meeting after the

selection.  The portion of the deposition that Jarmon cites for this erroneous premise simply

discusses the managers' consultation regarding how to conduct interviews.  <u>See</u> Def. Exh. 10,

Boyle Depo. at 31.  In response to a subsequent question, Mr. Boyle said that he did not believe

that any of the selectors discussed Jarmon's past EEO activity, and he had no recollection of

whether they were even aware of that activity.  <u>See</u> <u>id.</u> at 82.  Therefore, there is no grounds to

impute Mr. Boyle's knowledge to the other managers under a 'cats paw' theory.  <u>See</u> <u>Oliver-</u>

<u>Simon v. Nicholson</u>, 384 F. Supp. 2d 198 , 316 (D.D.C. 2005).

     Even if Mr. Davenport (or any of the other managers other than Boyle) had known about

Jarmon's EEO activity, on this record, no reasonable finder of fact could conclude that the past

EEO activity was the real reason for the selection decision.  The EEO activity was over a year

prior to Defendant's selection of Bentley, Hellmer, and Skadin.  <u>See</u> Def. Exh. 2, Miller Decl. ¶

14; Def. Exh. 1, Green Decl. ¶¶ 5, 9.  Therefore the duration of time between these events is

insufficient, as a matter of law, to establish causation.  <u>See</u> <u>Clark Cty. School Dist. v. Breeden</u>,

532 U.S. 268, 273 (2001); <u>Hamilton v. Paulson</u>, 542 F. Supp. 2d 37, 58 (D.D.C. 2008).  Jarmon's

attempt to infer causation from the alleged subjectivity of the job criteria, and his assessment of

his skills relative to the selectees', fails for the reasons discussed <u>supra</u>.  Jarmon has

demonstrated that he disagrees with some of the selection criteria and the managers' assessment of his skills. But Jarmon's opinion is neither relevant nor dispositive, and there is no reason to doubt that Defendant's honestly believed that the selectees had better, more relevant, experience and skills than Jarmon.

## III.   THE RECORD DOES NOT SUPPORT JARMON'S CLAIM THAT HE RECEIVED FEWER PERFORMANCE AWARDS THAN HIS COWORKERS BECAUSE OF HIS RACE.

Jarmon has failed to present sufficient evidence to survive summary judgment on his claims regarding an alleged disparity in his receipt of bonuses and performance awards. Among employees in the Investigations and Hearings Division who received performance awards and bonuses between December 2002 and December 2004, Jarmon ranked near, but not at, the bottom. See Pltf. Exh. 14. When applying for the GS-15 position, he acknowledged that he had received numerous time-off awards and other awards during his tenure at the FCC. See Def. Exh. 1, Green Decl., Attachment F pp. 93-94. That description of Jarmon's award history is consistent with Ms. DeNigro's testimony that Jarmon received more awards and bonuses than some employees, and less than others. See Def. Exh. 5, DeNigro Interview at 106. As Jarmon has failed to introduce evidence regarding the number of employees who received zero awards, he has neither disproven nor drawn into question Mr. Boyle's opinion that Jarmon's awards were "average" for the group.

There is no triable factual issue on this claim because the record establishes that the awards were based on the employees' performance, not their race, regardless of how Jarmon's awards compare to the selectees' or other employees' awards. As Jarmon acknowledges in his own application, awards and bonuses were rewards for performance and accomplishments. See Def. Exh. 1, Green Decl., Attachment F pp. 93-94. The awards that Hellmer received were

founded on her achievements.  See id. at pp. 47-49.  The managers' praise of Skadin's

performance indicates that he, too, deserved the awards he received.  Jarmon's receipt of fewer

awards is consistent with the managers' belief that Jarmon's performance was weaker than the

selectees.

Jarmon's conclusory assertion that defendants had discriminatory animus against him,

and had improper motives for granting awards, is unfounded and does not create a factual

dispute.  Jarmon bears the burden of establishing that his race was the "real reason" for the award

decisions.  See Brady, 520 F.3d at 495.  He cannot carry that burden with conclusory statements

unsupported by facts in the record, or his subjective assessment of his own qualifications.  Yet

that is all that Jarmon offers.  Therefore, Defendant should be awarded summary judgment on

the claims regarding awards and bonuses.

## **CONCLUSION**

For the foregoing reasons, Defendant moves that the Court GRANT Defendant's motion

and enter summary judgment in favor of Defendant on all claims.

Dated: July 27, 2009                              Respectfully submitted,


                                     _____/s/_____
                                     CHANNING D. PHILLIPS, D.C. BAR # 415793
                                     Acting United States Attorney

                                     _____/s/_____
                                     RUDOLPH CONTRERAS, DC BAR #434122
                                     Assistant United States Attorney

                                     _____/s/_____
                                     ROBIN M. MERIWEATHER, D.C. Bar # 490114
                                     Assistant United States Attorney
                                     555 4th Street, N.W.
                                     Washington, DC 20530
                                     (202) 514-7198 (voice)   (202) 514-8780 (facsimile)

37

**OF COUNSEL:**

Michael Krasnow
Federal Communications Commission
Office of the General Counsel
445 12th Street, S.W.
Washington, D.C.  20554
202-418-1740

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **WESLEY M. JARMON, JR.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Civil Action No. 06-1852 (EGS)** |
| | ) |
| **JULIUS GENACHOWSKI, Chairman,** | ) |
| **Federal Communications Commission,** | ) |
| | ) |
| **Defendant.** | ) |

**DEFENDANT'S REPLY TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN
DISPUTE; RESPONSE TO PLAINTIFF'S COUNTERSTATEMENT OF ADDITIONAL
FACTS; AND SUPPLEMENTAL STATEMENT OF
<u>MATERIAL FACTS FOR WHICH THERE IS NO GENUINE ISSUE</u>**

<u>**Reply to Plaintiff's Statement of Material Facts in Dispute**</u>

Plaintiff's "Statement of Material Facts For Which There Is A Genuine Dispute"

("Plaintiff's SOMF") fails to comply with Local Civil Rule 7(h), which requires that an

opposition to a motion for summary judgment "shall be accompanied by a separate concise

statement of genuine issues setting forth all material facts as to which it is contended there exists

a genuine issue necessary to be litigated, which shall include references to the parts of the record

relied on to support the statement." Plaintiff's SOMF contravenes the letter and spirit of this rule

in two main respects. First, it fails to respond to each numbered paragraph in Defendant's

Statement of Material Facts for Which There Is No Issue ("FCC's SOMF") with a

correspondingly numbered paragraph indicating whether Plaintiff admits or denies each of the

FCC's SOMF. It is therefore not possible in many cases to identify to what paragraph in the

FCC's SOMF plaintiff is attempting to respond. Second, Plaintiff's SOMF consists of lengthy

narrative argument dressed up as "facts," often containing information not relevant to the

paragraphs in the FCC's SOMF to which Plaintiff's arguments appear to relate. Plaintiff's

SOMF is therefore wholly inadequate, and the FCC's SOMF should be deemed admitted in its entirety. *See* Local Civil Rule 7(h); *Aguilar v. Salazar*, --- F.Supp.2d ----, 2009 WL 1687576 at *4 (D.D.C. 2009). To the extent that the Court may consider Plaintiff's SOMF, Plaintiff fails to establish any genuine issue for trial, and Defendant's specific responses to Plaintiff's SOMF are set forth below.

1-9: Plaintiff's SOMF does not dispute Paragraphs 1-9 of the FCC's SOMF; therefore, these paragraphs should be deemed admitted. *See* Local Civil Rule 7(h).

10: Plaintiff's SOMF does not deny Paragraph 10 of the FCC's SOMF as written, but "disputes that the Defendant ever conducted any comprehensive non-subjective interview process or a thorough review of all of his application materials." *See* Pl. SOMF at 3. In support of this contention, plaintiff asserts that defendant "did not provide formal guidelines to the managers involved in the selection process," and that one of the IHD managers who participated in the selection process for VAN 04-153-TJ (Hugh Boyle) did not consider plaintiff's participation in the "Certified Financial Officer Council Fellow program" or give proper weight to "Plaintiff's credentials as Certified Government Financial Manager." *Id.* at 3-4. These assertions, even if true, do not create a genuine issue for trial, because Plaintiff provides no evidence to suggest that defendant was required to provide "formal guidelines" to the managers involved in the selection process, or that the absence of such guidelines had the purpose or effect of discriminating against Plaintiff on the basis of his race, retaliating against him for his prior EEO activity, or providing an unfair advantage to the selectees. Similarly, plaintiff provides no evidence to suggest that the program or "credential" at issue were qualifications relevant to his candidacy for VAN 04-153-TJ or that, even assuming they were relevant, Mr. Boyle (who was not the selecting official) did not consider them because of plaintiff's race or prior EEO activity.

2

Accordingly, none of this information establishes a material factual dispute. *See Washington v. Chao*, 577 F.Supp.2d 27, 37 (D.D.C. 2008) (noting that to create a "genuine" factual dispute "the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party."

11-12: Plaintiff's SOMF does not dispute Paragraphs 11-12 of the FCC's SOMF; therefore, these paragraphs should be deemed admitted. *See* Local Civil Rule 7(h).

13: Plaintiff's SOMF does not deny Paragraph 13 of the FCC's SOMF as written, but "disputes that the Defendant's selection is supported by any legitimate non-discriminatory justification." *See* Pl. SOMF at 4. In support of this contention, plaintiff cites to his application materials (Pl. Ex. 3) and his own affidavit (Pl. Ex. 4). These documents reflect nothing more than plaintiff's subjective perception of his own qualifications and performance, which constitutes argument, not fact, and therefore does not create a genuine issue for trial. Moreover, plaintiff's subjective perception of his own qualifications and performance is insufficient to raise a legitimate issue of pretext. *See, e.g.*, *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *Washington v. Chao*, 577 F. Supp. 2d 27, 44 (D.D.C. 2008).

14-17: Plaintiff's SOMF does not dispute Paragraphs 14-17 of the FCC's SOMF; therefore, these paragraphs should be deemed admitted. *See* Local Civil Rule 7(h).

18: Plaintiff "disagrees" with Paragraph 18 of the FCC's SOMF because he believes that "Mr. Boyle's actions evidence his retaliatory animus toward Plaintiff." *See* Pl. SOMF at 5. In support of this contention, Plaintiff asserts that "unsupported negative statements by Mr. Boyle to Mr. Davenport establish a genuine dispute of fact and shows Mr. Boyle's retaliatory animus toward plaintiff," which is evidenced further by the absence of negative comments in plaintiff's performance appraisals. *Id.* at 6. Defendant admits that Mr. Boyle was aware of Plaintiff's prior

3

EEO activity, but denies that this knowledge factored into Mr. Boyle's consideration of plaintiff's candidacy for VAN 04-153-TJ. This disagreement does not create a genuine issue for trial, however, because it is undisputed that Mr. Boyle was not the selecting official for VAN-04-153-TJ (*see* FCC SOMF No. 5), and that Plaintiff's most recent EEO activity prior to his non-selection for VAN-04-153-TJ occurred in October 2003, more than a year prior to Mr. Davenport's selection decision in December 2004, and was therefore not sufficiently close in time to that decision to support an inference of retaliation. *See* FCC SOMF Nos. 13, 17. *See generally Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Hamilton v. Paulson*, 542 F. Supp. 2d 37, 58 (D.D.C. 2008).

19: Plaintiff disputes Paragraph 19 of the FCC's SOMF because Plaintiff contends that he "personally made William Davenport aware of his EEO activity in July 2003." *See* Pl. SOMF at 7. Defendant denies that Mr. Davenport was aware of Plaintiff's prior EEO activity at the time of the selection decision in December 2004. This disagreement does not create a genuine issue for trial, however, because even assuming that Mr. Davenport possessed knowledge of Mr. Jarmon's prior EEO activity at the time of his selection decision in December 2004, it is undisputed that plaintiff's most recent EEO activity prior to his non-selection for VAN-04-153-TJ occurred in October 2003, more than a year prior to Mr. Davenport's selection decision, and was therefore not sufficiently close in time to that decision to support an inference of retaliation. *See* FCC SOMF Nos. 13, 17. *See generally Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Hamilton v. Paulson*, 542 F. Supp. 2d 37, 58 (D.D.C. 2008).

20: Plaintiff's SOMF does not dispute Paragraph 20 of the FCC's SOMF; therefore, these paragraphs should be deemed admitted. *See* Local Civil Rule 7(h).

21: Plaintiff disputes Paragraph 21 of the FCC's SOMF because he contends that "there is a genuine dispute as to Ms. DeNigro's knowledge of Plaintiff's EEO activity." *See* Pl. SOMF at 7. Defendant denies that Ms. DeNigro was aware of Plaintiff's prior EEO activity when she participated in the selection process for VAN 04-153-TJ. This disagreement does not create a genuine issue for trial, however, because even assuming that Ms. DeNigro possessed knowledge of Mr. Jarmon's prior EEO activity at the time of the selection decision in December 2004, it is undisputed that Ms. DeNigro was not the selecting official for VAN-04-153-TJ (*see* FCC SOMF No. 5), and that plaintiff's most recent EEO activity prior to his non-selection occurred in October 2003, more than a year prior to Mr. Davenport's selection decision in December 2004, and was therefore not sufficiently close in time to that decision to support an inference of retaliation. *See* FCC SOMF Nos. 13, 17. Therefore, even if Ms. DeNigro had been aware of the activity, there is no legal basis to infer that the EEO activity was the real reason that Mr. Davenport selected Ms. Hellmer, Mr. Bentley, and Mr. Skadin.

22-23: Plaintiff's SOMF does not dispute Paragraphs 22-23 of the FCC's SOMF; therefore, these paragraphs should be deemed admitted. *See* Local Civil Rule 7(h).

24: Plaintiff does not dispute the FCC's assertion that Ms. Hellmer was qualified for the GS-15 position, or the FCC's description of Ms. Hellmer's qualifications. Therefore, Paragraph 24 should be deemed admitted. Plaintiff "disputes that either Ms. Hellmer or Mr. Skadin were the best qualified candidates." *See* Pl. SOMF at 8-9. In support of this contention, Plaintiff suggests that Ms. Hellmer possessed less years of experience at the FCC than him, cites to the deposition testimony of three managers involved in the selection process for VAN 04-153-TJ (Hardrader, Boyle, and DeNigro) to suggest that these individuals did not truly believe Ms. Hellmer was as qualified as Plaintiff, and asserts that Ms. Hellmer "did not make the best

5

qualified list" for a GS-15 Auditor position in 2002 and thus should not have been selected for VAN 04-153-TJ. *Id*. at 9. Plaintiff's subjective impression of the candidates' qualifications constitutes argument, not fact, and therefore does not create a genuine issue for trial. None of the deposition testimony cited by Plaintiff establishes that the IHD managers believed that Plaintiff was better qualified than Ms. Hellmer or that plaintiff's qualifications were "demonstrably superior" to Ms. Hellmer's. Even assuming that Ms. Hellmer did not make the best qualified list for a GS-15 Auditor position in 2002, this "fact" establishes nothing with respect to Mr. Davenport's December 2004 selection decision for VAN 04-153-TJ because, among other things, plaintiff fails to provide any evidence concerning the applicant pool for the 2002 position, or the candidates' qualifications, the identify of the selecting official, or the evaluation criteria for that position. Plaintiff's speculation regarding the selection process for a 2002 position is therefore insufficient to create a genuine issue for hearing.

25: Plaintiff does not dispute the FCC's assertion that Mr. Skadin was qualified for the GS-15 position, or the FCC's description of Mr. Skadin's qualifications. Therefore, Paragraph 25 should be deemed admitted. Plaintiff "disputes that either Ms. Hellmer or Mr. Skadin were the best qualified candidates." *See* Pl. SOMF at 9. In support of this contention, plaintiff cites to Mr. Skadin's application materials to suggest that Plaintiff was better qualified. Plaintiff's subjective impression of the candidates' qualifications constitutes argument, not fact, and therefore does not create a genuine issue for trial. Moreover, none of the materials cited by plaintiff establish that the IHD managers believed that Plaintiff was better qualified than Mr. Skadin for VAN 04-153-TJ or that plaintiff's qualifications were "demonstrably superior" to Mr. Skadin's qualifications.

**<u>Response to Plaintiff's Counterstatement of Additional Facts</u>**

Plaintiff contends (Pl. SOMF at 9) that "there are additional facts directly relevant to the non-selection which are omitted by the Defendant," and devotes seven pages of narrative argument to address these purported "facts." This section of Plaintiff's SOMF suffers from the same defects under Local Civil Rule 7(h) as discussed above, and Defendant denies that there are any material factual disputes that preclude the entry of summary judgment in Defendant's favor. Defendant's response to Plaintiff's counterstatement of "additional facts" is set forth below.

Plaintiff counterstatement contends generally that he "raises a genuine dispute as to the Defendant's claims that he lacked the necessary qualifications to be selected for the position of GS-15 Auditor," and endeavors to attack what he believes to be inconsistencies concerning Defendant's view of his qualifications. *See* SOMF at 10-15. As explained in Defendant's Reply Brief (at Part I-A-3-a), Plaintiff appears to misapprehend Defendant's rationale for its selection decision in this case, because at no point has Defendant argued that Plaintiff "lacked the necessary qualifications" for VAN 04-153-TJ. On the contrary, Defendant does not dispute that Plaintiff was qualified for VAN 04-153-TJ, but chose the selectees to fill VAN 04-153-TJ because their qualifications rendered them best suited to fill that vacancy. Plaintiff cannot establish a genuine issue for trial by attacking a "phantom" legal position not advanced by Defendant.

Plaintiff asserts throughout his counterstatement that the decision not to select him was "based on undocumented performance concerns, which are disputed by plaintiff," and argues that none of his performance evaluations listed any concerns or problems. *See* SOMF at 10-15. First, as stated, Plaintiff's "performance concerns" were not the premise for Defendant's decision to select Mr. Bentley, Ms. Hellmer, and Mr. Skadin to fill VAN 04-153-TJ. Moreover,

defendant admits that Plaintiff's performance evaluations during the time period May 2002 through December 2004 were based on a "pass/fail" appraisal system that was applicable to all FCC bargaining unit employees, and that Plaintiff's appraisals reflect only ratings of "pass," with no commentary concerning any performance deficiencies. *See* Supplemental Declaration of Noelle M. Green, Defendant's Exhibit 18, at ¶ 3. This information does not create a genuine issue for trial, because evidence of acceptable performance appraisals, and lack of commentary regarding plaintiff's performance shortcomings, demonstrate only that plaintiff was performing at an acceptable competence level at the GS-14 level, not that he was capable of performing at, or should have been selected for, the higher level GS-15 Auditor position. Nor does this create a genuine issue for trial concerning whether plaintiff's qualifications are "demonstrably superior" to the selectee' qualifications; indeed, it is undisputed that the selectees also received ratings of "pass" at the GS-14 level. *See* FCC SOMF Nos. 23-25.

The remaining contentions in this section of Plaintiff's SOMF parrot the arguments in Plaintiff's Brief, and do not constitute "facts." Plaintiff's arguments are addressed in detail in Defendant's Reply Brief. In all cases, Plaintiff's assertions fail to create a genuine issue for trial, therefore this Court should grant Summary Judgment in Defendant's favor.

<u>**Supplemental Statement of Material Facts**</u>
<u>**For Which There Is No Genuine Issue**</u>

During the litigation of this case to date Plaintiff did not pursue aggressively (*e.g*., in discovery) his allegation that he was subjected to disparate treatment in compensation by receiving lower bonuses and time-off awards than other auditors. *See* Pl. SOMF at 15. Defendant therefore addressed this claim only briefly in its Motion for Summary Judgment (at 28), and did not address the claim in the FCC's SOMF. Plaintiff's SOMF fails to allege any specific facts concerning this claim to which Defendant can respond. Plaintiff nonetheless

8

suggests that because this claim was not addressed in the FCC's SOMF, "[d]efendant should be deemed not to have included this issue in its Motion for Summary Judgment and Count II should proceed to hearing." *See* Pl. SOMF at 15, citing <u>Green v. Chao</u>, Civ. Action No. 03-1984 (EGS), 2005 U.S. Dist. LEXIS 3955 (D.D.C. 2005)." Defendant disagrees with plaintiff's interpretation of the legal authority that he maintains supports his position.  This disagreement does not create a genuine issue for trial, however, because the "bonus and award" information upon which Plaintiff's allegation is based is included as Exhibit No. 14 to Plaintiff's Opposition to Defendant's Motion for Summary Judgment.  That exhibit makes clear that Plaintiff received less awards than many auditors, but more awards than some, which is fully consistent with the testimony that Defendant has proffered on this issue.  Plaintiff does not dispute the accuracy of the "bonus and award" information set forth in Plaintiff's Ex. 14, therefore Defendant presents the following supplement to Defendant's Statement of Material Facts For Which There Is No Genuine Issue:

26. During the time period December 1, 2002 through December 31, 2004, Mr. Jarmon received 32 hours in time-off awards and $600.00 in cash awards. *See* Pl. Ex 14.

27. During the time period December 1, 2002 through December 31, 2004, IHD Auditor Alexander Chan received 8 hours in time-off awards, and no cash awards.  *Id.*

The foregoing facts demonstrate that during the time period December 1, 2002 through December 31, 2004, two Auditors received less monetary and/or time-off awards than Plaintiff. Plaintiff's allegation that he received lower awards than other auditors because of his race or prior EEO activity is therefore unfounded, as is Plaintiff's allegation that his managers' testimony regarding his history of receiving awards contains misstatements.

Dated: July 27, 2009                     Respectfully submitted,


___/s/_____
CHANNING D. PHILLIPS, D.C. BAR # 415793
Acting United States Attorney


____/s/_____
RUDOLPH CONTRERAS, DC BAR #434122
Assistant United States Attorney


_____/s/_____
ROBIN M. MERIWEATHER, D.C. Bar # 490114
Assistant United States Attorney
555 4th Street, N.W.
Washington, DC 20530
(202) 514-7198 (voice)   (202) 514-8780 (facsimile)

10