# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| WESLEY M. JARMON, JR., | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) Civil Action No. 06-1852(EGS) |
| v. | ) |
|  | ) |
| JULIUS GENACHOWSKI[1], Chairman, | ) |
| Federal Communications Commission | ) |
|  | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Wesley M. Jarmon, Jr., brings this action against Julius G. Genachowski ("defendant") in his official capacity as Chairman of the Federal Communications Commission ("FCC"), under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.* Plaintiff claims that defendant violated Title VII by denying him a promotion and by awarding him fewer bonuses and less time-off pay than similarly-situated colleagues on the basis of his race. Plaintiff also claims that defendant retaliated against him for previously filing two Equal Employment Opportunity ("EEO") complaints. Currently pending before the Court is defendant's motion for summary judgment on all three claims. Upon consideration of the motion, the response and reply thereto, the applicable law, the entire record, and for the

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Julius G. Genachowski is automatically substituted as the named defendant.

following reasons, the Court **DENIES** defendant's motion for summary judgment.

## I.     Background

Plaintiff, an African-American male, began working for the FCC in 1987 as an auditor at the GS-11 pay level in the Common Carrier Division.  Jarmon Application, Pl.'s Ex. 3[2] ("Jarmon Appl.") at 4; Jarmon Declaration, Pl.'s Ex. 4 ("Jarmon Decl.") ¶ 2.  By 2000, plaintiff was an auditor at the GS-14 level.  Jarmon Appl. at 4.  Plaintiff left the FCC temporarily from 2000 to 2001 to serve as a Chief Financial Officers Council Fellow at the Environmental Protection Agency, and from 2001 to 2002 to serve as an accountant in the FCC's Office of the Chief Financial Officer.  Jarmon Appl. at 3-4.  Plaintiff returned to auditing work at the FCC in early 2002 as a GS-14 auditor in the Investigations and Hearings Division ("IHD") of the FCC's Enforcement Bureau.  Jarmon Appl. at 2-3.

On April 2, 2004, the FCC published Vacancy Announcement 04-153-TJ, advertising two auditor positions at the GS-15 level in the IHD.  *See* Attach. B to Def.'s Ex. 1 ("Vacancy Ann.") at 1.  This announcement sought two auditors to be "responsible for developing, organizing, and coordinating the most complex and

_____

[2] Unless otherwise noted, exhibits are cited herein as "Def.'s Ex. ___" or "Pl.'s Ex. ___," and refer to exhibits filed in support of defendant's motion for summary judgment ("Def.'s Mot.") or plaintiff's memorandum of points and authorities in opposition to defendant's motion for summary judgment ("Pl.'s Opp'n"), respectively.

novel [IHD] audit assignments, and in connection with this activity also lead[] and coordinate[] the technical work of a team of auditors." Vacancy Ann. at 2. Plaintiff timely applied for the advertised positions along with several other FCC employees. Green Declaration, Def.'s Ex. 1 ("Green Decl.") ¶ 5. The FCC convened a ratings panel to evaluate the applications and to determine which candidates should be referred to William H. Davenport, the then-Division Chief of the IHD, for further consideration. Green Decl. ¶¶ 5-6. On September 21, 2004, the ratings panel referred the five highest-scoring applicants to Davenport: (1) plaintiff; (2) Robert Bentley; (3) Constance Hellmer; (4) Patricia Green; and (5) Andy Skadin. Green Decl. ¶¶ 5-6. Bentley, Hellmer, Green, and Skadin are all white (not of Hispanic origin). Def.'s Statement of Material Facts for Which There is No Genuine Issue ("Def.'s SOF") ¶ 8.

Davenport was solely responsible for selecting which candidates would be selected for the advertised positions. Davenport Dep., Def.'s Ex. 4 ("Davenport Dep.") at 12:7-9. To assist him with making that decision, however, he solicited the input of a group of managers. Davenport Dep. at 13:4-7. Davenport indicated that he intended to follow the group's choice. Davenport Dep. at 14:15-18. Davenport and four other managers in the IHD — Hillary DeNigro, Eric Bash, Trent Harkrader, and Hugh Boyle (collectively, the "selection panel" or

"panel") — interviewed the final candidates in two rounds; the first round with Bash and Harkrader and the second round with Davenport, DeNigro, and Boyle. Davenport Dep. at 21:11-15. None of the panel members were African-American. Def.'s SOF ¶ 10.

After completing the interviews, Davenport and the selection panel met to discuss the candidates and agreed on who they would hire. Davenport Interv., Def.'s Ex. 3 ("Davenport Interv."), at 26:3-5. On December 17, 2004, Davenport and the selection panel chose Bentley, Hellmer, and Skadin to fill the available positions.[3] Green Decl. ¶ 9.

On January 14, 2005, plaintiff contacted the FCC's Office of Workplace Diversity and alleged that his non-selection constituted race discrimination and retaliation for engaging in prior EEO activity.[4] Miller Declaration, Def.'s Ex. 2 ("Miller Decl.") ¶ 3; *see also* Formal Discrimination Compl., Def.'s Ex.

---

[3] Although the vacancy announcement listed only two available positions, after the interviews Davenport and the selection panel believed that three of the candidates were qualified for the positions. Davenport Dep. at 19:12-14. Accordingly, Davenport and the selection panel went to Human Resources and obtained an additional slot for a third GS-15 level auditor. Davenport Dep. at 15:12-19, 18:1-19:15.

[4] The retaliation claim was related to two prior EEO complaints plaintiff filed against the FCC, each alleging an unlawful failure to promote. Miller Decl. ¶ 4. In the first, filed on January 27, 2000, plaintiff alleged that the FCC discriminated against him on the basis of his race when he was not promoted to the GS-14 level in 1998 and to the GS-15 level in 1999. Miller Decl. ¶ 4. That case eventually resulted in this Court awarding summary judgment in favor of the FCC. *See* Miller Decl. ¶ 5 (citing *Jarmon v. Powell*, 208 F. Supp. 2d 21 (D.D.C. 2002) (Bates, J.)). The second complaint, filed on October 23, 2003, alleged that the FCC discriminated against him on the basis of his race when he was not selected for a GS-15 level auditor position in the FCC's Enforcement Bureau. Miller Decl. ¶ 4. In that case, summary judgment was entered for the FCC at the administrative level. *See* Miller Decl. ¶ 5.

17.  Two months later, on March 23, 2005, plaintiff filed an
administrative EEO complaint alleging that Davenport and the FCC
discriminated against him by failing to promote him to one of the
GS-15 positions.  Miller Decl. ¶ 3.  Administrative Law Judge
Gladys Collazo entered judgment in favor of the FCC on all
counts.  Am. Compl. ¶ 16.  Following the dismissal of his
administrative claims, plaintiff filed suit in this Court
alleging: (1) that defendant's failure to select him for a
promotion was discriminatory; (2) that he received bonus pay and
time-off awards in a lesser amount than other auditors;[5] and (3)
retaliation.  Plaintiff seeks a promotion to the GS-15 position,
back pay, compensatory damages of not less than $350,000,
attorney's fees and costs, and any further declaratory and
equitable relief the Court deems proper.  Am. Compl. at 4-6.
Defendant filed a motion for summary judgment on February 12,
2009.  This motion is now ripe for decision by the Court.

## II.  Standard of Review

Summary judgment should be granted only if the moving party
has shown that there are no genuine issues of material fact and
the moving party is entitled to judgment as a matter of law.  *See*

---

[5]  In support of this argument, plaintiff offers evidence that he received 32
hours of time-off awards during the period of December 1, 2002 through
December 31, 2004.  During that same time period, however, Helmer received 104
hours, Bentley received 80 hours, and Skadin received 72 hours.  List of
Monetary and Time-Off Awards, Pl.'s Ex. 14 ("Awds.") at 8-9.  Monetary awards
for the same time period were as follows: Skadin- $1,300; Bentley- $1,200;
Helmer- $900; Jarmon- $600.  Awds. at 6.

Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991-92 (D.C. Cir. 2002). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. Moreover, if the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

Although summary judgment "'must be approached with special caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial.'" *Bolden v. Winter*, 602 F. Supp. 2d 130, 136 (D.D.C. 2009) (quoting *Morgan v. Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001)). Summary judgment will be

6

granted, therefore, if the plaintiff fails to submit evidence that creates a genuine factual dispute or entitlement to judgment as a matter of law. *See Wada v. Tomlinson*, 517 F. Supp. 2d 148, 180-81 (D.D.C. 2007) (finding that even though the "special standard" applied to motions for summary judgment in employment discrimination cases is "more exacting, it is not inherently preclusive" of a grant of summary judgment in favor of defendants).

## III. Analysis

Plaintiff makes three claims in his complaint: (1) defendant denied plaintiff's promotion on the basis of plaintiff's race; (2) defendant gave out bonus pay at a lower rate and fewer time-off awards to plaintiff than to other similarly-situated auditors; and (3) defendant denied plaintiff's promotion in retaliation for plaintiff's prior EEO activity. Am. Compl. ¶¶ 20-33. Defendant seeks summary judgment on all three claims. Def.'s Mem. P. & A. Supp. Mot. Summ. J. ("Def.'s Mem.") at 1-2. The Court will explore each argument in turn.

### A. Claim I: Denial of Promotion

Plaintiff's first claim is that he was unlawfully denied a promotion because of his race. Title VII makes it unlawful for a federal government employer to discriminate "based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). In the absence of direct evidence of discrimination, the

Court analyzes a Title VII claim under the traditional *McDonnell Douglas* burden-shifting framework.  Under this framework, the plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002).  Once the plaintiff establishes a prima facie case, the burden shifts to the employer "to articulate some legitimate, non-discriminatory reason" for the employment action.  *McDonnell Douglas*, 411 U.S. at 802.  The employer only has the burden of production and "need not persuade the court that it was actually motivated by the proffered reason[]."  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  The burden then shifts back to the plaintiff to show that the employer's stated reason is pretextual and that the true reason was discriminatory.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Stella*, 284 F.3d at 144.

The D.C. Circuit recently clarified the application of *McDonnell Douglas* and concluded that:

> In a Title VII disparate-treatment suit where an
> employee has suffered an adverse employment action and
> an employer has asserted a legitimate, non-
> discriminatory reason for the decision, the district
> court need not—*and should not*—decide whether the
> plaintiff actually made out a prima facie case under
> *McDonnell Douglas*.  Rather, in considering an
> employer's motion for summary judgment or judgment as a
> matter of law in those circumstances, the district
> court must resolve one central question: Has the
> employee produced sufficient evidence for a reasonable

8

> jury to find that the employer's asserted non-
> discriminatory reason was not the actual reason and
> that the employer intentionally discriminated against
> the employee on the basis of race, color, religion, sex
> or national origin?

*Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir.

2008) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-

08 (1993); *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S.

711, 714-16 (1983)).  In resolving that "central question," the

district court looks to "all of the evidence," that is,

> any combination of (1) evidence establishing the
> plaintiff's prima facie case; (2) evidence the
> plaintiff presents to attack the employer's proffered
> explanation for its actions; and (3) any further
> evidence of discrimination that may be available to the
> plaintiff, such as independent evidence of
> discriminatory statements or attitudes on the part of
> the employer.

*Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) (citing *Aka

v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en

banc)).  "The ultimate burden of persuading the trier of fact

that the defendant intentionally discriminated against the

plaintiff remains at all times with the plaintiff."  *Burdine*, 450

U.S. at 253.

In this case, defendant produced a legitimate, non-

discriminatory reason for not promoting plaintiff: namely that

his supervisors did not believe that he was one of the three

most-qualified candidates for the position.  *See* Def.'s Mem. at

11.  Accordingly, the Court must determine whether plaintiff has

produced sufficient evidence for a reasonable jury to find that defendant's qualifications-based explanation is pretextual for unlawful discrimination. *Brady*, 520 F.3d at 494. Plaintiff argues that he is better qualified than the chosen applicants and that other evidence demonstrates defendant's discriminatory practices and, therefore, defendant's explanation is pretext. The Court will explore the evidence pro by plaintiff.

### 1. Comparative Qualifications

Contrary to defendant's assertion that the selectees were more qualified than plaintiff, plaintiff argues that his qualifications were "vastly superior" to those of Hellmer and Skadin. Pl.'s Opp'n at 12.[6] Courts in this Circuit have consistently declined to serve as a "super-personnel department that reexamines an entity's business decisions." *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)). "In a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call." *Aka*, 156 F.3d at 1294.

---

[6] Plaintiff only addresses the qualifications of Hellmer and Skadin and does not address defendant's argument that Bentley was just as qualified as plaintiff. *See* Pl.'s Opp'n at 13-14; *see also* Def.'s Reply Supp. Mot. Summ. J. ("Def.'s Reply") at 6 n. 1. Accordingly, the Court will treat that argument as conceded. *See Franklin v. Potter*, 600 F. Supp. 2d 38, 60 (D.D.C. 2009) (treating defendant's argument in motion for summary judgment as conceded where plaintiff failed to address it in his opposition and citing authorities in support).

Thus, in order to challenge a defendant's qualifications-based explanation, a plaintiff must show that he or she was "*significantly* better qualified for the job" than those ultimately chosen. *Holcomb*, 433 F.3d at 897. The qualifications gap must be "great enough to be inherently indicative of discrimination" — that is, inherently indicative that the qualifications-based reason is pretext. *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007) (citing *Holcomb*, 433 F.3d at 897). Viewing the facts in the light most favorable to plaintiff, the Court concludes that no such qualifications gap exists here.

Plaintiff has a Bachelor's of Business Administration (Accounting) and is a Certified Government Financial Manager. Jarmon Appl. 2. At the time he submitted his application, plaintiff had more than 25 years of financial accounting and auditing experience, 17 of which were at the FCC. Jarmon Appl. 2-5. Plaintiff had worked his way up from GS-11 to GS-14 and had been a senior auditor at the GS-14 level in the IHD since 2002. Jarmon Appl. 3-4. From 2000 to 2001, plaintiff served as a Chief Financial Officers Council Fellow in the Environmental Protection Agency, and then from 2001 to 2002 he was detailed as an accountant in the FCC's Office of the Chief Financial Officer. Jarmon Appl. 3-4. In the IHD, plaintiff was a lead auditor on two occasions, each time supervising three other auditors. Jarmon Decl. ¶ 12. Plaintiff consistently received good

performance evaluations and feedback, and his ratings during the time period prior to the selection were passing in all areas. Jarmon Decl. ¶ 6; *see also* Jarmon Empl. Revs. 2002-03 & 2003-04, Pl.'s Ex. 6.

While plaintiff's record is impressive, it is not obvious that plaintiff's qualifications are significantly greater than those of either Hellmer or Skadin. Skadin has a Bachelor's of Science in Accounting and has been employed by the FCC since 1985. Skadin Application, Pl.'s Ex. 8 ("Skadin Appl.") at 1-9. At the time of the selection Skadin had been a senior auditor at the GS-14 level since 1994. Skadin Appl. at 1. Moreover, during his time at the FCC, Skadin had supervisory duties on at least six audits.[7] Skadin Appl. at 1-4. Hellmer also has a Bachelor's of Science degree with coursework in accounting and has been employed by the FCC since 1995. Hellmer Application, Pl.'s Ex. 7 ("Hellmer Appl.") at 5, 10. At the time of the selection, Hellmer had been a senior auditor in the IHD at the GS-14 level since 2000. Hellmer Appl. at 5. Both Skadin and Hellmer had also received pass ratings in the time period prior to the selection. Skadin Appl. at 13-14; Hellmer Appl. at 18-19. Thus, Skadin and Hellmer had comparable experience to plaintiff.

The relative similarity in the qualifications of plaintiff,

---

[7] Skadin also occasionally served as Acting Branch Chief when both the Chief and Deputy Chief were away, a position plaintiff never held. *See* Skadin Appl. at 4.

Hellmer, and Skadin presents the sort of "close case" in which
the Court is required to defer to the employer's judgment. *See*
*Aka*, 156 F.3d at 1294. Furthermore, even if a reasonable jury
could find plaintiff to be better qualified than Hellmer and
Skadin for the advertised positions, no reasonable jury would
find him to be *significantly* better qualified based on the record
before the Court. *See, e.g.*, *Lathram v. Snow*, 336 F.3d 1085,
1092 (D.C. Cir. 2003) (finding the plaintiff substantially more
qualified where she had three years of experience in precisely
the area required for the position and where the appointee, an
unemployed journalist, lacked any relevant experience); *Aka*, 156
F.3d at 1299 (finding a significant qualifications gap for a
pharmacy technician job where the plaintiff had nineteen years of
experience as a hospital assistant and bachelor's and master's
degrees, whereas the hired applicant had no college education,
had worked in the hospital laundry for slightly over a year, and
had spent only two months as a pharmacy volunteer). The
significant gaps in experience present in *Lathram* and *Aka* do not
exist here and therefore do not give rise to an inference of
discrimination.

## 2. Other Evidence of Discrimination

A plaintiff attacking a qualifications-based explanation "is
of course not limited to comparing his qualifications against
those of the successful candidate. The plaintiff can instead

seek to expose other flaws in the employer's explanation" and "can also attempt to show by other means that the explanation was made up to disguise illegitimate bias." *Aka* 156 F.3d at 1295, 1299. "The plaintiff's attack on the employer's action must always be assessed in light of the total circumstances of the case." *Id.* at 1291. Having carefully considered the evidence in the light most favorable to plaintiff, the Court concludes that there is some evidence from which an inference of illegitimate bias could be drawn in this case. Specifically, the panel members' explanation of why plaintiff was less qualified than the other candidates raises questions as to their credibility. Furthermore, there are material issues of fact regarding what selection criteria were used, and whether those criteria were applied objectively when evaluating the candidates. Accordingly, and for the following reasons, the Court finds that there is sufficient evidence from which a reasonable jury could infer discrimination.

### i.  Evaluation of Candidates

Plaintiff contends that defendant raises undocumented performance issues about him and that defendant's erroneous statements regarding his leadership and supervisory experience give rise to an inference of pretext. Pl.'s Opp'n at 15, 19-20. To determine whether defendant's proffered reasons for not promoting plaintiff were pretextual, the relevant inquiry is

whether there is evidence that a manager made a statement that is either so erroneous or so inconsistent as to demonstrate that the manager does not honestly believe the reasons put forth for not promoting plaintiff - i.e., that the reasons given were "phony." *Fischbach v. District of Columbia*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). Indeed, the Court is concerned with the circumstances surrounding defendant's justification for not promoting plaintiff.

In explaining why the panel did not feel that plaintiff was one of the three best qualified candidates, defendant asserts, among other things, that plaintiff did not get along well with others, had poor writing skills, had difficulty complying with deadlines, proposed audits that made no sense, and lacked leadership skills.[8] Plaintiff argues that these undocumented performance issues either raise a material dispute of fact or indicate pretext. Pl.'s Opp'n at 15. As evidence, plaintiff points to the fact that he has received consistently high marks on performance evaluations and was never disciplined for his

---

[8] *See* Def.'s Resps. to Pl.'s Interrogs. and Req. for Produc. of Docs., Pl.'s Ex. 1 at #16 ("the recollection of IHD managers is that [plaintiff] was generally slow in accomplishing tasks and often had little to show for his efforts . . . ."); DeNigro Interv. at 104:22-24 ("[Plaintiff] has a great deal of difficulty meeting deadlines, or even accepting deadlines, from the managers of the group."), 104:10-17 ("[S]ome audit work that [plaintiff] performed in the division immediately prior to the promotion being available required a great deal of redoing and editing . . . . [T]he initial work product was not satisfactory or complete . . . ."); Davenport Dep. at 84:7-9 (stating that plaintiff's audit ideas made "no sense").

performance.  *See* Pl.'s Opp'n at 16.[9]  Indeed, plaintiff's
performance evaluations contain no narrative or discussion of any
performance issues and he received a "pass" rating in areas
including technical skills and working well with others.  Pl.'s
Ex. 6, Performance Evaluations.  Plaintiff maintains that no
performance concerns have ever been raised or discussed with him
and that during his performance evaluations he asked what he
should do to get a promotion and was always told "that [he] was
doing a great job and should just keep on doing what [he] had
been doing."  Jarmon Decl. ¶ 8.  As plaintiff puts it, "[d]espite
the Federal Government's zeal for documenting performance
problems, Plaintiff's file is devoid of any documentation of the
alleged performance problems."  Pl.'s Opp'n at 15.  This Court
agrees.

     While there is some evidence that plaintiff did not get
along with other members of the audit team[10] – indeed, plaintiff
himself admits that his outspoken attitude had made him "not a
favorite" on the team[11] – plaintiff's record is devoid of any
evidence supporting defendant's assertion that plaintiff was a

---

[9] Plaintiff received a "pass" rating on all of his performance evaluations
prior to the selection.  Pl.'s Ex. 4.  Before defendant adopted a pass/fail
rating system, plaintiff typically received ratings of 4 or 5, in a rating
system in which 5 was the highest possible rating.  Pl.'s Ex. 4.

[10] *See* Def.'s Reply Ex. 19 (emails indicating disagreement over management of
the "Saddleback Audit" and informing plaintiff that his tone was
"inappropriate and unprofessional.")

[11] Jarmon Mem. to Harkrader, Def.'s Ex. 16 at 3.

bad writer, did not meet deadlines, and had ideas that made "no sense." While an employee's subjective assessment of their own performance is generally not relevant, *see Gross v. Akin Gump, Strauss, Hauer & Feld, LLP*, 599 F. Supp. 2d 23, 31 (D.D.C. 2009), the substantial concerns regarding plaintiff's performance that were never previously documented do create a question as to whether the decision makers honestly believed the reasons given and potentially give rise to an inference of discrimination.[12]

For instance, in *Hussain v. Principi*, the court found the defendant hospital's explanation for not promoting plaintiff to Chief of Radiology Service to be sufficient where there were well documented performance issues related to his skills as a radiologist. 344 F. Supp. 2d 86, 92 (D.D.C. 2004). In that case, the plaintiff had received "low satisfactory" ratings on his performance evaluations, as well as comments indicating that there were many issues regarding plaintiff. *Id.* The plaintiff's employment record also demonstrated that his clinical privileges had been modified and that he required additional supervision because of questionable medical practices. *Id.* at 92-93. The court held that those documented reasons combined with other

_____

[12] While the Court notes that before this case, there was no occasion for defendant to explain its decision, *see Jackson*, 496 F.3d at 709-10 ("Before [plaintiff] commenced this employment discrimination suit, the [defendant] simply had no occasion to explain its decision to hire [the other candidate]; rather, the first time the [defendant] had to explain that decision was in defending this case."), the extreme nature of the defendant's reasoning with no prior documentation does raise some concerns regarding the legitimacy of that explanation.

areas in which plaintiff's qualifications were found lacking were sufficient to rebut plaintiff's allegations of pretext. *Id.* at 97-98.

By contrast, in this case, defendant has put forth no documentary evidence substantiating its allegations of plaintiff's purported performance deficiencies. Indeed, defendant's concerns regarding plaintiff's performance and abilities appear to have surfaced for the first time in relation to this lawsuit. From this evidence, a reasonable jury could conclude that "the employer's stated reason was pretextual and that the true reason was discriminatory." *Stella*, 284 F.3d at 144 (citing *McDonnell Douglas*, 411 U.S. at 804).

Plaintiff also points to an erroneous statement by Davenport regarding his leadership and supervisory experience in support of his argument that the selection panel's decision was racially motivated. *See* Pl.'s Opp'n at 19-20. In his EEO interview, Davenport stated that plaintiff, "as far as I can tell, has never supervised any other auditors to my recollection." Davenport Interv. at 29:1-3.[13] Plaintiff argues that Davenport's recollection is false — that he had, at the time of the

---

[13] Plaintiff also argues that a statement by DeNigro that plaintiff had not performed as a leader and had not demonstrated leadership capabilities was erroneous. DeNigro Dep., Def.'s Ex. 6 ("DeNigro Dep.") at 42:3-6. The Court finds this argument unconvincing because DeNigro only referred to plaintiff's leadership *skills* and *capabilities;* she did not claim that he had no experience. DeNigro's "misstatement," to the degree that it is incorrect, does not rise to the level of "adequate evidence" of discrimination this Circuit has identified elsewhere. *See Aka*, 156 F.3d at 1295.

selection, "more than 13 years of experience supervising others and conducting field audits and/or investigations . . . ." Jarmon Appl. at 8. Plaintiff specifically points to two occasions when as Lead Auditor he supervised three other auditors, *see* Pl.'s Opp'n at 20, and one occasion where he supervised eight accountants. *See* Jarmon Appl. at 8.

The pertinent question is not whether plaintiff lacked leadership and supervisory experience, but whether Davenport "honestly and reasonably believed" that he lacked it. *Brady*, 520 F.3d at 496 (citing *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005); *Fischbach*, 86 F.3d at 1183). Evidence of pretext includes an employer making an error regarding an employee's performance or qualifications that is "too obvious to be unintentional," *see Fischbach*, 86 F.3d at 1183, or an employer making false or inconsistent explanations for its actions. *See Czekalski v. Peters*, 475 F.3d 360, 367 (D.C. Cir. 2007); *Farris v. Clinton*, 602 F. Supp. 2d 74, 89-90 (D.D.C. 2009); *see also Anderson v. Zubieta*, 180 F.3d 329, 345 (D.C. Cir. 1999).

Here, plaintiff has demonstrated that Davenport's statement is false and raises doubts as to whether that mistake was an honest one. Given that Davenport was tasked with choosing the best candidate for the job, a reasonable factfinder would assume that he had reviewed the applicant's history and was familiar with plaintiff's qualifications, including his leadership

19

experience.  A reasonable juror could therefore question whether Davenport's mistake was an honest one.  *See Aka*, 156 F.3d at 1295 (finding that pretext can be inferred if, for example, "the employer says that it did not hire the plaintiff because he did not speak Portuguese, [and] the plaintiff can show that he did speak Portuguese, and that the employer knew it.").

While the evidence is not overwhelming, "in an appropriate case, 'the factfinder's disbelief of the reasons put forward by the defendant' will allow it to infer intentional discrimination."  *Aka* at 1294 (citing *Hicks*, 509 U.S. at 511).  Furthermore, because this is a discrimination case, "special caution" must be employed at the summary judgment stage.  *Bolden*, 602 F. Supp. 2d at 136.  Accordingly, when viewing the facts in the light most favorable to plaintiff, the Court finds that this error, combined with plaintiff's undocumented performance issues, could give rise to an inference of discrimination.

### ii.  Criteria Used to Select Candidates

Plaintiff also argues that defendant's use of subjective criteria in making its selection decision permitted defendant to select "less qualified white candidates."  Pl.'s Opp'n at 29.  While subjective reactions to a candidate during an interview may be used in forming an employment decision, and may even permit an employer to select a candidate who may be otherwise less

qualified, *see Jackson*, 496 F.3d at 709 (citing *Aka*, 156 F.3d at 1294 n. 10), "courts traditionally treat explanations that rely heavily on subjective considerations with caution." *Aka*, 156 F.3d at 1298. For instance, "an employer's heavy use of 'interpersonal skills' could support an inference of discrimination." *Id.* (citing *Fischbach*, 86 F.3d at 1184).

Here, there was no consensus as to how each member of the selection panel would evaluate the candidates. While, for example, Davenport highlighted certain factors to decide who was best for the position including leadership ability, experience, creativity, and ability to work with other people, Davenport Interv. at 26 - it does not appear that Davenport ever shared this criteria with the other members of the selection panel. Pl.'s Opp'n at 29.

Harkrader, for instance, testified that he received no written or oral instruction regarding how to make the selection, *see* Harkrader Dep. at 28:10-16, and that he did not remember having any written questions that were asked of all candidates. *See* Harkrader Dep. at 33:21-34:2. Instead, he considered his own work experience with each candidate, the kind of work they had done in the IHD, and "things of that nature." Harkrader Interv., Ex. 7 to Def.'s Mot., at 73:25-74:3. DeNigro also testified that the committee "didn't have specific formal criteria" and that "[t]here was no specific list of elements or numbered grading or

lettered grading of, you know, different elements." DeNigro Dep. at 60:9-11. She stated that she considered factors such as setting and meeting deadlines, organizational skills, oral presentation skills, writing skills, accepting direction, and working well with different kinds of people. *See* DeNigro Interv. at 101:14-18, 102:20-21.

Because there is disputed evidence regarding different criteria and standards used by different members of the selection panel, a reasonable juror could find that the process was subjective and left open the potential for illegitimate bias.[14] Furthermore, the criteria of being able to work with others and being able to work with management is similar to the "interpersonal skills" criterion that is viewed with suspicion in this Circuit. *See Aka*, 156 F.3d at 1298; *Fischbach*, 86 F.3d at 1184. The Court finds that there are material issues of fact regarding what criteria were used to evaluate the candidates and whether those criteria were objectively applied to each

---

[14] In contrast to this case, courts have found no evidence of discrimination where there was a set list of criteria by which to judge each candidate and a uniform set of questions that were asked. *See, e.g.*, *Chappell-Johnson v. Bair*, 574 F. Supp. 2d 103, 107 (D.D.C. 2008) (granting summary judgment for government where all applicants who were interviewed were asked the same questions); *Brown v. Small*, 437 F. Supp. 2d 125, 135 (D.D.C. 2006) (finding no evidence of discrimination where "the panelists who interviewed candidates for the three vacancies applied an impartial method for assessing the ability of each candidate to succeed in the position by using the same criteria to grade all applicants. . . . Identical questions were administered and the same four panelists were present at every interview").

candidate.

In sum, the Court finds that there is sufficient evidence in the record to create a jury question as to whether defendant's explanation for not hiring plaintiff was false and as to whether defendant acted with discriminatory intent.[15]  For these reasons, the Court **DENIES** summary judgment on this claim.

## B.   Claim 2: Disparate Compensation

Plaintiff's second claim is that he received bonus pay at a lower rate and fewer time-off awards than other auditors because of his race.  Am. Compl. ¶¶ 27-28.  Plaintiff notes that "[o]f the 19 individuals in the [IHD] that received [cash] awards, only one received a lesser award than Plaintiff."  Pl.'s Opp'n at 32 (citing Awds., at 6).  Plaintiff also notes that between December 1, 2002, and December 31, 2004, plaintiff received only 32 hours in time-off awards, as compared to Helmer's 104 hours, Bentley's

---

[15] Plaintiff made several other challenges to defendant's explanation, none of which the Court finds persuasive.  First, plaintiff argues that the selecting officials harbored racially discriminatory animus against him based on statements made by members of the selection committee.  Pl.'s Opp'n at 22. This argument fails because plaintiff has not presented sufficient evidence to demonstrate that these statements were linked to plaintiff's race.  Second, plaintiff argues that the selecting officials lack credibility based on inconsistencies in their reasoning for not hiring plaintiff, see Pl.'s Opp'n at 28; however, none of these alleged inconsistencies, even if true, give rise to a material issue of fact.  Further, while plaintiff's argument that the panel members' discussion of their testimony prior to providing discovery responses puts their credibility in question, see Pl.'s Opp'n at 28, does raise some question as to why they would do so, there is no rule precluding them from such activity.  Finally, plaintiff argues that defendant lacks African-American employees in professional positions.  Pl.'s Opp'n at 31.  The statistics provided, however, are general and do not provide relevant hiring data that would permit a reasonable jury to infer discrimination. *See, e.g.*, *Aguilar v. Salazar*, 626 F. Supp. 2d 36, 41 (D.D.C. 2009); *Harris v. Rice*, 480 F. Supp. 2d 125, 136 (D.D.C. 2007).

80 hours, and Skadin's 72 hours.  Pl.'s Opp'n at 32; *see also*
Awds. at 9.


Plaintiff claims that the alleged discriminatory reasons
that contributed to his denial of promotion also caused him to
receive lower pay and awards.  *See* Pl.'s Opp'n at 32 ("As
discussed above, Plaintiff's managers harbored discriminatory
animus against him.").  Defendant counters that plaintiff's lower
awards are consistent with the managers' belief that Jarmon's
performance was weaker than the selectees'.  As previously
explained, the Court finds that there is sufficient evidence for
a jury to infer discrimination.  Accordingly, summary judgment on
this claim is therefore **DENIED**.

### C.   Claim 3: Retaliation

Plaintiff also alleges that defendant's failure to promote
him was in retaliation for plaintiff's prior EEO activity.  As
with the first two claims, in the absence of direct evidence of
retaliation, the *McDonnell Douglas* burden-shifting framework
governs this claim.  *Holbrook v. Reno*, 196 F.3d 255, 263 (D.C.
Cir. 1999).  To state a prima facie case of retaliation,
plaintiff must show that (1) he engaged in statutorily protected
activity; (2) his employer took an adverse personnel action
against him; and (3) a causal connection exists between the two.
*Vickers v. Powell*, 493 F.3d 186, 195 (D.C. Cir. 2007) (quoting

*Carney v. Am. Univ.*, 151 F.3d 1090, 1095 (D.C. Cir. 1998)).[16]

If the defendant offers a legitimate non-discriminatory reason for its decision, the *Brady* rule applies, and the issue for the court becomes retaliation *vel non*, requiring the court to determine whether there is sufficient evidence for a reasonable finder of fact to conclude that retaliation was the real reason for the challenged decisions. *See Jones v. Bernanke*, 557 F.3d 670, 678-79 (D.C. Cir. 2009) (citing *Brady*, 520 F.3d at 494) (applying *Brady* to a retaliation claim; *see also Pardo-Kronemann v. Jackson*, 541 F. Supp. 2d 210, 215-16 (D.D.C. 2008) (same).

In this case, defendant asserts a legitimate, non-discriminatory reason for not promoting plaintiff, namely that it promoted Bentley, Hellmer, and Skadin because they were better qualified. *See* Def.'s Mot. at 11. Thus, the only remaining question is whether that qualifications-based explanation is "'unworthy of credence.'" *Taylor v. Solis*, 571 F.3d 1313, 1322 (2009) (quoting *Burdine*, 450 U.S. at 256). When making this determination, the court considers each of the three relevant categories of evidence - (1)the prima facie case; (2) pretext; or

---

[16] Plaintiff misstates the law regarding retaliation claims in this Circuit by setting forth a *prima facie* case that is not recognized in this Circuit. Furthermore, plaintiff does not acknowledge the recent shift in this Circuit after *Brady*, which does not require proof of the prima facie case where an employer has asserted a legitimate non-discriminatory reason for its action. *See* 520 F.3d at 494. Plaintiff's arguments therefore erroneously focus on establishing a prima facie case. Plaintiff's arguments are addressed to the extent that they offer support for his retaliation claim under the framework recognized by this Circuit.

(3) any other reason – "to determine whether they 'either separately or in combination' provide sufficient evidence for a reasonable jury to infer retaliation." *Jones*, 557 F.3d at 679 (citing *Waterhouse*, 298 F.3d at 996). The issue of causation is relevant to the overall inquiry as part of the prima facie case and may be inferred if the defendant "'had knowledge of [the plaintiff's] protected activity, and . . . the adverse personnel action took place shortly after that activity.'" *Holbrook*, 196 F.3d at 263 (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)).

The parties dispute whether plaintiff's managers had knowledge of his prior EEO activity. Plaintiff argues that Davenport, Boyle, and perhaps DeNigro had knowledge of his prior EEO activity. Plaintiff claims that he personally made Davenport aware of his prior EEO activity during a meeting with Davenport and his second line supervisor, Maureen Del Duca. Jarmon Decl. ¶ 5. According to plaintiff, the purpose of the meeting was to ascertain why he had not been selected for the GS-15 position in 2002. Jarmon Decl. ¶ 5. Davenport, on the other hand, claimed that he was unsure if he knew about plaintiff's prior EEO complaints at the time of the selection decision. *See* Davenport Interv. at 30:22-24. When asked if he recalled plaintiff telling him about prior EEO complaints at the meeting with Del Duca, Davenport stated that he did not remember plaintiff telling him

and that he did not think plaintiff had told him because he would have remembered. *See* Davenport Dep. at 40:9-21. Thus, there is a disputed issue of material fact regarding whether Davenport knew about plaintiff's prior EEO activity.

DeNigro acknowledged that she knew plaintiff had prepared a grievance, but she could not recall whether that grievance pre-dated or post-dated the selection at issue. *See* DeNigro Interv. at 107:17-108:5. Boyle acknowledged his awareness of plaintiff's prior EEO activity at the time of selection. Boyle Dep. at 77: 7-8. Taking the facts in the light most favorable to plaintiff, the Court assumes that plaintiff's managers did know about his prior EEO activity. Furthermore, as discussed above, the Court finds that there are material issues of fact relating to defendant's reasons for not promoting plaintiff. The Court therefore **DENIES** defendant's motion for summary judgment on plaintiff's retaliation claim.[17]

---

[17] While the Court's finding rests on the reasons discussed above, the parties' arguments focused primarily on the issue of temporal proximity and the Court will therefore briefly address the issue. Defendant argues that the events at issue were too far apart to infer retaliation. The time period between the protected activity and the non-promotion was almost fourteen months. This Circuit requires that the temporal proximity between the protected activity and the adverse action be "'very close' to show a causal connection." *McIntyre v. Peters*, 460 F. Supp. 2d 125, 133 (D.D.C. 2006) (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)). This Court has often stated that three months is the outer bound. *See, e.g.*, *Hamilton v. Paulson*, 542 F. Supp. 2d 37, 58 (D.D.C. 2008); *Walker v. Johnson*, 501 F. Supp. 2d 156, 174 (D.D.C. 2007); *Davis v. District of Columbia*, 503 F. Supp. 2d 104, 125 (D.D.C. 2007); *McIntyre*, 460 F. Supp. 2d at 133. That requirement applies, however, only where a plaintiff is relying *solely* on temporal proximity to prove causation. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept *mere* temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima

## III. Conclusion

For the aforementioned reasons, the Court **DENIES** defendant's

motion for summary judgment.  An appropriate Order accompanies

this opinion.

     **SO ORDERED.**

Signed:    **Emmet G. Sullivan**
            **United States District Judge**
            **July 2, 2010**

---

facie case uniformly hold that the temporal proximity must be very close.")
(emphasis added).  Here, plaintiff seeks to rebut his employer's legitimate
non-discriminatory reason for not selecting him by arguing that they knew
about his prior EEO activity, fabricated the reason after the fact, and did
not objectively evaluate the candidates; therefore, plaintiff is not relying
solely on temporal proximity to prove causation.  Thus, the Court finds
defendant's argument unpersuasive.